# EXHIBIT B

1

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT
        IN  AND  FOR  THE  DISTRICT  OF  UTAH,  CENTRAL  DIVISION
 2
                            *  *  *
 3    GRAYSTONE  FUNDING              ,
      COMPANY,  LLC  a  Utah          )
 4    limited  liability  company     )   Case  No.
      d/b/a  Graystone  Mortgage,     )   2:19-cv-00383-JNP-CMR
 5    LLC,                            )
                                      )   Deposition  of:
 6    Plaintiff  and                  )   DERK  RASMUSSEN
      Counterclaim  Defendant,        )   (Via  Zoom)
 7                                    )
            vs.                       )
 8                                    )
      NETWORK  FUNDING,  L.P.,  a     )
 9    Texas  Limited                  )
      Partnership;  JASON             )
10    GAUTREAU,  an  individual;      )
      and  CRISTIE  NORTH,  an        )
11    individual,                     )
                                      )
12    Defendants,  Counterclaim       )
      Plaintifffs,  &                 )
13    Third-Party  Plaintiff,         )
                                      )
14          vs.                       )
                                      )
15    KIPP  MYERS,  an                )
      individual,                     )
16                                    )
      Third-Party  Defendant.        )
17
                            *  *  *
18
                        June  1,  2021
19                       10:03  a.m.

20                          *  *  *

21              Via  Remote  Zoom  Connection

22                          *  *  *

23                       Amber  Park
               -  Certified  Court  Reporter  -
24            -  Registered  Professional  Reporter  -

25
```

COPY

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

                                                                    4

 1                    Tuesday, June 1, 2021:  10:03 a.m.

 2                      P R O C E E D I N G S

 3                         DERK RASMUSSEN,

 4        called as a witness, having been duly sworn,
             was examined and testified as follows:
 5

 6                          EXAMINATION

 7    BY MR. STULTZ:

 8          Q     Good morning, Mr. Rasmussen.

 9          A     Morning.

10          Q     Can you hear me okay?

11          A     Yeah.

12          MR. STULTZ:  Okay.  Thanks, Amber, for

13    giving those instructions.

14          Q     You've done a few depositions, correct?

15          A     Yes.

16          Q     Okay.  So I won't give any of the

17    instructions, and Amber just gave the most important

18    one anyway.  If you need to take a break at any point,

19    just let me know and I'll ask you to answer any

20    outstanding questions but then we can take a break

21    whenever you would like.  Do you understand that?

22          A     Yes.

23          Q     Okay.  Can you state your full name for

24    the record, please?

25          A     It's Derk G. Rasmussen.

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                              Derk Rasmussen

5

1          Q      Okay.  Did you bring any documents with

2     you today?

3          A      I brought copies of my report and

4     Mr. Saba's reports.

5          Q      Did you say copies of your report or

6     reports?

7          A      Reports, plural.

8          Q      Thanks.  The sound quality isn't that

9     great.  Is there anything we can do about that?

10                (Whereupon, an off-the-record discussion

11    was held.)

12    (BY MR. STULTZ)

13         Q      Okay.  So you said your reports,

14    Mr. Rasmussen?

15         A      Yes.  And Mr. Saba's report.

16         Q      Okay.  Thank you.  Who hired you in this

17    case?

18         A      NFLP.

19         Q      And that's Network Funding Limited

20    Partnership?

21         A      Yes.

22         Q      Besides the attorneys in this case --

23    Mr. Gilson and the other attorneys at Durham Jones --

24    and the people at Sage Forensics, who have you

25    communicated with about this lawsuit?

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                                Derk Rasmussen

6

1          A      I've communicated with in-house legal

2    counsel for NFLP, I have communicated with

3    Mr. Gautreau and Ms. North, and maybe one other person

4    at NFLP -- yeah, it was the person who recruited

5    Miss North and Mr. Gautreau.

6          Q      Was that Brett Snortland?

7          A      That's my recollection, yes.

8          Q      What is -- well, skip that.

9                 Have you done a lost profits analysis as

10   an expert in other lawsuits?

11         A      Yes.

12         Q      Have you ever done one where a breach of

13   duty of loyalty or fiduciary duty was the cause of the

14   damages claim for lost profits?

15         A      I'm sure I have.  I've done hundreds of

16   these.

17         Q      Okay.  Can you think of any off the top of

18   your head?

19         A      I don't have the causes of action

20   memorized for the different cases I've worked on.

21         Q      Okay.  So you've done a -- you've done two

22   reports for this lawsuit, correct?

23         A      Yes.

24         Q      And one of the reports was dated

25   February 19, 2021, is that right?

7

1        A    Yes.

2        Q    Okay.  And then I believe you had -- and I

3   got these -- I'll just represent to you I got these

4   last week -- two supplements, two supplemental pages

5   that you added to that report, is that right?

6        A    They're not supplemental pages, they are

7   corrections because the numbers didn't flow up from

8   the summary schedule properly.  And so the numbers are

9   right in the report, it's the summary schedule that

10  was incorrect so we provided a corrected summary

11  schedule.

12       Q    Okay.  And then the other report you did

13  was a rebuttal report dated May 10, 2021, is that

14  right?

15       A    That's correct.

16       Q    Combined, are these two reports a complete

17  statement of all expert opinions you have in this

18  case?

19            MR. GILSON:  I object to the form of the

20  question.  He's giving deposition today and his report

21  speaks for itself with respect to his opinions and his

22  opportunity to supplement.

23            THE WITNESS:  My opinions are contained

24  within my reports, but in response to testimony that

25  will be provided, I can't anticipate what all that is

8

1    or any new information that is presented.  I always

2    reserve the right to augment or update my opinions

3    based on additional evidence or testimony.

4    (BY MR. STULTZ)

5         Q    Is there any information you have that you

6    didn't have when you wrote these two reports that

7    would require you to update your opinions from these

8    reports?

9         A    Not that I can think of right now.

10        Q    Okay.  Do you intend to update the reports

11   or supplement the reports?

12        A    Only if I receive additional information

13   and then that would be up to counsel.  I do have one

14   other piece of information that I've been -- that's

15   been brought to my attention.  It doesn't alter my

16   opinions but it would perhaps enhance the opinions

17   once the additional information is provided.

18        Q    What's the additional information?

19        A    I understand that Graystone is in the

20   process of selling off its interest.

21        Q    Okay.  So that may cause you to supplement

22   one or both of your opinions --

23        A    It's possible --

24        Q    Excuse me, one or both of your reports.

25   Sorry.  Go ahead.

9

1      A      It's possible, depending on the terms.

2             MR. STULTZ:  Did you get that okay, Amber?

3      Q      Thank you, sir.  I'm going to try not to

4   introduce your report as an exhibit since you -- you

5   have a printed version there, right?

6      A      Yes.

7      Q      Okay.  I'm going to try to just go off of

8   that.  Hopefully we can do it that way.  If not, I may

9   have to put it in the chat box.  So first can we start

10  with your February 19, 2021 report?

11     A      Okay.

12     Q      If you go to the third page it's your

13  letter.  It's on Sage Forensic Accounting letterhead.

14     A      Okay.

15     Q      Let's see, it says -- first paragraph,

16  second sentence it says, "Specifically, as part of

17  this assignment I have been asked to evaluate and

18  opine regarding the amount of damages suffered by

19  Defendants relative to the damage claims stemming

20  from actions of Graystone Funding Company, LLC as

21  alleged in the above referenced litigation."

22             So is that what you do in this report,

23  provide an opinion regarding the amount of damages

24  suffered by Defendants relative to the damage claims

25  from the actions of Graystone Funding as alleged in

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                                    Derk Rasmussen

10

1    the litigation?

2         A     Yes.  It assumes that the allegations are

3    proven, that legal liability is demonstrated.

4         Q     So is it fair to say your expertise for

5    this report is as a damages expert?

6         A     I think you could characterize it that

7    way, yes.

8         Q     Would you characterize it any other way?

9         A     Other elements of forensic accounting,

10   which damage expertise is part of that, but assembling

11   all of the documentation is part of a forensic

12   accounting type exercise.  So the expertise employed

13   was forensic accounting and it ultimately ended up in

14   a damage calculation.

15        Q     Okay.  Thank you.

16              You're not opining on whether the actions

17   of Graystone or Kipp Myers caused the alleged damages

18   suffered by any of the defendants, is that correct?

19        A     I'm offering that in my opinion that there

20   is -- there aren't any other intervening factors

21   related to the damage calculation.  As a result, I've

22   assessed what's referred to as economic causation.  I

23   can't determine or see any other intervening

24   factors -- I've looked for them -- and as a result I

25   believe that there is a causal link between the

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.

June 01, 2021                                                    Derk Rasmussen

11

1    actions of Graystone and the damages I've calculated.

2         Q    Okay.  Let's start with page 12, please,

3    if you could turn to your page 12.  It will say

4    page 12 of 36 on the top left.

5         A    Okay.

6         Q    At the very bottom there's a section C1,

7    "Evaluation of North's unpaid compensation as director

8    of operations."  Do you see that?

9         A    Yes.

10        Q    Okay.  So if we go to page -- so within

11   this section if you go to page 14, we're still in that

12   same section at the top of 14, right?  Evaluating

13   North's unpaid compensation, is that right?

14        A    Yes.

15        Q    Page 14, paragraph two, last sentence you

16   put, "As shown on schedule 2, it is my opinion

17   Ms. North's compensatory damage for unpaid earnings as

18   director of operations is between $52,312.09 and

19   $61,781.05."  Did I read that correct?

20        A    Yes.  Appears to, yes.

21        Q    Excuse me?

22        A    Yes, that appears to be correct, yes.  You

23   read it correctly.

24        Q    Thanks.  I didn't hear the last part.

25             Is this your only expert opinion on this

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.

June 01, 2021                                              Derk Rasmussen

12

1    claim by Miss North for unpaid compensation or wages?

2         A    I'm not sure I understand the question.

3    But that's the ultimate conclusion.

4         Q    So what is your basis for opining that

5    Miss North was director of operations?

6         A    Her testimony.  I believe Mr. Myers also

7    doesn't disagree with that in his own deposition

8    testimony.

9         Q    So you're saying in her deposition

10   testimony she's -- Miss North testified that she was

11   director of operations?

12        A    Yeah.  If you go to page 13 I quote her

13   deposition testimony.

14        Q    Okay.  Go to page 13.  It just says:

15             "Answer:  In 2015, approximately July

16   through, I want to say, December, I came in and helped

17   fill the role of operations manager alongside Kipp in

18   doing operational roles?"

19             I don't -- where in there does it say that

20   she was director of operations?

21        A    I believe we're just quibbling, perhaps,

22   over semantics.  She was asked to manage operations,

23   be a operations manager, she refers to that as

24   director of operations in conversations I've had with

25   her, and she's -- she indicates she was promised

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                            Derk Rasmussen

96

1   this?

2        A     Because they needed it to have the same

3   functionality they had before, which they no longer

4   had.

5        Q     But isn't -- I mean, wouldn't you just

6   concede that this is added functionality?  I mean, she

7   didn't even work there before.  How is this the same

8   functionality?

9        A     No, I would not concede that it's

10  additional functionality.

11       Q     Okay.  Going back to schedule 8a.

12       A     Okay.

13       Q     Lines 7 through 10, those are offsets,

14  correct?

15       A     Yes.

16       Q     And, again, those offsets are net book

17  value numbers for furniture and equipment, right?

18       A     That's my recollection, yes.

19       Q     Okay.  So the furniture and equipment had

20  depreciated in the old office?

21       A     Yes.  It would -- furniture and computer

22  equipment depreciate very rapidly.  Much more so than

23  what you would have in book value.  There's economic

24  depreciation and book value depreciation.  This is

25  book value, which I think overestimates its value.

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                              Derk Rasmussen
97

1      Q      Okay.  So what was the remaining useful

2   life of the furniture and equipment in the old office?

3      A      It's hard to say.  It would be based on

4   each individual piece of equipment.  Furniture can

5   have a long useful life.  Equipment, maybe not so

6   long.  Telephone equipment can have a fairly long

7   useful life.  Computer equipment can have a decent

8   useful life, depending on what it's used for.

9      Q      But you didn't analyze that all in this

10  case, did you?

11     A      I took the book value because I thought

12  that would be conservative.

13     Q      You would agree that the economic useful

14  life in the life of a laptop is pretty short, wouldn't

15  you?  Two to three years?

16     A      It depends on what it's used for.  If it's

17  used for internet access, emails, for drafting

18  documents in Word, Excel, it can have a fairly long

19  useful life.  If it's something that requires an awful

20  lot of speed and computing power, it has a relatively

21  short period of life.  If you're a software developer,

22  it's going to have a very short period of life.  If

23  you're an office worker, it can have a fairly lengthy

24  period of life.

25     Q      But you didn't do an analysis of that in

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.

June 01, 2021                                          Derk Rasmussen

98

1    this case, what the expected economic useful life

2    would be for all this old furniture and --

3         A    No.  I took book value as a surrogate.

4         Q    And the furniture and equipment that was

5    purchased by NFLP -- again, in schedules 8a, 8b, and

6    8c -- that was all new, correct?

7         A    Yes.

8         Q    Okay.  How did you account for the

9    difference in the remaining useful life between the

10   new furniture and equipment and the old furniture and

11   equipment?

12        A    I don't think there would be any

13   difference in useful life of furniture.  Probably not

14   much of a useful life difference in the phone system.

15   There may be some useful life difference in the

16   equipment, particularly the computer equipment, but

17   since this is mainly office uses of equipment, they

18   can have a fairly long useful life so I didn't account

19   for any differences.

20        Q    How did you account for any increase in

21   the quality, aesthetically or functionally, between

22   the new furniture and equipment and the old furniture

23   and equipment?

24        A    Aesthetically, I didn't make any sort of

25   adjustment for aesthetics because that's subjective.

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

99

1    Functionality, according to their testimony, they're

2    acquiring equipment that has the same functionality

3    they had before.

4        Q    Isn't it possible that all of this

5    furniture and equipment damage of 140,000 and change

6    is attributable to the fact that the furniture and

7    equipment in the new space was newer, nicer, or wasn't

8    even in the old space?

9        A    Well, newer, nicer is not -- is a

10   subjective thing.  Unavailable is I don't believe

11   relevant, because according to the testimony that will

12   be provided, they're only acquiring equipment that

13   would allow them to be as functional as they were in

14   their old space.

15       Q    Okay.  Let's turn to your rebuttal report.

16       A    Okay.

17            MR. GILSON:  Can we take a short break?

18            MR. TOLMAN:  Yep.

19            MR. GILSON:  Also, we sent you an email

20   with that Exhibit 2, Joe, in case you want to look at

21   that before you move on to the next report.  But I

22   guess we can just take five minutes.

23            MR. STULTZ:  Okay.

24            (Whereupon, a recess was taken.)

25   (BY MR. STULTZ)

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

100

1      Q     Before we go into the rebuttal report I

2  had one more last question on the -- on the tenant

3  improvements in the new space.  Did you ever

4  personally go and take a look at those, Mr. Rasmussen?

5      A     I haven't been to the space.  I haven't

6  been to the space, I haven't looked at the furniture

7  or the improvements or the space.  I'm relying on

8  their testimony of that.  I think I would add that

9  when I say that their furniture they got was new, I

10  think the operative thing there is it was new to them.

11  I think some of it what they purchased was from used

12  sources.

13      Q     Okay.  But do you know or not?  Is that

14  going to come from their testimony?

15      A     By -- I understand their testimony will be

16  that they did purchase some used equipment and some

17  used furniture, and some of it they were forced to

18  just buy new because it's the only way to get the

19  functionality they needed and wanted.

20      Q     Okay.  So the rebuttal report, do you have

21  that in front of you?

22      A     Yes.

23      Q     Let's see, cover page, the letter page --

24  it's like the third page in has the Sage Forensic

25  Accounting letterhead, May 10, 2021.  Do you see that?

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

101

1        A      Yes.

2        Q      It says, "Dear Mr. Gilson" -- third

3    sentence says, "I was asked to evaluate and critique

4    the opinions offered by Mr. Saba."  Do you see that?

5        A      Yes.

6        Q      So is it fair to say that you don't have

7    any opinions in this rebuttal report besides

8    critiquing Carl Saba's February expert report, is that

9    right?

10       A      I'm not sure what other opinions there

11   would be.  That was my assignment.

12       Q      Okay.  So in your rebuttal report on

13   page 4 -- let's see, it's like the -- it's the

14   paragraph that starts, "It is my opinion" -- do you

15   see that?

16       A      Yes.

17       Q      So the last sentence there says, "Of

18   critical importance to any expert analysis is the

19   nexus between what is being measured and the claims

20   specified in the complaint."  Is that right?

21       A      That's what it says.

22       Q      Okay.  So it's your opinion that

23   Mr. Saba -- or excuse me, it's your opinion that

24   damages experts like Mr. Saba need to provide a nexus

25   between the damages measured and the claims being

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.

June 01, 2021                                          Derk Rasmussen

102

1    made, is that correct?

2          A     It's my opinion that if damage experts

3    don't provide and analyze that nexus, that their

4    opinions are subject to being excluded by a trier of

5    fact.  So I would agree with Mr. Saba that you can

6    just assume causation, but you assume causation at

7    your own risk.  Because potentially your report could

8    be thrown out because you didn't do that analysis.  So

9    if you want to assume causation, you know, you can do

10   that, but you do it at a huge risk that your report

11   could be thrown out.  And the literature is replete

12   with that warning.

13         Q     And is your opinion that Mr. Saba's report

14   does not contain any analysis of the nexus between

15   what he measures as damages and the causes of action

16   that have been brought by the plaintiff in this case?

17         A     I can't think of any portion of his report

18   that talks about that nexus or evaluating intervening

19   factors.  He claimed in his depo that part of his

20   analysis accomplishes that, but then he admits that

21   it's -- he basically admits that it's deficient and

22   that he has assumed causation and hasn't done a

23   complete analysis of intervening factors.

24         Q     Okay.  But you've added intervening

25   factors, right?  Does intervening factors have

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                              Derk Rasmussen

103

1    something to do with an analysis of the nexus between

2    causes of action and damages?

3         A    Well, yes.  I mean, when you're looking at

4    a damage claim -- in this case a diminution of

5    business value -- you have to look for are there other

6    possible explanations for the diminution in business

7    value but for the alleged wrongdoing of the

8    defendants?  And have you accounted for those other

9    possible explanations or intervening factors?  Other

10   possible explanations/intervening factors, are used

11   sort of interchangeably.  So in a case like this where

12   you don't have a direct causal link, you have to be

13   able to eliminate those intervening factors.  And I

14   think -- I talk about in my rebuttal report -- I give

15   an example, I can't remember if it was a bakery or

16   what the example was, but an example of that is --

17        Q    It was a jewelry --

18        A    -- often used is a bakery.

19        Q    I think it was a jewelry store, wasn't it?

20        A    Oh, yeah.  It was a jewelry store.  The

21   bakery/jewelry store, it works the same way.  Let's

22   say you have a bakery and a truck careens off the road

23   and smashes into the bakery and it's no longer

24   functioning.  So if an expert just looks at the

25   historical performance of the bakery and projects that

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.

June 01, 2021                                                Derk Rasmussen

104

1    into the future and says this is the damages, the

2    bakery would have performed like this but for the

3    truck hitting it, that may be very well and good.  But

4    what if the baker of the bakery that had been there

5    for years and years quit a week before the truck hit

6    it?  What if a new bakery opened up across the street

7    a week before the truck hit it?  What if the key

8    employee that was the real emphasis behind the bakery

9    quit?  What if flour prices and everything else

10   changed in the interim?  Those are all intervening

11   factors, other possible explanations, for the

12   difference, the delta, for what is being calculated.

13              Unless you deal with those intervening

14   factors and incorporate them into your analysis, you

15   run the risks of having your report excluded because

16   you didn't look at those things.  Because at that

17   point it becomes unreliable, unsubstantiated,

18   speculative, and you're subject to exclusion,

19   potentially, by a motion to exclude for Daubert

20   issues.  And that's, in my opinion, exactly what

21   Mr. Saba did.  He assumed causation, which if he wants

22   to, that's fine, but the problem is there are

23   consequences to making an assumption like that.  One

24   of which is possible exclusion because you didn't

25   account for all these intervening factors and

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

105

1   therefore your opinions are highly speculative and a

2   trier of fact could exclude you.

3          Q     Okay.  And you put that in your report on

4   page 6.  Go to page 6.

5          A     Okay.  I'm there.

6          Q     The first indentation the paragraph that

7   starts, "The second prong of a lost profits claim is

8   causation."

9          A     Yes.

10         Q     And then if you go down a little it

11  says -- it's like the third sentence -- "For example,

12  assume a defendant admits responsibility for the fire

13  that closed the plaintiff's boutique jewelry business

14  for seven months.  Also assume that a large national

15  discount jewelry store opened across the street from

16  the plaintiff's business six weeks before the fire.

17  Although the plaintiff can demonstrate that it was

18  closed for seven months and assumedly lost profits

19  during this period of time, the amount of profits lost

20  due to the fire and the amount of profits that would

21  have been lost in any event due to the increased

22  competition will have to be addressed."

23              Is that kind of what you're talking about

24  with an intervening factor?

25         A     Yes.  This is a quote from the PPC Guide

GRAYSTONE FUNDING COMPANY, LLC vs NETWORK FUNDING, L.P.
June 01, 2021                                          Derk Rasmussen

106

1    to Litigation Support Services.  This is generally

2    accepted literature.

3            Q       Right.  But isn't this intervening factor

4    that they're saying needs to be accounted for

5    something that actually happened?  A jewelry store

6    opened across the street before the fire occurred?

7            A       In this instance, yes, it's something that

8    actually happened, but it could also --

9            Q       (Inaudible due to speaking at the same

10   time.)

11                   (Court reporter asked for clarification.)

12   (BY MR. STULTZ)

13           Q       This isn't a "what if," is it?  It

14   actually happened.  The jewelry store opened across

15   the street.

16           A       It's something that actually happened,

17   yes.  Or it's something that could have happened in an

18   alternative explanation for the damages.  It's all

19   part of the possibility --

20           Q       That's not what this literature says,

21   right?  It doesn't say it could have happened.  It's

22   what actually happened, right?

23           A       In this particular example that's what

24   it's talking about, but it's not limited to that.

25           Q       Well, that's what it says, right?  Is