# EXHIBIT D

Carl Saba
April 09, 2021

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              DISTRICT OF UTAH, CENTRAL DIVISION

 3                        --oo0oo--

 4   GRAYSTONE FUNDING COMPANY,   )
     LLC, a Utah limited          )Case No.
 5   liability company,           )2:19-CV-00383-JNP-CMR
                                  )
 6        Plaintiff,              )Judge Jill N. Parrish
                                  )
 7   vs.                          )
                                  )
 8   NETWORK FUNDING, L.P., a     )
     Texas Limited Partnership;   )
 9   JASON GAUTREAU, an           )
     individual; and CRISTIE      )
10   NORTH, an individual,        )
                                  )
11        Defendants.             )
     _____)
12   NETWORK FUNDING, L.P., a     )
     Texas Limited Partnership;   )
13   JASON GAUTREAU, an           )
     individual; and CRISTIE      )
14   NORTH, an individual,        )
                                  )
15        Third-Party Plaintiffs,)
                                  )
16   vs.                          )
                                  )
17   KIPP V. MYERS, an            )
     individual,                  )
18                                )
          Third-Party Defendant.  )
19   _____)

20

21        VIDEO CONFERENCED DEPOSITION OF CARL SABA

22

23           Taken on Friday, April 9, 2021

24                 at 10:00 A.M.

25
```

```
 1   April 9, 2021                                  10:00 A.M.
                          P R O C E E D I N G S
 2                           EXAMINATION

 3                          CARL SABA,

 4        called as a witness, having been first duly sworn,

 5             was examined and testified as follows:

 6   BY MR. GILSON:

 7        Q.    Good morning, Mr. -- is it Saba?  Am I

 8   pronouncing your last name correctly?

 9        A.    Yes, Mr. Saba.  Good morning, Mr. Gilson.

10        Q.    Good morning.  Thank you for taking time

11   today.

12             Are you in your office in California?

13        A.    I am, specifically our San Mateo office.  We

14   have several.

15        Q.    Have you ever testified in a matter pending

16   in state or federal court in the state of Utah before?

17        A.    Not in the state of Utah.

18        Q.    What have you done to prepare for your

19   deposition today?

20        A.    I reviewed a number of documents.  I reviewed

21   my report.  I reviewed Mr. Myers' deposition transcript,

22   Mr. Stooksbury's deposition transcript.  A lot of the

23   supporting documents that I cite in my report, I reviewed

24   those.  I reviewed the complaint.  And I had

25   conversations with counsel, with Mr. Stultz, as well as
```

Carl Saba
April 09, 2021

1  with Mr. Myers.

2      Q.    How long did you meet with Mr. Stultz to

3  prepare for your deposition?

4      A.    Approximately five hours.

5      Q.    When was that?

6      A.    Let's see, we are Friday today, it was a

7  little bit of time yesterday, and most of that time the

8  day before, on Wednesday.

9      Q.    And was Mr. Myers present during those

10 meetings?

11     A.    He was present for yesterday's meeting, but

12 not the Wednesday meeting.

13     Q.    Did you meet with Mr. Myers before then?

14 Have you talked with him before then?

15     A.    I did.  I've had conversations with Mr. Myers

16 in the course of preparing my report.

17     Q.    Did you take notes of your conversations with

18 Mr. Myers?

19     A.    I don't think so.  I mean, I may have -- I

20 may have written a few items on a Word document that were

21 then later synthesized into my report.

22     Q.    In your report, you identified the documents

23 that you relied upon in forming your opinions; is that

24 correct?

25     A.    That's correct.

1        Q.    Let's go ahead and mark your report.

2              (Deposition Exhibit No. 600 was

3               marked for identification.)

4              MR. GILSON:  I think we will start with, Joe,

5    600, just to have a clean start.  I am not sure where we

6    left off.

7              MR. STULTZ:  I can't remember.

8    BY MR. GILSON:

9        Q.    Okay.  So we will mark your report as Exhibit

10   No. 600.  And Lyndon is going to be helping me with the

11   documents today, but do you have a copy of your report in

12   front of you, Mr. Saba?

13       A.    I do.  I have one, not in physical form but

14   in the electronic form, on a side screen that is facing

15   this direction.

16       Q.    Okay.

17             MR. GILSON:  Joe, do you have the exhibit

18   handy?  If I don't actually publish this one on the

19   screen, do you have that report handy?

20             MR. STULTZ:  I do, yes.

21             MR. GILSON:  Okay.

22   BY MR. GILSON:

23       Q.    Mr. Saba, if you could look in your report,

24   you identify those documents that you relied upon, and I

25   believe it's toward the end.

 1        A.    Yes, it starts on page 102 of the electronic

 2   version of the report, and it is labeled Exhibit K.

 3        Q.    **Is this an accurate list of the documents**

 4   **that you considered and relied upon, Exhibit K?**

 5        A.    Yes.  To the best of my knowledge, it is.

 6        Q.    **I don't see in Exhibit K any reference to any**

 7   **depositions.  You indicated that you reviewed**

 8   **Mr. Stooksbury's and Mr. Myers' deposition, but I don't**

 9   **see those listed as documents that you relied upon.**

10        A.    I may have received those after I submitted

11   my report.  I believe that's the reason why they are not

12   here.

13        Q.    **So is there any other depositions that you**

14   **reviewed, besides the Stooksbury and Myers depositions?**

15        A.    No, I don't believe so.

16        Q.    **Which Myers deposition did you review?**

17        A.    I believe -- I believe it was January of this

18   year, if I'm remembering correctly.  I could go into our

19   directory, if you would like, and look at the document to

20   confirm.

21        Q.    **The deposition that was taken in January of**

22   **this year was actually the deposition of Graystone, the**

23   **30(b)(6) deposition of Graystone, in which Mr. Myers was**

24   **the representative.**

25               **Is that the deposition that you are referring**

1    to?

2          A.    I believe so, because there were references

3    to 30(b)(6) throughout the deposition.

4          **Q.    Okay.  So did you review any other**

5    **depositions or testimony of Mr. Myers besides the one**

6    **that he gave as a 30(b)(6) witness in January of this**

7    **year?**

8          A.    No.

9          **Q.    Do you know why you didn't review those**

10   **depositions before you issued your report?**

11         A.    I didn't have a copy of those depositions

12   when I was working on my report, and I was having

13   conversations with Mr. Myers to gather the type of

14   information that would have come from that -- from a

15   deposition transcript.

16         **Q.    When did you review Mr. Stooksbury's and the**

17   **deposition of Graystone, the 30(b)(6) deposition of**

18   **Graystone?**

19         A.    In the last week or so.

20         **Q.    Based on that review, do you intend to modify**

21   **any of the opinions in your report?**

22         A.    No.

23         **Q.    None of the evidence that's set forth in**

24   **those depositions leads you to believe that you would**

25   **need to make changes whatsoever to anything in your**

1  report?

2           MR. STULTZ:  Objection; mischaracterizes the

3  evidence set forth.

4           Go ahead.

5           THE WITNESS:  The evidence that's contained

6  in those deposition transcripts confirms information that

7  I gathered through direct communications with those

8  individuals in the course of preparing my report, as well

9  as through other documents.

10          So there isn't anything that I came across in

11 those depositions that is inconsistent with the

12 information that was provided to me, that was relevant to

13 preparing my report at the time that I prepared it.

14 BY MR. GILSON:

15     Q.   Did you read copies of any of the depositions

16 that have been taken in this matter prior to issuing your

17 report, which was issued -- let's see, the date of your

18 report is what?

19          The date of the front of Exhibit 600 -- what

20 was the date that you issued your report?

21     A.   Just a moment.

22     Q.   Looks like February 18th is the signature

23 date?

24     A.   Yes.  So that is the issuance date, February

25 18th of 2021.

1          Q.    Did you request copies of any depositions

2    that had been taken in this matter prior to doing your

3    report that's dated February 18, 2021?

4          A.    I know I had conversations with counsel about

5    deposition transcripts.  I don't recall if they preceded

6    the issuance of my report or not.  But what I can say is

7    that in issuing my report, there weren't -- there weren't

8    material information gaps that I felt it was necessary to

9    get deposition transcripts to fill in those information

10   gaps.  Because I had direct -- the ability to communicate

11   directly with Mr. Myers and Mr. Stooksbury.

12         Q.    So I don't know the answer to my question, or

13   if you could, maybe answer it directly, "yes" or "no."

14         Did you request copies of any deposition

15   transcripts prior to issuing your report?

16              MR. STULTZ:  I am going to object.

17              THE WITNESS:  I --

18              MR. STULTZ:  Hold on for a second.  I am

19   going to object for attorney work client privilege.

20   Mr. Saba was hired by my law firm, and any

21   communications, I would say, is attorney work product

22   between Mr. Saba and me or my firm.

23              MR. GILSON:  Now that he is testifying as an

24   expert, we are entitled to know the information that he

25   relied upon.

1           MR. STULTZ:  That's fine, but you're not

2    entitled to know what he asked me for.  You can ask him

3    what he relied upon and what depositions he relied upon

4    and whether he asked for any depositions, but --

5           MR. GILSON:  That was my question.

6           MR. STULTZ:  Okay.

7    BY MR. GILSON:

8       Q.   Did you ask for any deposition transcripts so

9    you could review them before you issued your report?

10      A.   Okay.  And the answer to that would be I

11   don't know, because as I relayed earlier, I had

12   communications with counsel about depositions

13   transcripts.  I don't recall if those communications

14   preceded my issuance of my report.

15          So at some point we discussed that.  I don't

16   recall the timing and whether it was before my report was

17   issued or after.

18      Q.   Do you know who has been deposed in this case

19   besides Graystone's 30(b)(6) witness and Mr. Stooksbury?

20      A.   I don't know all the individuals.  It's my

21   understanding that Jason Gautreau and Cristie North have

22   been deposed.  I don't -- I don't know who else was

23   deposed in this case.

24      Q.   Did you not consider their testimony to be

25   relevant in this matter, Jason and Cristie's?

1          A.    I have been retained as an expert for the

2    plaintiff in this matter, and my task was to calculate

3    damages assuming the plaintiff prevails on their claims,

4    their liability claims.  So testimony from defendants,

5    you know, stating that -- a different prospective on

6    liability, I don't know that that would be particularly

7    useful to my task at hand.

8          **Q.    As an expert witness, you are assuming the**

9    **plaintiff prevails on liability on their claims.**

10              **Are you also then assuming that they prevail**

11   **on causation, that the acts caused the damage?  Are you**

12   **assuming causation as well?**

13         A.    I think that's a fair characterization, that

14   I am assuming causation.

15         **Q.    Have you ever been excluded as a witness in**

16   **any lawsuit before?**

17         A.    No.

18         **Q.    Has any expert report that you have authored**

19   **been excluded, in whole or in part, in any prior**

20   **litigation?**

21         A.    My reports have never been excluded.  There

22   have been instances where one of the parties does not

23   prevail on their legal claims, in which case, my

24   analysis, which assumes causation, assumes liability,

25   becomes not relevant.

1          Q.   So have any of those cases happened, where

2    your report was not allowed to be presented at trial, or

3    are you talking about that it was presented at trial, but

4    the jury chose not to follow your damage analysis?

5               I am talking about pretrial exclusion of your

6    report.  Has that ever happened, in whole or in part, in

7    any other case?

8          A.   I am not aware of an instance where my report

9    has been excluded pretrial.

10         Q.   In your report, it includes your curriculum

11   vitae, and it, you know, goes through your experience and

12   your education and your employment background.  I want to

13   ask specifically as it relates to your experience in

14   calculating economic damages.

15              Can you give me a summary of your experience

16   as it relates to providing expert witness testimony on

17   economic damages that have been suffered or alleged to

18   have been suffered by a business?

19              MR. STULTZ:  Objection; compound.

20              Go ahead.

21              THE WITNESS:  Yes.  And I'll caveat first

22   that there is an overlap between economic damages and

23   valuation work that I do, because in a number of

24   instances, valuation of a business or a business unit or

25   a piece of a business is the measure of economic damages.

 1            I have, in the course of the last 15 years,

 2    prepared over 800 assignments that involve either

 3    valuation or economic damages.  I don't know exactly how

 4    many of them are restricted to economic damages, but

 5    they're a significant amount.  Probably in excess of 100

 6    instances, and they're a variety of types of economic

 7    damages.

 8    BY MR. GILSON:

 9            Q.    **Have you done any lost profit damage**

10    **calculations?**

11            A.    I have.

12            Q.    **And how many cases have you done lost profit**

13    **damage calculations?**

14            A.    I don't know.  You know, if I had to

15    estimate, I would say it's probably, at least, 50 cases.

16            Q.    **Would it be fair to say this report that's**

17    **Exhibit 600 in this case is not a lost profit damage**

18    **calculation?**

19            A.    I would say that there is a portion of it

20    that relates to lost profits, but not all of the analysis

21    is a lost profit approach.

22            Q.    **If the defendants testified in their**

23    **depositions, the 30(b)(6) deposition of the defendant,**

24    **Network Funding, and Jason Gautreau and Cristie**

25    **North -- if their testimony testified to facts that was**

1  **relevant to damages, would that have an impact on your**

2  **calculations?**

3           A.    It might.  But oftentimes in these types of

4  instances, there's a conflicting interpretation of facts.

5  And given that I am retained as plaintiff's expert, and I

6  am trying to reflect the value of plaintiff's claims,

7  almost by definition, I should be looking at the

8  plaintiff's interpretation of those claims, not the

9  defendants'.

10          **Q.    What about facts that are not disputed or**

11  **subject to interpretation?  They are undisputed facts?**

12               MR. STULTZ:  Objection; argumentative.

13  BY MR. GILSON:

14          **Q.    Is it your testimony that as an expert**

15  **witness, it is not appropriate or relevant for you to**

16  **consider any factual testimony, other than the**

17  **plaintiff's witnesses, in doing your analysis?**

18               MR. STULTZ:  Objection; compound,

19  argumentative.

20               Go ahead.

21               THE WITNESS:  No, that's not my testimony.

22  Undisputed facts, if they are, in fact, undisputed, and

23  if they are relevant to my analysis, then yes, I would

24  want to consider those.

25  BY MR. GILSON:

 1         Q.   And did you consider undisputed facts in your

 2    report?

 3              MR. STULTZ:   Objection; assumes undisputed

 4    facts not in evidence.

 5              Go ahead.

 6    BY MR. GILSON:

 7         Q.   What undisputed facts did you consider in

 8    making your analysis of damage?

 9         A.   Well, let's take an example that I think is

10    an undisputed fact.  Jason Gautreau and Cristie North

11    submitted their notice of resignation from Graystone on

12    April 8, 2019.  As far as I know, that is an undisputed

13    fact.

14         Q.   Okay.  Any other undisputed facts that you

15    relied upon?

16         A.   I think I'd have to go through the complaint.

17    I am sure there are others.  I mean, there's a timeline

18    of events that I took into account.

19         Q.   Can you identify in your report factual

20    assumptions or undisputed facts as you indicated that you

21    relied upon in making your opinions --

22              MR. STULTZ:   Objection; mischaracterizes -- I

23    am sorry.

24              MR. GILSON:   Let me finish, Joe, then you can

25    make your objection.

1  section that we talked about earlier, we would need to

2  start with paragraph 39, which is the first paragraph

3  under the heading "Financial review."

4         And if we start with paragraph 39 and we go

5  through paragraph 68, all of those paragraphs relate to a

6  combination of documents that were provided to me, in

7  concert with verbal communications, in order to

8  understand and interpret that data.

9         Q.   Anything else?

10        A.   When we get to the estimate of value section,

11 which starts with paragraph 87, there were some

12 communications I had with Mr. Myers and Mr. Stooksbury

13 relating to developing assumptions that went into those

14 valuation approaches.  And they related to understanding

15 trends in the business and how past historical results

16 might relate to future historical -- future anticipated

17 results.

18        And those paragraphs start at 87, I believe,

19 and go through -- I am still scrolling, give me a moment.

20 It would go through Paragraph 165.  So 87 to 165.  It

21 doesn't mean that for every single paragraph, there was

22 information gained through a verbal conversation.

23        But what I'm relaying is that in general

24 terms, those paragraphs all describe my valuation

25 methodologies and my damages methodologies and

1  significant assumptions that went into the methodologies.

2  And developing those significant assumptions involved

3  review of documents and verbal conversations.

4       **Q.   If you didn't review the testimony of the**

5  **defendants in this case, how do you know that there were**

6  **not events that would affect the assumptions that you**

7  **make or that were facts that might impact the assumptions**

8  **that you do rely upon?**

9            MR. STULTZ:  Objection; compound.

10           Go ahead.

11           THE WITNESS:  The primary information that I

12  was looking at to develop my estimates related to

13  financial statements of Graystone, related specifically

14  to the financial statements of the three branches in

15  question:  Cottonwood, Sugar House, and Denver, Colorado,

16  and related to loans that were closed at Network Funding

17  but contained borrower information that was in

18  Graystone's database.

19           I don't really see how that information would

20  be different because of defendants' deposition testimony,

21  but it's possible there's something in defendants'

22  testimony that might have some bearing on my analysis.

23  BY MR. GILSON:

24       **Q.   But you don't know because you haven't**

25  **considered any testimony, other than that of**

 1  Mr. Stooksbury and Mr. Myers.  Correct?

 2        A.   I would say I have not reviewed defendants'

 3  testimony.  That's correct.

 4        Q.   Or any other testimony, other than the oral

 5  statements that you had with Mr. Myers and

 6  Mr. Stooksbury, because you didn't even review their

 7  depositions before the report.  You relied -- for the

 8  factual background, is what I am getting at, you relied

 9  on the oral statements of Mr. Myers and Mr. Stooksbury,

10  as well as --

11             MR. STULTZ:  Objection -- go ahead.

12  BY MR. GILSON:

13        Q.   -- as well as the documents that you

14  identified in Exhibit K of your report, is that the sum

15  total of the factual basis for your report?  I guess also

16  conversations with counsel, who are not -- obviously,

17  counsel are not witnesses.  Would you agree with that,

18  that counsel is not a witness in the case?

19             MR. STULTZ:  Objection.  I am not sure what

20  the question is here.  It is very compound.

21             MR. GILSON:  It is.  Let me break that down.

22  BY MR. GILSON:

23        Q.   Would you agree, Mr. Saba, that counsels are

24  not witnesses in the case?

25        A.   I would agree that counsel is not a witness

Carl Saba
April 09, 2021                                                          Page 30

1  in the case, yes.

2       Q.   Would you agree then that based on what you

3  have said, that the factual basis for your report was

4  based upon oral statements -- oral conversations that you

5  had with Mr. Myers and Mr. Stooksbury and then the

6  documents that you identified as Exhibit K of your

7  report?

8       A.   I would agree with that.  And I would point

9  out that the documents I have identified in my report are

10  quite voluminous.  I have considered a lot of documents

11  in forming my opinion.

12      Q.   So you don't know whether or not any exhibits

13  to the defendants' depositions might have an impact on

14  damages?

15      A.   I don't.  But I, again, would make the

16  comment I made earlier, to the extent that we are talking

17  about defendants' perspective on events that differs from

18  plaintiff's perspective, that may not be particularly

19  relevant to my analysis.  Because, again, the purpose of

20  my analysis is to estimate damages to plaintiff, if

21  plaintiff's claims prevail.

22      Q.   Both on liability and causation.  Correct?

23      A.   Correct.

24      Q.   But you don't think that they would be

25  particularly relevant, but unless you look at them, you

1    don't really know, do you?

2            MR. STULTZ:  Objection; argumentative.

3            Go ahead.

4            THE WITNESS:  Mr. Gilson, your question

5    implies that I am missing some important information, and

6    I just don't think that is the case.  And I agree with

7    you, there is a possibility that defendants' testimony

8    contains something that is relevant to my analysis, but

9    the large majority of my analysis is based on financial

10   data, not individual's interpretations of qualitative

11   events.

12   BY MR. GILSON:

13       Q.   Well, I am not necessarily talking about

14   interpretations of events.  I asked about exhibits, if

15   there are documents that were exhibits to a deposition,

16   regardless of who the witness was.

17            And, for instance, it was Mr. Stultz,

18   Graystone's counsel, who took the depositions of

19   Ms. North and Mr. Gautreau, and a lot of documents were

20   attached as exhibits to their depositions.  You didn't

21   look at any of the documents that were exhibits to the

22   defendants' depositions either; is that correct?

23       A.   That's correct.

24       Q.   Do you know who Cathy Castle is?

25            MR. STULTZ:  I didn't hear that.  What was

1    that?  Can you repeat the question?

2              MR. GILSON:  I am asking the witness if he

3    knows who Cathy Castle is.

4              THE WITNESS:  I have come across her name,

5    but I don't know what her title or position is.

6    BY MR. GILSON:

7         **Q.   Do you know anything about who she is or what**

8    **her role in this case might -- it might affect the damage**

9    **calculations that you've made?**

10        A.   Not as we sit here today.  I don't recall at

11   the moment.

12        **Q.   Back to your curriculum vitae, what**

13   **professional affiliations do you possess that**

14   **specifically relates to your expertise and training, as**

15   **it relates to performing an economic damage calculation?**

16        A.   Yes, just a moment.  So I have an

17   undergraduate degree from the University of California at

18   Berkley, and I have an MBA from the University of

19   Southern California.

20             My coursework included, particularly at the

21   graduate level, valuation courses and a number of courses

22   related to finance.  Economic damages is applied finance,

23   and economic damages heavily overlaps with valuation

24   concepts.

25             In addition to that, I am an Accredited

Carl Saba
April 09, 2021                                                        Page 33

1   Senior Appraiser with the American Society of Appraisers.

2   That is the most difficult valuation credential to obtain

3   from any of the credential organizations.  It requires a

4   combination of practical experience, exams, demonstration

5   reports, courses, etc.  I am an accredited valuation

6   analyst -- sorry, a Certified Valuation Analyst with the

7   National Association of Certified Valuators and Analysts,

8   which is another valuation credential, and I am

9   accredited in business valuation by the AICPA.  All of

10  those designations relate to both valuation and economic

11  damages concepts.

12            In addition to that, I have spoken in

13  national conferences on valuation and damages-related

14  matters.  I've published -- authored articles,

15  contributed to publications on this topic.  I am the

16  cofounder and chair of the Fair Value Forum, which is an

17  expert group that involves experts with valuation and

18  damages expertise.

19            And I am a former member of the Valuation

20  Roundtable of San Francisco, and I went through a stint

21  as president of that organization.  And, again, that's

22  another expert group that met regularly to discuss

23  valuation and damages topics.

24       Q.   Will you explain to me what your assignment

25  was in this case?  What were you asked to do?

Carl Saba
April 09, 2021                                                    Page 34

1      A.    What I was asked to do was to determine the

2   diminution and the value of the Graystone's business as a

3   result of defendants' actions.  And I was also tasked

4   with determining the value of lost profits associated

5   with loans that were closed at Network Funding that

6   related to customer database information that was held by

7   Graystone.

8      **Q.    Is it your opinion that your calculation of**

9   **the diminution and business value is also a calculation**

10  **of economic damage?**

11     A.    Yes, it's a measure of the economic damage

12  suffered by Graystone.

13     **Q.    So were you asked to assume that a diminution**

14  **in value occurred and to measure the diminution?**

15     A.    I don't think I would characterize it that

16  way.  I was asked to assume that defendants are liable

17  for their actions, from a legal perspective, that's a

18  foundation assumption that I'm making, that led to my

19  observation of the negative impact to Graystone's

20  business operations after May of 2019.

21          So I was not asked to assume a diminution.  I

22  determined what that was based on analysis and review of

23  Graystone's financial statements.  It's readily apparent

24  that there is a large portion of Graystone's revenues

25  that are lost after May of 2019, relating to departure of

1  defendants and, substantially, all the employees in those

2  three branches.

3        **Q.   Were you asked to value the three branches of**

4  **Graystone's business; the Cottonwood branch, the Sugar**

5  **House branch, and the Denver branch?  Were you asked to**

6  **perform a business valuation of those branches as of May**

7  **31, 2019?**

8        A.   That's close to my assignment, but it's not

9  exactly on point.  I was asked to determine the

10 diminution in value of Graystone, and part of the steps

11 involved in determining that diminution in value was to

12 value -- to determine the value of those three branches.

13       But that is not the only step that leads to

14 my determination of diminution in value.  That is not the

15 entirety of it.

16       **Q.   Okay.  I am just trying to get clear as to**

17 **what you were asked to do.  You were asked to value the**

18 **three branches of Graystone as --**

19       MR. STULTZ:  Objection; asked -- go ahead

20 BY MR. GILSON:

21       **Q.   -- as of May 31, 2019?**

22       MR. STULTZ:  Objection; asked and answered.

23       Go ahead.

24       THE WITNESS:  I was asked to determine the

25 loss in value incurred by Graystone as a result of those

1  three branches' operations substantially terminating as a

2  result of defendants' actions.  And that's not quite the

3  same thing as valuing the three branches, because if we

4  value the three branches, and we call that the "damages,"

5  we assume that there's a complete loss of the three

6  branches, and that's not the assumption I made.

7  BY MR. GILSON:

8      **Q.   Did you have to perform an evaluation of the**

9  **whole of Graystone, and then the value of Graystone minus**

10 **the three branches?**

11         MR. STULTZ:  Objection; mischaracterizes

12 prior testimony.

13 BY MR. GILSON:

14     **Q.   As of a given date?  I am just trying to**

15 **understand.  You said you were asked to calculate the**

16 **loss of value incurred by Graystone by those three**

17 **branches leaving the company.**

18         **Is that an accurate characterization of what**

19 **you were asked to do?**

20         MR. STULTZ:  Objection; asked and answered.

21         Go ahead.

22         THE WITNESS:  I would say that that's

23 generally an accurate characterization.  As of May 31st

24 of 2019, substantially, all of the staff and operations

25 of those branches had ceased.  And I was asked to

1  calculate the loss in business value or diminution in

2  value to Graystone from that event.

3  BY MR. GILSON:

4        Q.   Okay.  So you said that it was not a total

5  loss; is that right?  Of those three branches or --

6        A.   Correct.  That's correct.

7        Q.   Can you explain what you mean by that?

8        A.   Yes.  In my analysis, I considered whether

9  some of the business that was in those branches was

10 retained by Graystone as a mitigation to their damages.

11 And I quantified that, and I treated it as a mitigation

12 of reduction in the diminution in value of Graystone.

13        So my ultimate result for damages is not the

14 entire value of all three of those branches, but it is,

15 substantially, most of the value of those three branches.

16       Q.   Where do you account for some of the business

17 of those branches being able to be assumed by other

18 branches of Graystone as mitigation?

19       A.   It's that -- that analysis is outlined in

20 Exhibit H of my report, and it also shows on Exhibit A as

21 a mitigation item.

22       Q.   Do you talk about that in your report, or is

23 it just in exhibits?

24       A.   I believe I discuss it in my report.

25       Q.   Where?

1    A.    Let me find it.  So if you would look at

2  paragraph -- starting on paragraph 166, and there is a

3  header above that, that says, "Fair market value of

4  retained loans, capitalized cash flow method."

5    **Q.    So this Paragraph 166, is that what you are**

6  **referring to, that there were 27 loans that were**

7  **originated by Graystone with borrowers who were customers**

8  **of those three branches?**

9    A.    That's correct.  And then the discussion

10 continues into paragraph 167, 168, and reaches a

11 concluded value.  And for clarity, it's not just those 27

12 loans.  I am looking at those 27 loans as evidence of a

13 retained stream of income into the future.

14         So those 27 loans occurred over an

15 approximate one-year time period after May of 2019, and

16 then I am turning those into an income stream and

17 assuming that there will be more retained business beyond

18 that one-year period.  So with that conservative

19 assumption, I have, essentially, a stream of retained

20 income that's being treated as a mitigation to damages or

21 reduction in damages.

22   **Q.    Do you assume that the three branches, the**

23 **Cottonwood, the Sugar House, and the Denver branches,**

24 **that what happened to those branches as of May 31st of**

25 **2019, was caused by the actions of the defendants?**

Carl Saba
April 09, 2021                                                          Page 39

1           MR. STULTZ:  Objection; asked and answered.

2           Go ahead.

3           THE WITNESS:  I believe that's correct.

4  There's a foundational assumption I'm making that what

5  I'm observing in the financial statements, which is a

6  substantial termination of operations in those three

7  branches, results from defendants' actions and is related

8  to the claims that plaintiff is making in the complaint.

9  BY MR. GILSON:

10      **Q.   You didn't make an analysis of any other**

11  **variables.  You were asked to assume that that was the**

12  **causation; is that accurate?**

13      A.   I think that's accurate, with one caveat.

14  Part of my analysis relates to -- and I mentioned this

15  earlier, relates to loans that were closed at Network

16  Funding that contained borrower information that was in

17  Graystone's database.

18           In performing that analysis, I did, along

19  with my team, spend a significant amount of time

20  reviewing each loan and confirming that it related to

21  database information that was held by Graystone, either

22  in their Encompass loan organization software or in their

23  Surefire CRM database, and that that some of that

24  information was downloaded to defendants' accounts and

25  that of other departed employees.

1           So this just gets a little bit to the issue

2   of causation.  While I am generally assuming causation, I

3   have engaged in some procedures to validate that there

4   appears to be causation.

5   BY MR. GILSON:

6           **Q.   So are you assuming that all of the loans**

7   **that were closed at Network Funding after April of 2019**

8   **from loan officers who formally worked at Graystone, that**

9   **that occurred through the use of software or customer**

10  **database of Graystone?  Was that an assumption that**

11  **you're making?**

12          A.   Not exactly, because I don't believe I have

13  captured all the loans that were closed at Network

14  Funding over a certain time period.  Network Funding

15  provided information on the loans that were closed over a

16  certain time period.  And to be specific, it's from May

17  2019 through -- I am just looking at my report -- July of

18  2020, so it is a little more than a year.

19          And I went through those loans, and I

20  cross-checked the borrowers's information and the

21  borrowers's property address that was being financed

22  against data in Graystone's Encompass database loan

23  organization software, as well as Surefire database,

24  which really related to downloads that were made of that

25  data to defendants' email accounts.  I have the email

1  notices that are part of the documents that I cited.

2            And wherever loan that was closed at Network

3  Funding related to information that was either in those

4  Surefire downloads and/or was in the Encompass database,

5  I included it in my analysis.

6        **Q.   My question is, then, did you assume that**

7  **Network Funding -- employees of Network Funding gathered**

8  **or used the customer information that was at Graystone as**

9  **opposed to getting that anew from the customer?**

10            **I am just asking if you assumed that they got**

11  **that customer information from the Encompass or Surefire**

12  **software of Graystone.  Did you make that assumption?**

13        A.   I think it would be correct that that's a

14  foundational assumption that's being made.  Because what

15  I'm looking at is the correlation between the borrower

16  information that's in the Network Funding loans that were

17  closed, and that same information being contained in

18  Graystone's database.

19            So I -- beyond that, I am not -- I don't have

20  an opinion as to how those loan officers obtained that

21  information, other than I can say that I can see that in

22  many instances, they downloaded that information to their

23  email accounts.  And in the remaining instances, at the

24  very least, that information is contained in Graystone's

25  Encompass database.

1          Q.    When you say "they downloaded it to their

2    email accounts," what time period are you talking about?

3    In April of 2019?

4          A.    Yes, and very specifically, I think it was

5    April 22nd and 23rd.

6          Q.    Okay.  Let's take a short break here for

7    maybe ten minutes.

8               (Whereupon, a break was taken.)

9    BY MR. GILSON:

10         Q.    Before the break, we were talking about some

11   of this customer database that you mentioned in paragraph

12   169 of your report.

13              When you talk about the Surefire CRM

14   software, is that the Top of Mind software?

15         A.    I don't know if they are the same.  It is

16   possible.  I know it as Surefire.

17         Q.    You mentioned that you looked at information

18   that showed that it was downloaded on April 22nd and 23rd

19   of 2019, some of this customer information that was

20   downloaded by some employees who formally worked at

21   Graystone and then worked at Network Funding; is that

22   correct?

23         A.    That's correct.  And that includes

24   Mr. Gautreau and Ms. North.

25         Q.    Which documents relate to those that are

1  identified in Exhibit K?

2       A.   Let me find them for you.  I think I made a

3  reference to it in the body of the report as well, and it

4  might be easier -- yes.  So if you look at paragraph 170,

5  Subsection 3, says "Emails with downloads from

6  Graystone's Surefire CRM software with the following

7  Bates numbers."

8       Q.   Okay.

9       A.   And then it cites a Bates range.

10      Q.   Yes.  Okay.  Thank you.

11           Were you ever advised that Graystone asked

12 for that customer database to be returned and deleted

13 from those departed employees' possession?

14      A.   Yes, I believe I am aware of that.

15      Q.   And were you asked to assume that none of

16 that information was, in fact, deleted?  Is that one of

17 the assumptions that you made, that that customer

18 information was not deleted and returned to Graystone

19 despite the request that had been made by Graystone?

20      A.   No, I am not making an assumption about that,

21 one way or another, as to whether it was deleted or not.

22 As I relayed earlier, my analysis is quantifying the

23 profits associated with loans that were closed at Network

24 Funding that contained borrower information and sometimes

25 property information that was in Graystone's Encompass or

1  Surefire systems.  That is the extent of my analysis.

2          I am not making assumptions, one way or the

3  other, as to whether that information was subsequently

4  deleted or not, whether that information was used or not.

5  I am assigning a value to a certain subset of business

6  income.

7          Q.   So I guess my question is:  Why are you

8  assuming that that was damage or wrongful if you didn't

9  assume -- are you assuming that that customer information

10  was obtained through a misappropriation of trade secrets,

11  and that but for that alleged misappropriation, that

12  those loans would not have been closed at Network

13  Funding?

14          A.   There are allegations in the complaint that

15  defendants misappropriated loan and borrower information.

16  To the extent that plaintiff prevail on those claims,

17  this is a measure of the lost profits to Graystone

18  associated with those claims.

19          Q.   Okay.  So you are assuming then that all of

20  the customer information that you talked about was

21  misappropriated, and that it wasn't deleted.  You are

22  assuming that then; is that correct?

23          MR. STULTZ:  Objection; asked and answered.

24          Go ahead.

25          THE WITNESS:  I think I would say that I'm

1   assuming that it was misappropriated.  I don't know if I

2   agree that it wasn't deleted, because I can think of a

3   scenario where the information is deleted, but it is

4   still used prior to deletion.

5   BY MR. GILSON:

6        **Q.   You said it went through July, I think, of**

7   **2020.  If it had been deleted a year prior, how could it**

8   **have been based on the misappropriation, if that**

9   **information had been deleted?**

10       A.   I think it would just depend on the timing of

11  when the deletion occurred.  It would depend on what we

12  mean when we say "deleted."  I mean, if it's a download

13  that's deleted, but the information has already made its

14  way into Network Funding system, and there is a loan

15  being processed -- I mean, I don't know -- I don't have

16  opinions about that, I mean, to be perfectly clear.  We

17  are talking about hypotheticals that I don't have

18  opinions about.

19       **Q.   Well, I am trying to understand what**

20  **assumptions you are making to form your opinion that all**

21  **of those loans were based upon misappropriated**

22  **information, and that is my question.**

23            **Are you assuming then that all of those loans**

24  **were procured or able to be financed through Network**

25  **Funding as a result of customer information that was**

Carl Saba
April 09, 2021

Page 46

1  misappropriated from Graystone as alleged in their

2  misappropriation of trade secrets claim?

3       A.   I believe that's correct, and I answered that

4  in the affirmative earlier; that there is an assumption

5  that all of these loans relate to misappropriated

6  information that was contained in Graystone's database.

7       Q.   Did you review any declarations from former

8  Graystone employees regarding the deletion and return of

9  customer information to Graystone?

10      A.   No, other than I am aware that that was a

11  request that was made by Graystone.

12      Q.   So you were assuming then that despite the

13  request, that somehow, some way, the information was

14  retained in order to use that information?

15      A.   I have been able to confirm that that

16  information was in Graystone's database.  And yes, there

17  is a foundational assumption that that information was

18  used in some manner to consummate those loans at Network

19  Funding.

20      Q.   But if it can be established that that

21  customer information was obtained independently, without

22  based upon -- from the software of Graystone but was

23  obtained independently, then that would defeat that

24  damage claim to that extent; is that correct?

25      A.   I would say that if it can be established

1  that for every single one of these loans, that

2  information was obtained by some means that are not a

3  misappropriation or, essentially, don't relate to any of

4  the claims that are being made in the complaint, then I

5  think we have a scenario where liability of defendants on

6  those claims has not been established.  In which case, my

7  analysis, which assumes liability, is not relevant.

8          Q.   And if they deleted the information and did

9  not otherwise obtain an authorized copy of it before it

10 was deleted, then that would be a subtraction from this

11 damage analysis as to each instance in which that

12 occurred; is that correct?

13         A.   Could you please either repeat your question,

14 or, perhaps, it can be read back to me?  Because it

15 temporarily cut out part of what you were saying.

16              (The requested portion was read back.)

17              THE WITNESS:  I think my answer would be

18 deletion of this information alone may not be sufficient

19 to establish that there is no liability.

20              And, again, I have no opinions about legal

21 claims and liability, but if your question is:  If

22 plaintiff doesn't establish defendants' liability related

23 to plaintiff's claims, then there are no damages, or

24 damages are not relevant that I calculated, I would agree

25 with that

 1  BY MR. GILSON:

 2       Q.   Well, when you say "liability," you are

 3  assuming -- you are talking that the acts occurred and

 4  the acts caused damage.  You are assuming liability and

 5  causation; is that correct?

 6       A.   It is correct.  Although I think I have

 7  relayed earlier that I have done some work related to

 8  causation.  Even though I am still assuming causation, I

 9  have done some work associated with that, which was, at

10  least, establishing that there is a correlation between

11  the information that is in Graystone's database and the

12  information that is in those Network Funding loans.

13       Q.   But you are assuming that that correlation

14  was because of misappropriation of trade secrets as

15  opposed to that same customer information being obtained

16  independently through some perfectly legal way?

17       A.   I would agree with that.  That is a

18  foundational --

19            MR. STULTZ:  I am going to object.  Asked and

20  answered.

21            Go ahead, Carl.  Sorry.

22            THE WITNESS:  Okay.  Thank you.

23            I would agree with your statement, Counsel.

24  That is an assumption I am making.

25  BY MR. GILSON:

1        Q.    Is correlation, in your mind, sufficient to

2   establish causation?

3        A.    Not in and of itself.  It is a step along the

4   way to establishing causation, and I -- but my

5   observation would be:  Emailing information to yourself

6   which contains customer information, I mean, seems to

7   imply intent to use that information.

8              But at the end of the day, I don't have an

9   opinion about causation.  I am assuming it.

10       Q.    Did you do any analysis of any loans that

11  were closed by Graystone through the use of referral

12  sources of the former branches?

13       A.    I have captured loans that were closed by

14  Graystone subsequent to May 2019 that relate to borrowers

15  that were associated with those branches.  And I don't

16  know, but it is possible that some of those had something

17  to do with the referral from Network Funding.  I don't

18  know, one way or the other.

19             And those loans, as I explained earlier, are

20  being treated -- the income from those loans is being

21  treated as a mitigation of damages, a reduction of

22  damages.

23       Q.    I understand that.  And my question wasn't

24  about borrowers that kept their business, their repeat

25  business, at Graystone.

1          **My question is:  Did you look at what**

2  **referral sources per loans that Graystone was able to**

3  **continue to use after the folks from -- the employees who**

4  **left the Network Funding, that those referral sources**

5  **were used to originate new loans by Graystone as a**

6  **mitigation of damage?**

7          MR. STULTZ:  I am going to object on

8  vagueness.

9          Go ahead.

10          THE WITNESS:  I think the answer to that

11  would be no.  I did -- I did look at -- in addition to

12  what I relayed earlier, I did look at some level of

13  business, a small amount, that continued to accrue to

14  those branches past May as a mitigation item, as well as

15  business that went to other branches associated with the

16  same borrowers.  Those are the items I looked at as

17  mitigation.

18          I did not try to go to referral sources,

19  because in my mind, that can be inherently subjective.

20  You can have a referral source that has a relationship

21  with multiple loan officers, and some of the loan

22  officers have left and some are still at Graystone.

23  BY MR. GILSON:

24          **Q.   How do you know that without -- I mean, you**

25  **didn't do that analysis, I guess, is the question.  In**

Carl Saba
April 09, 2021                                                          Page 51

1   other words, the loan officers who were at the other

2   retained branches of Graystone could have contacted those

3   same referral sources that had previously been referring

4   customers to the Cottonwood, the Sugar House, and the

5   Denver branches.

6           But those retained branches could have said,

7   "Hey, we can take care of those, your clients, through

8   these other branches.  We can still service you, and let

9   us take care of it."

10          Did you attempt to look at mitigation that

11  was done that way through the retained branches of

12  Graystone?

13      A.   I didn't prepare that analysis.  I -- my

14  comment on -- related to your question would be that my

15  understanding of the way business is generated is through

16  relationships that the loan officers have with referral

17  sources.  And the relationships that the departed loan

18  officers have would follow them, and the relationships

19  that the loan officers who stayed, who are the other

20  branches, that proceeded May, would continue to be at

21  Graystone.

22          So, you know, on the surface, it would seem

23  that the business that continues to come into Graystone

24  is associated with relationships that were already there

25  with loan officers who didn't depart, who were not part

1  of the defendants in this action, and I wouldn't treat

2  that as mitigation.

3         Q.    But let's say a loan officer has a referral

4  source, has a relationship with someone both at the

5  Cottonwood branch and also with the Salt Lake branch, you

6  know, a retained branch of Graystone.  And now that the

7  Cottonwood branch loan officer is now working for Network

8  Funding, are you assuming that all of that referral's

9  business would go with that Network Funding loan officer

10 as opposed to that referral source then choosing to give

11 more of its referrals to that loan officer who chose to

12 stay at Graystone?

13        A.    It's possible that that referral source will

14 send more work to the loan officer who stays at

15 Graystone, but I would think it is more probable that

16 they will continue to split their referrals between the

17 two loan officers, the one that's departed and the one

18 that stayed.

19        Q.    What is the factual basis?  Are you just

20 speculating?  Do you have any factual basis for that

21 statement?  Did you do any analysis of that?

22        A.    I did not.  I think, as I stated earlier, I

23 didn't analyze that.

24        Q.    Did the loan --

25        A.    I did gain an understanding that business

 1  comes in through relationships that loan officers
 2  maintain.
 3        **Q.   Did the loan officers who stayed use the**
 4  **departing loan officers' contacts, to your knowledge?**
 5  **Did you consider or investigate whether or not loan**
 6  **officers who stayed used the departing loan officers'**
 7  **referral sources?**
 8        A.   Well, I think I did, in the sense that as I
 9  relayed earlier, I gathered information on loans that
10  were closed subsequent to May 2019 at Graystone that was
11  using borrower information associated with the three
12  branches.  That would be information or relationships
13  that the departed loan officers previously had.
14        **Q.   That's not my question.  That relates to**
15  **borrowers.  I am talking about the referral sources.**
16             **Did you investigate whether -- or have any**
17  **facts about whether loan officers who stayed at Graystone**
18  **used the referral sources of the departing loan officers**
19  **to generate loans?**
20             MR. STULTZ:  Objection; vague as to "referral
21  sources."
22             Go ahead.
23             THE WITNESS:  I think there's going to be
24  overlap between referral sources and borrowers.  So there
25  is some analysis I have done related to that, but I did

 1  information?

 2        A.   Not explicitly, no.

 3             MR. STULTZ:  Hold on a second.

 4             Same objections.

 5             Go ahead.

 6  BY MR. GILSON:

 7        Q.   **You were not aware of that?**

 8             MR. STULTZ:  Same objections.

 9             THE WITNESS:  No, not explicitly.

10  BY MR. GILSON:

11        Q.   **Where in Exhibit A is there discussion of**

12  **mitigation?**

13        A.   There are two places where there's

14  mitigation.  Under the -- starting at the top and going

15  about halfway down Exhibit A on the left side at the

16  labels, there's a label that says "Gross damages value."

17             Below "Gross damages value," the next two

18  lines, one of them says, "Excess rent expense," that

19  number has been reduced by a mitigation amount, which is

20  associated with continued income into those branches

21  after May of 2019.  And that -- there's further detail on

22  that in Exhibit G, which is referenced there.

23             And then below that, it says, "Minus retained

24  loans, capitalize cash flow method," it references

25  Exhibit H, that is all mitigation income, and that's

1    associated with the 27 loans that we discussed earlier

2    that are turned into an assumption of a recurring

3    retained income stream.

4         **Q.   Do you know how Graystone used the database**

5    **that contained customer information and referral sources**

6    **that have been generated and associated with loan**

7    **officers who left to join Network Funding?**

8              MR. STULTZ:  Objection; compound.

9    BY MR. GILSON:

10        **Q.   Are you aware of how Graystone utilized that**

11   **database after those loan officers left to join Network**

12   **Funding?**

13        A.   Well, I mean, my general understanding is

14   that that database contains borrower information that

15   might be a source of future business for Graystone.

16        **Q.   That wasn't my question.  I didn't ask what**

17   **the database was.**

18             **My question was:  Are you aware of how**

19   **Graystone utilized that database that contained customer**

20   **information and referral sources?  It's a yes/no**

21   **question.**

22             MR. STULTZ:  Objection; assumes facts not in

23   evidence, argumentative.

24             Go ahead.

25             THE WITNESS:  I have a general understanding

1  of how they used that database, yes.

2  BY MR. GILSON:

3       **Q.   Can you explain what that understanding is,**

4  **and what it is based on?**

5       A.   My understanding is that database was used as

6  a source of prospective new business for Graystone.  And

7  that understanding is based on discussions with

8  management.

9       **Q.   And how did they use that?  How did they use**

10 **that database after some loan officers left to join**

11 **Network Funding?**

12      A.   I don't know the specifics.  I think it would

13 generally relate to reaching out to those borrowers to

14 see if there's an opportunity for another transaction

15 with those borrowers.

16      **Q.   Is it your understanding they did do that?**

17      A.   I am trying to remember, you know, at what

18 level of detail this was discussed.  You know, I don't

19 know if they reached out to all the borrowers or what

20 subset of them.  I don't know down to that level of

21 detail.

22      **Q.   Do you know how much Graystone business came**

23 **from the former loan officers' database?**

24           MR. STULTZ:  Objection; mischaracterizes the

25 evidence.

1           Go ahead.

2           THE WITNESS:  Well, over the time period of

3    May 2019 through July of 2020, my understanding is that

4    it's those 27 loans that we have discussed earlier.

5    BY MR. GILSON:

6         Q.    That's just repeat loans.  Right?  From

7    common borrowers?

8                Was there any attempt to analyze how much

9    other business Graystone has been able to realize by

10   utilizing that database that contained referral source

11   information and customer information that had been

12   populated by loan officers who left to join Network

13   Funding?

14          MR. STULTZ:  Objection; assumes facts not in

15   evidence, mischaracterizes the evidence.

16          Go ahead.

17          THE WITNESS:  Well, okay.  By definition,

18   those 27 loans would be part of that database.

19   BY MR. GILSON:

20        Q.    Okay.  Beyond that, I guess, is my question.

21        A.    So that would contemplate loans that are made

22   by Graystone subsequent to May 2019 that are to borrowers

23   that are contained in that database, but somehow those

24   borrowers are not associated with those branches.  I

25   think that's your question.

Carl Saba
April 09, 2021                                                      Page 64

1          Q.    No, not necessarily borrowers, business that
2    was obtained by utilizing the contacts in that database.
3    You know, referral sources, any of the contacts, any of
4    the marketing information.
5          A.    No, I -- if your question is:  Have I done
6    that analysis?  No, because that doesn't relate to
7    plaintiff's claims that I have been asked to quantify.
8    Right?  I wasn't asked to quantify:  How much business
9    did plaintiff generate from contacts that it owned.
10              I was asked to quantify:  What was the
11   economic harm to plaintiff from defendants' actions.
12          Q.    And in paragraph 19 of your report, you state
13   that -- this is the first sentence.  You say, quote, "In
14   early April 2019, Gautreau and North resigned their
15   respective positions at Graystone to join NFLP."
16              and the second sentence says, "Graystone
17   alleges that in the months, weeks, and days prior to
18   submitting their resignation, the two former executives
19   improperly recruited Graystone employees, particularly
20   but not exclusively, Graystone employees at the
21   Cottonwood branch."
22          A.    Would you please tell me which paragraph you
23   are looking at?
24          Q.    Paragraph 19.
25          A.    Okay.  Thank you.  I am there.

1      Q.   So my question is, in your report, you assume

2  that the damages in this case is the diminution and value

3  of the Cottonwood branch, the Sugar House branch, and the

4  Denver branch; is that correct?

5      A.   That's correct.  That's a part of my

6  analysis:  Is the diminution in value associated with the

7  loss of a significant portion of the business in those

8  three branches.

9      Q.   What are the dates of the diminution of

10  value?  What is the beginning date and the end date that

11  you are looking at in terms of the diminution in value?

12  What is the start and end date on those three branches?

13      A.   It's a point-in-time damages estimate.  It's

14  what are the -- what's the diminution in value as of May

15  31, 2019, from defendants' actions, which is -- what

16  happens in May 31st of 2019, is a majority of the

17  operations and income of those three branches is lost by

18  Graystone.

19      Q.   Okay.  So what is your baseline comparing

20  what it would have been?  What is your data point to show

21  the delta between the two points?

22      A.   Well, we -- what I looked at was the level of

23  the revenues and income that those branches were

24  generating in periods leading up to May 31st of 2019, and

25  that formed a basis for an estimate of what income those

1  branches would have continued to generate past May 2019

2  but for defendants' actions, and that is compared to what

3  actually happened.

4          And what actually happened is that there is a

5  little bit of income that goes into those branches past

6  May of 2019, and then it goes to zero, and there's some

7  level of retained business that shifts to other branches

8  of Graystone that continues in perpetuity.

9          Q.   Okay.  I am just trying to figure out what is

10  the baseline.  You said in the periods before.  What

11  period are you looking at?  I mean, May 31st is your date

12  when you're looking at the value of those branches as far

13  as how it had been diminution.

14          What point in time prior to that are you

15  saying was the high point of the baseline from which you

16  can show the diminution?

17          A.   The answer to that is that I looked at

18  multiple years leading up to May of 2019.  So I analyzed

19  historical results for both Graystone and those three

20  branches going all the way back to 2014, of course.

21          Q.   What part of your report are you looking at?

22  Are you looking at a graph or something?

23          A.   So I think it would be useful to start with

24  Exhibit B2.

25          MR. STULTZ:  Just for the record, Counsel,

1    Mr. Saba is actually looking at his report.  It is not a

2    draft.

3              MR. GILSON:  Sorry, if I said, "draft," I

4    misspoke.

5              MR. STULTZ:  That's fine.  I just wanted to

6    clear it up for the record.

7              THE WITNESS:  Okay.  In Exhibit B2, I

8    analyzed the historical income statements for all of

9    Graystone, starting in fiscal year 2014 and then leading

10   up to May of 2019.  And then I also look at results

11   subsequent to May of 2019, which demonstrates the impact

12   of the loss of those three branches.

13             I also engage in the same analysis on a

14   branch-by-branch basis, and that starts with Exhibit C1,

15   which pertains to Sugar House branch, and C1, C2, C3,

16   relate to that branch.  Then Exhibit C4, C5, and C6

17   relate to an analysis of Cottonwood's operating history

18   over several years leading up to May of 2019.  And then

19   Exhibit C7 relates to the Denver, Colorado branch, which

20   has a much shorter history proceeding May 2019.

21             And based on that, I make an estimate of what

22   the future results would have been for those branches,

23   but for defendants' actions.  And the estimate of future

24   results is based on a weighting of past results as

25   explained in my report.

```
 1  BY MR. GILSON:
 2       Q.   How much weight did you give?  Did you give
 3  the most weight to the preceding year?  What weighting
 4  did you give to the prior years?
 5       A.   It depends on the analysis we're talking
 6  about.  So for the analysis that starts with all of
 7  Graystone, I placed an equal weighting to 2015 through
 8  2018, and then a lesser weighting to the five months, end
 9  of 2019, recognizing those were only five months of
10  results.
11            For the branches, I applied a similar
12  approach.  Although specifically for Cottonwood, I
13  de-emphasized my weighting to 2016, because Cottonwood
14  had relatively high profit margins in 2016, and I didn't
15  see clear evidence that that was going to occur at that
16  level in the future.
17            (Phone ringing.)
18            THE WITNESS:  And I apologize, my phone is
19  ringing.  Let me just see if I can put that on silent.
20  Okay.
21  BY MR. GILSON:
22       Q.   What was your rational to giving equal weight
23  to the year that -- you know, 2015 as opposed to 2018,
24  the most current year prior to the year in question?
25       A.   There are multiple reasons, but to summarize,
```

1   expenses doesn't offset the reduction in revenue.  The

2   bottom line for 2019 is materially worse than, say, 2017

3   or 2016.

4           **Q.   But by 2020, the bottom line was better than**

5   **the previous four years.  Correct?  By September 2020,**

6   **the bottom line net income figure was greater than it had**

7   **been since 2016, and that's only nine months of that**

8   **year?**

9           A.   By September of 2020 -- I would say it's

10  comparable to 2016 and '17.  There is seasonality in the

11  business, so I don't know -- I don't think you can take

12  the nine months and just prorate those results for what

13  they would have been for the 12 months.

14               There's seasonality in this business.  There

15  are periods of the year that are profitable, and periods

16  of the year that are not profitable.

17          **Q.   Why didn't you do that for the end of 2020?**

18  **The report wasn't until February of 2021.**

19          A.   Because when I was working on my report, that

20  is the information that was available at the time.  And,

21  ultimately, I am coming up with a damages estimate as of

22  May 2019, not sometime in 2020.

23          **Q.   But to consider mitigation, wouldn't you**

24  **agree that you need to analyze how much of Graystone's**

25  **recovery and the subsequent period, including through the**

Carl Saba
April 09, 2021                                                                    Page 72

1   nine months ending in September of 2020, came from

2   Graystone using the former employees' contacts and

3   database?

4        A.   I don't know that I would agree with that

5   premise.  I think when we look at recovery and mitigation

6   income, I think we -- I think we have to make a

7   distinction between what is mitigation and what is

8   continued growth for Graystone.

9            Graystone experienced growth prior to the

10  date of damages, and it experienced growth after the date

11  of damages, after having a big drop in revenue.  Most of

12  that growth occurred in branches that were not part of

13  these three branches that are the subject of this action.

14  They occurred with loan officers that were not part of

15  the employees that departed, and they occurred with

16  borrowers that were not associated with those branches.

17           So I don't think you can make a broad,

18  sweeping assumption that all of that is some sort of

19  mitigation income.  That is growth that Graystone would

20  have achieved anyway.

21       Q.   Well, that is the assumption that you are

22  making, sir.  And my question is:  What analysis did you

23  do, that's shown in your report, that increase in

24  business to Graystone as a whole and to other branches

25  wasn't made up based upon customers who otherwise would

1    **have gone to those -- otherwise would have gone to the**

2    **branches who left?**

3                  **In other words, that they were able to**

4    **achieve the same kind of business and even do better with**

5    **fewer branches and fewer employees?**

6         A.    Well --

7         **Q.    Is there anything in your report where you**

8    **have considered, if that's not what happened here?**

9    **Because looking at the bottom line numbers, within a**

10   **year, the company is doing better than it has done since**

11   **2016.**

12        A.    So I did do some analysis relating to that,

13   and I will explain it.  First of all, I analyzed branch

14   results, and what I determined by looking at branch

15   results is that if you do a calculation of the 12 months,

16   end of May 2019, for each of the branches, with the

17   exception of Denver, Colorado, which was on a big growth

18   projector, they would be similar to the prior fiscal

19   years.

20                Meaning, those branches were on a trajectory

21   to achieve -- to replicate prior year results up through

22   May.  And then subsequent to May, there is almost nothing

23   there anymore.

24                And so it is clear, from looking at

25   individual branch results, that there is a very

1  significant, almost complete loss of business in those

2  branches.  As it relates to business that went to other

3  parts of Graystone, which you alluded to in your

4  question, I looked at business that's associated with

5  borrowers formerly in those branches, that -- for which

6  business had been conducted with the same borrowers in

7  those branches, and I treated that as a source of

8  continuing mitigation income.

9          **Q.   We have talked about that.  And my question**

10  **is simply:  Did you look at the increase in growth of**

11  **Graystone as a whole?  Did you not agree that that growth**

12  **would be accounted for by those other branches that were**

13  **making up work from the lost branches, not just from the**

14  **borrowers but from mining the contacts and from marketing**

15  **and using those contacts that Graystone retained?**

16          A.   That is possible, but, I mean, the evidence I

17  am seeing is that we have growth occurring in the other

18  branches that are primarily driven by new borrowers, loan

19  officers who have stayed as opposed to loan officers who

20  left, and branches that have been retained as opposed to

21  these three branches.

22              So it doesn't look like mitigation income to

23  me.  It looks like continued growth of the rest of

24  Graystone.

25          **Q.   Where is that analysis?  How do you know that**

1  the new business wasn't generated from the contacts and

2  database that was formally associated with those departed

3  branches?

4          A.    Well, first of all, part of my analysis is

5  capturing a significant amount of loans that were closed

6  at Network Funding, not Graystone.  386, I think, loans

7  in a one-plus year period, clearly those didn't go to

8  Graystone.  So that's part of that analysis.

9          The other part of the analysis, we've talked

10 about this several times, is 27 loans that were closed at

11 Graystone in about a one-year period, that I assume that

12 that volume of business will continue as a mitigation.

13         Q.    You know, back to paragraph 19 where you are

14 saying that the Mr. Gautreau and Ms. North improperly

15 recruited Graystone employees, particularly but not

16 exclusively Graystone employees at the Cottonwood branch,

17 yet your damage report talks not just about the

18 Cottonwood branch but also Sugar House and Denver.

19         What is the factual basis for concluding that

20 the defendants' conduct was -- that the departure of the

21 Sugar House branch and the Denver branch was the result

22 of improper conduct on behalf of the defendants?

23         MR. STULTZ:  Objection; mischaracterizes the

24 report, the evidence.

25         Go ahead.

1          THE WITNESS:  I think I want to clarify one

2   point about your statement, and then I'll answer your

3   question.

4          In paragraph 19, I haven't made a conclusion

5   that there's misappropriation of trade secret

6   information.  I haven't made a conclusion about anything

7   relating to causation or liability.  I think we have

8   established that earlier, but those are allegations that

9   are being made by plaintiff that I'm assuming are for

10  purposes of my damages analysis.

11         And the allegations that plaintiff made

12  include allegations that defendants' actions resulted in

13  the departure of, substantially, all the staffing, not

14  just in Cottonwood but also in the Denver, Colorado, as

15  well as the Sugar House locations.  So that is what my

16  analysis is premised on.

17  BY MR. GILSON:

18       Q.   **So you are assuming that that happened with**

19  **all three branches because that's what plaintiffs have**

20  **alleged; is that what you are saying?  You are assuming**

21  **that all three branches left as a result of improper**

22  **conduct of the defendants?**

23       A.   I'm assuming that there is liability on the

24  part of the defendants for the claims made in the

25  complaint, and those claims do relate to the departures

1  that occurred in those three branches.

2          I am not -- just for clarity, I am not making

3  an assumption about the departures themselves.  That's

4  plainly evident.  I can see in the financial statements

5  that after May, there is, effectively, no activity

6  anymore, in any of those three branches.

7      **Q.   What bad acts are you aware of, that you are**

8  **assuming occurred, that caused these three branches to**

9  **leave Graystone and join Network Funding?**

10          MR. STULTZ:  Object; assumes facts not in

11  evidence.

12  BY MR. GILSON:

13      **Q.   Can you identify the bad acts that you assume**

14  **occurred in order for you to have made your calculation,**

15  **or are you not concerned with that?  You're just**

16  **concerned with the bottom line that they left, and that**

17  **it was because of -- you assumed it was because of the**

18  **defendants, and you weren't really concerned with getting**

19  **into any specific bad acts?**

20      A.   Well, there are -- there is an assumption of

21  certain bad acts.  They are summarized in Footnote 2 on

22  page 5 of my report.  The causes of action alleged in

23  plaintiff's complaint include breach of duty of loyalty,

24  breach of fiduciary duty, inducing breach of

25  loyalty -- breach of loyalty and fiduciary duty,

1  misappropriation of trade secrets, tortious interference

2  with business relationships, and civil conspiracy and

3  injunction.  Those are the claims that are in the

4  complaint.

5          In terms of my analysis, what those claims

6  relate to, in terms of an economic analysis or valuation

7  analysis that I prepared, is a loss of, substantially,

8  all the business, or a very significant proportion of the

9  business, in those three branches, as well as significant

10 amount of loans that were closed at Network Funding that

11 contain information in Graystone's database.

12     Q.   Footnote 2 is a recitation of the causes of

13 action, you know, the claims, but they are not -- it is

14 not a recitation of specific bad acts, specific conduct.

15          Did you not concern yourself with the details

16 about what the specific bad acts were?  You are

17 just -- you're assuming that whatever the bad acts were,

18 they caused all three branches to leave?

19     A.   Can you explain to me what your distinction

20 is between "claims" and "bad acts"?

21     Q.   Yes.  A claim would be breach of fiduciary

22 duty that is a cause of action, it is a generic, you

23 know, allegation.

24          Bad acts are the specific actions that

25 occurred that constitute -- when considered as a whole,

1   that resulted in this claim of breach of fiduciary duty.

2            So it's specific facts that are alleged to

3   have occurred that the defendants committed, that taken

4   as a whole, constitute breach of fiduciary duty or

5   misappropriation of trade secrets.

6        A.   Right.

7        Q.   So it is a difference of detail.

8        A.   So the bad acts that lead to the claims?

9        Q.   Yes.

10       A.   I am aware of them.  They are summarized in

11  the background section of my report, and then they are

12  discussed, I think at length, in the complaint that I

13  have reviewed multiple times.

14       Q.   Okay.  So to the extent you have identified

15  specific bad acts, it would be in the background section?

16       A.   Let me just look at my report and see if I

17  can confirm that.  I think that's where the primary

18  summary of those bad acts is included.  However, there's

19  further discussion of those towards the end of the

20  report.

21            For example, paragraph 169 talks about

22  database information taken by defendants, evidence that

23  defendants and departed employees downloaded and emailed

24  to themselves this customer information.

25            Paragraph 173 states, "The company alleges

1  that Gautreau, North and NFLP misappropriated not just

2  Graystone customer contact information but also Graystone

3  customer loan documents, and used this information in

4  furtherance of closing loans at NFLP."

5          So those are places where those bad acts are

6  described.

7      Q.   Can you identify what bad acts any of the

8  defendants allegedly committed as it relates to the Sugar

9  House or Denver branches departing?

10     A.   Just a moment.  Okay.  In paragraph 19, I

11 will just read it to you.

12     Q.   I can read it.  Don't take the time to read

13 it, sir.  I have it in front of me, so you don't need to

14 read it to me.

15          Point out to me where in paragraph 19 it

16 specifically references bad acts that defendants

17 committed as to Sugar House or Denver branches.

18     A.   Where it says that "The two former

19 executives" -- and this is referring to Ms. North and

20 Mr. Gautreau -- "improperly recruited Graystone

21 employees, particularly but not exclusively Graystone

22 employees at the Cottonwood branch."

23     Q.   What specific improper recruiting are you

24 aware of that has been alleged that the defendants did

25 with respect to Sugar House or Denver branches of

1  **Graystone?**

2      A.    In general terms, that Ms. North and

3  Mr. Gautreau were leaving Graystone and were encouraging

4  or soliciting employees of those branches to depart

5  Graystone and follow them.

6      **Q.    Before they announced; is that your**

7  **understanding?  That they solicited employees of the**

8  **Sugar House and Denver branches to Network Funding before**

9  **they, themselves, had given notice that they were**

10 **leaving?**

11      A.    No, I think you inserted that.  I never said,

12 "before they gave notice."  The allegations that I have

13 read, and some of those are discussed in Mr. Myers'

14 deposition as well, are that defendants engaged in

15 negotiations with Network Funding that proceeded their

16 notice of termination of employment with Graystone on

17 April 8th of 2019.

18          And that furthermore, once they gave notice

19 they -- well, and actually, I take that back.  I believe

20 some of the allegations, at least as it relates to the

21 Cottonwood branch, relates to possibly encouraging or

22 solicited employees to leave with them before they gave

23 their formal notice.

24          I don't know as to the timing of that as it

25 relates to Sugar House and Denver Colorado.

1        Q.   Are you aware of any factual allegation or

2   any evidence that there was any solicitation by

3   defendants of Graystone's -- any Graystone employees at

4   the Sugar House or Denver branch prior to the time of

5   April 8th, I believe, when Jason and Cristie gave their

6   notice of termination?

7        A.   I am not aware of specific evidence or

8   events.  I am aware that's an allegation that is

9   made -- well, the allegation, I don't know -- again, I

10  don't know if the allegation that is in the complaint is

11  that there was solicitation of Sugar House and Denver,

12  Colorado employees prior to Ms. North and Mr. Gautreau

13  giving notice of termination of their employment with

14  Graystone.

15        What I'm aware of is that the complaint

16  alleges liability on the part of those individuals for

17  the departures that occurred in those two branches.

18        Q.   Yes, and I --

19        A.   And that is an assumption that I am making,

20  that defendants are liable for the departure of employees

21  and the discontinued operations of those branches.

22        Q.   But you can't identify what the bad acts were

23  of the defendants as it relates to those two branches,

24  Sugar House and Denver?

25        A.   Well, my understanding of the bad acts is

1 solicitation of those employees.  As to -- what I have

2 relayed to you is I don't know about the timing of those

3 bad acts.

4      **Q.   Do you believe that a bad act of solicitation**

5 **occurred after April 8, 2019?**

6            MR. STULTZ:  I will object as to relevance.

7 This expert is not opining on any of this.

8            But go ahead.

9            THE WITNESS:  I think what you are asking

10 calls for legal opinion or conclusion, and I am not in

11 the capacity of providing such an opinion or conclusion.

12 BY MR. GILSON:

13      **Q.   Well, I am not asking for your opinion.  I am**

14 **just asking for what you assumed was improper recruitment**

15 **in paragraph 19.**

16            **You say that in early April 2019, that**

17 **Ms. North and Mr. Gautreau improperly recruited Graystone**

18 **employees.  I am just asking you if you assumed that that**

19 **recruitment was improper based upon the timing of it,**

20 **being before they, themselves, gave their notice of**

21 **termination.**

22      A.   For purposes of my damages analysis, the

23 timing of that recruitment or solicitation isn't

24 particular relevant.  What is relevant is the assumption

25 that it is an improper and illegal act.

1    **Q.    Okay.  Why don't we stop and take our lunch**

2  **break.**

3            (Whereupon, a break was taken.)

4  BY MR. GILSON:

5    **Q.    How are you being compensated for your**

6  **services in this matter?**

7    A.    Based on my hourly billing rate.

8    **Q.    Which is what?**

9    A.    $535.

10    **Q.    And why did you not read the deposition of**

11  **Kipp Myers?**

12    A.    I did read Kipp Myers' deposition, as we

13  talked about earlier.

14    **Q.    I believe that was Graystone's 30(b)(6)**

15  **deposition that he was the witness for.  You didn't read**

16  **his individual deposition?  He testified earlier in the**

17  **case as an individual.  Were you aware of that?**

18    A.    I may have been aware of that.  And no, I did

19  not read that deposition.

20    **Q.    Do you know why you didn't read it?**

21    A.    As I relayed earlier, it is not information I

22  had when I was preparing the report, and it is not

23  information that I felt I needed, because I was able to

24  have direct communications with Mr. Myers to resolve

25  questions that I had regarding timeline, regarding facts

1  and circumstances, regarding interpretation of financial

2  data, etc.

3       Q.   Would you agree, though, that his sworn

4  testimony that was subject to cross-examination would be

5  important information to bear upon the background facts

6  that you relied upon?

7       A.   Yes, it may be, but it may also be highly

8  duplicative of the information that I obtained through

9  direct communications with him.

10      Q.   But how do you know if you didn't read it?

11      A.   Well, I think we are going back to a

12 discussion we were having earlier, which is there is a

13 certain set of information I need to prepare my analysis,

14 and I obtained that information.  There is a lot of

15 information I looked at, considered, and in my opinion,

16 it was sufficient to prepare my analysis.

17      Q.   You did not read the deposition of any other

18 employee or officer or owners of Graystone either, did

19 you, such as Daniel Myers, Wendy or Rick Carter?

20      A.   That's correct.

21      Q.   Did you talk with any of those people?

22      A.   I did not.

23      Q.   Wouldn't you agree that there would have

24 been -- even under your analysis, that there would have

25 been some diminution of value, even if Jason Gautreau and

Carl Saba
April 09, 2021                                                                Page 86

1  **Cristie North had left the employment of Graystone**

2  **without improperly recruiting employees as has been**

3  **alleged?**

4        A.   Well, I think it's possible that their

5  departure -- if your hypothetical is one where they

6  depart, nobody else departs, and that's not an illegal

7  act; is that your hypothetical?  I just want to clarify.

8        **Q.   Yes.  Just Jason and Cristie leaving, isn't**

9  **it true that there would be some diminution of value from**

10 **Graystone as a result of them leaving, without any bad**

11 **acts?**

12       A.   I think that's possible.

13       **Q.   And is it true that you did not account for**

14 **that in your report?  You didn't subtract that out?**

15       A.   No.  Because, again, I'm reflecting

16 plaintiff's claims, and plaintiff's claims are that

17 Mr. Gautreau and Ms. North's departure, and that of all

18 other employees or, substantially, all other employees in

19 those branches, constituted an illegal act or set of

20 illegal acts.

21       **Q.   Why would it have been an illegal act for**

22 **Jason and Cristie to just leave?**

23       A.   Well, I think it depends on the

24 circumstances, and what they do or don't do before or

25 after they leave.

Carl Saba
April 09, 2021                                                    Page 87

1       Q.    If they just quit and go to work for Network

2   Funding.  Are you assuming that it would have been

3   illegal for them to go to work for Network Funding, just

4   themselves?

5       A.    I'm assuming, as alleged in the complaint,

6   that the conduct that they engaged in, preceding and

7   after their notice of termination on April 8th,

8   constituted one or more illegal acts as alleged.

9       Q.    Well, let me ask a hypothetical question.

10  Assuming that Jason and Cristie left the employment of

11  Graystone without any illegal acts, you know, they just

12  quit and went to work for Network Funding, would that

13  result in a diminution in value of Graystone?

14      A.    I think the best answer I can give you is

15  it's possible, but that's not what's alleged to have

16  happened.  And so we are talking about a scenario that

17  didn't occur, and we can't observe the impact of this

18  scenario that didn't occur on Graystone's business.

19      Q.    Why do you say it's possible that it would

20  have caused a diminution of value?  Why would that have

21  possibly happened?

22          MR. STULTZ:  Objection; misstates prior

23  testimony.

24          THE WITNESS:  It's possible, because it's

25  possible that their departure, in your hypothetical,

1  would have an impact on Graystone's business after their

2  departure.

3  BY MR. GILSON:

4      **Q.   Do you have an understanding as to whether or**

5  **not they had any noncompete agreements that prohibited**

6  **them from going to work with a competitor after they left**

7  **the employ of Graystone?**

8      A.   It is my understanding that they were subject

9  to non-solicitation and confidentiality provisions.  I

10 don't think specifically noncompete provisions were part

11 of that.  That's my recollection.

12     **Q.   Do you have any understanding as to whether**

13 **any of the employees, who formally worked for Graystone**

14 **who went to work for Network Funding, were subject to any**

15 **restrictive covenant with respect to going to work for a**

16 **competitor?**

17     A.   I don't know.

18     **Q.   You don't know either way?**

19     A.   I don't know either way.

20     **Q.   If you were to assume that none of the**

21 **employees had noncompete agreements, does that impact**

22 **your analysis, in any way, of the alleged damages that**

23 **you have concluded in your report?**

24     A.   No.  Because, again, my damages make a

25 foundational assumption about causation and liability.

1  And what you're speaking of in your question is an issue

2  of liability.  Right?  It's an issue of:  To what extent

3  do those employees -- and under what circumstances do

4  they have obligations to Graystone versus they don't.  I

5  am making an assumption about that.

6       **Q.   About liability and causation?**

7       A.   As we've talked about before, that there's an

8  allegation of liability and causation, and I am

9  calculating damages under that assumption.

10      **Q.   What assumption did you make as to what**

11 **constitutes improper recruitment by Jason and Cristie?**

12 **You know, in paragraph 19 we looked at of your report,**

13 **you referenced, and I believe you testified, that they**

14 **engaged in improper recruitment of employees.**

15           **What is your understanding -- I am not asking**

16 **for your legal opinion.  I am just asking, what was your**

17 **understanding as to what constitutes improper**

18 **recruitment?**

19           MR. STULTZ:  I will object; asked and

20 answered.

21           Go ahead.

22           THE WITNESS:  Going back to the allegations

23 that are made in the complaint, the allegations involve

24 Ms. North and Mr. Gautreau engaging in negotiations with

25 Network Funding while they are still employees of

1  Graystone.  They engage -- they involve also allegations

2  that these two individuals solicited employees while they

3  were still employees themselves of Graystone.

4  BY MR. GILSON:

5       Q.   **That is what you understood was improper?**

6       A.   That's part of the allegations of what is

7  improper, yes.  That is my understanding of them.

8       Q.   **Would you agree that you assumed -- and I**

9  **apologize if this is a repetitive question, but just to**

10 **be clear, would you agree that you assumed that all of**

11 **the employees in the three branches of Graystone that are**

12 **the subject of your report, namely, Cottonwood, Sugar**

13 **House, and Denver, were left to join Network Funding as a**

14 **result of improper recruitment by Ms. North or**

15 **Mr. Gautreau?**

16      A.   I think that's one piece of it, but I think

17 that it's -- I think it's more nuance than that in terms

18 of the allegations.  I know some of the allegations

19 relate to Ms. North and Mr. Gautreau's communications

20 with Network Funding while they were still employees,

21 causing an interference in an impact on the ability of

22 Graystone to consummate a merger with Network Funding.

23           There are a number of different allegations

24 in the complaint.  It is not just improper solicitation

25 of employees, as I understand it.

Carl Saba
April 09, 2021                                                          Page 91

1        Q.   Well, I am just trying to look in the report.

2   In paragraph 19 -- I am trying to understand what factual

3   assumptions you made with respect to the Cottonwood

4   and -- excuse me, the Sugar House and Denver branches

5   leaving Graystone to join Network Funding.

6             What were the bad acts that you understood

7   occurred as it relates to those two offices, employees of

8   those offices, if it was just based on alleged improper

9   recruiting, or if there's any other bad acts that you

10  assumed occurred that caused those two branches to leave?

11       A.   My understanding is, again, that the

12  allegations are that defendants engaged in improper

13  solicitation of employees while they, themselves, were

14  still employees of Graystone.  And that that occurred

15  primarily in Cottonwood, because that was where the

16  majority of those employees were who were solicited, but

17  that it also occurred in the other two branches.

18            And there might have also been a cascade

19  effect where employees, either in the Cottonwood branch

20  or the other branches, left because so many others were

21  leaving, that they were concerned about the financial

22  stability of Graystone as their continuing employer.  So

23  there is an interplay of factors that I believe is

24  alleged.

25       Q.   Do you identify that anywhere in your report,

1  **what you just said about the cascade effect or anything**

2  **like that?  I don't recall seeing that in your report.**

3          A.   I don't, because I don't know that that

4  really matters to how I calculate my damages.  At the end

5  of the day, I am making an assumption that defendants'

6  acts, as alleged, resulted in a mass departure in those

7  three branches.  And then I am quantifying the damages

8  that results from that mass departure based on an

9  assumption of causation and liability.

10         **Q.   Okay.  So nowhere in your report do you**

11 **identify the April 10th announcement by Kipp Myers about**

12 **Network Funding deciding to team up or merge or join with**

13 **Graystone, and that all the employees would become -- of**

14 **Graystone would become employees of Network Funding.  I**

15 **don't see that identified anywhere in your report.**

16              **Is that correct, or did I miss something in**

17 **the report on that?**

18         A.   You may be correct that it's not in my

19 report.  It's, certainly, something I was well aware of

20 as I was preparing my report.  And, again, that event

21 didn't occur, and so, again, I don't see it as

22 particularly important or impactful as to how I would

23 calculate damages.  Because, again, the damages relate to

24 the discontinuation of the business operations of those

25 three branches.

Carl Saba
April 09, 2021                                                                      Page 93

 1        Q.    The first of your answer, did I hear you
 2   correct to say that that event did not occur?
 3        A.    What I mean by that, Mr. Gilson, is that the
 4   acquisition was not consummated.
 5        Q.    But you understand that there was a
 6   company-wide announcement by the owners of Graystone on
 7   April 10th, announcing that the company was going to be
 8   joining Network Funding?
 9        A.    I do understand that, and I also understand
10   that according to Mr. Myers, as of that date, he had not
11   received any sort of written document constituting a
12   purchase offer or purchase agreement.  It was -- he was
13   awaiting that.
14        Q.    Would you agree that you assumed that his
15   announcement to -- his company-wide announcement had
16   absolutely no effect on the decision of any employees to
17   decide to leave to join Network Funding; is that a fair
18   assumption?
19              Based upon your report, you are making
20   assumptions that the events between April 10th and April
21   18th, where Graystone was taking affirmative steps and
22   publicizing that they were going to be joining Network
23   Funding, had absolutely zero effect on the decision of
24   any of the Graystone employees to choose to leave to join
25   Network Funding?

1      A.    I don't know that I can conclusively say it

2  had a zero effect, but what I can say is that based on

3  the evidence, it doesn't appear to be a primary factor.

4  As I understand the sequence of events, Ms. North and

5  Mr. Gautreau gave their notice of resignation on April

6  8th, two days earlier.

7            And they also informed Mr. Myers that all, or

8  substantially all of the employees were going to be

9  following them.  And so that event already creates a

10 major destabilization of the environment at Graystone.

11     Q.    And --

12     A.    Sorry, I am not done with my answer.  A

13 subsequent announcement made by management two days later

14 that they are going to merge, I don't know what

15 incremental impact that has on further destabilization

16 the situation or enticing or motivating employees to

17 consider employment elsewhere.

18     Q.    Are you done now?

19     A.    I am.

20     Q.    You said that evidence was not a primary

21 factor in your opinion.

22            Where in your report do you consider that

23 evidence?  Because there is nowhere in the report that

24 you even discuss it.  So I am just kind of curious as to

25 how you can make a conclusion that is not in your report,

1  based upon evidence that is not in your report, based

2  upon depositions that you don't even read.  I am just

3  asking if you want to maybe rephrase your -- or meant to

4  say that you're making an assumption that it did not have

5  any effect on other employees leaving.  Rather than you

6  saying that the evidence leads you to conclude that that

7  wasn't the primary factor?

8         MR. STULTZ:  Objection; argumentative, and

9  compound.  I am not sure what the question is.

10        But if you can answer it...

11        THE WITNESS:  You are asking me a question

12 about the -- my perception of the impact of that event on

13 the departure of employees?

14 BY MR. GILSON:

15     Q.  No, that is not my question.  We can have the

16 reporter read back the question.  My question was:  Isn't

17 it true that you assumed that the announcement had no

18 effect, no causal effect, on the decision employees of

19 the three branches to leave Graystone?  You assumed that

20 that fact, that event, the events between April 10th and

21 April 18th, had no causal effect on the damages according

22 to your calculation?

23        MR. STULTZ:  Objection; compound.

24        THE WITNESS:  I would agree with your

25 characterization.  That's an assumption made.  Because I

 1  am assuming that the causal factor is defendants' actions

 2  as alleged.

 3  BY MR. GILSON:

 4       **Q.   Because you haven't considered all the**

 5  **evidence.  You haven't even read the depos.  So you are**

 6  **assuming that fact.  Right?**

 7            MR. STULTZ:  Objection; argumentative.

 8  Objection; asked and answered.

 9            Go ahead, I guess.

10            THE WITNESS:  Well, I relayed my

11  interpretation of the impact of that event, but going

12  back to your question, I am assuming that the causal

13  factor is defendants' actions as alleged.

14  BY MR. GILSON:

15       **Q.   Have you listened to the recording of the**

16  **announcement of Kipp Myers, that he made to all the**

17  **employees of Graystone on April 10th, 2019?**

18       A.   No.

19       **Q.   Do you know what he said?**

20       A.   Not specifically.  I know that in his

21  testimony and from my discussions with him, that at that

22  point in time, he was making a good faith attempt to

23  consummate that merger.

24       **Q.   Did you consider the fact that if Jason and**

25  **Cristie had decided to leave Graystone, that the natural**

Carl Saba
April 09, 2021                                                           Page 97

1  consequence of them leaving, that other employees would

2  naturally follow with them, like they had done when they

3  joined Graystone from Security National?  Did you take

4  into that factor that into account in your damage

5  analysis?

6            MR. STULTZ:  Objection; assumes facts not in

7  evidence.

8            Go ahead.

9            THE WITNESS:  No.  Because, again, that

10  doesn't align with the allegations that I am assuming.

11  The allegations are that they engaged in improper conduct

12  which led to these mass departures.

13  BY MR. GILSON:

14      Q.   So are you assuming then that these employees

15  would not have left Graystone but for the alleged

16  improper action of the defendants?

17      A.   I don't think I am making that explicit

18  assumption either.  The assumption I am making is

19  defendants engaged in improper conduct.  That improper

20  conduct included solicitation of employees, which

21  resulted in a mass departure in those three branches.

22            That's the allegation and that's the

23  assumption.  I am not contrasting that with some

24  hypothetical scenario where they leave lawfully and maybe

25  some of the employees follow them.

1        Q.   And you are not also accounting for any other

2   possible causal factor of why employees would choose to

3   leave either; is that correct?  You're assuming the

4   causation that is alleged in the complaint.  You are not

5   taking into account any other possible causal factors in

6   your report.  You are assuming causation that has been

7   alleged?

8        A.   I'm assuming causation.  And I think we

9   discussed earlier that I have done some work related to

10  causation, but, ultimately, I am assuming it, yes.

11       Q.   Did you consider in your analysis any natural

12  attrition rate of employees at Graystone or in the

13  mortgage industry, attrition of employees?  Maybe more

14  specific, loan officers.  Did you take into account a

15  report -- and if so, please show me where -- that there

16  is going to be some normal attrition rate of loan

17  officers in the mortgage industry?

18       A.   There's -- there is an implicit, rather than

19  explicit, assumption regarding normal attrition, because

20  when I calculate damages based on, for example, three

21  different -- that's actually four different income

22  approaches, three for each of the three branches and one

23  for all of Graystone, I am looking at the historical

24  trajectory, and I am using that to predict the future

25  trajectory in a "but for" scenario.

Carl Saba
April 09, 2021                                                     Page 99

```
 1              The historical trajectory including normal
 2   attrition that occurs in those branches and inside of
 3   Graystone.  And when I use that to project out a future
 4   trajectory, there is an implicit assumption that that
 5   normal process of attrition, as well as hiring new
 6   employees, will continue.
 7         Q.   Were you aware or consider the state of
 8   morale that exists at Graystone in the one year period
 9   prior to April of 2019?
10         A.   Not explicitly.  To the extent that morale
11   impacted financial results, then that's implicitly
12   included in my analysis.
13         Q.   What was the morale, or do you have any
14   understanding as to the state of the morale amongst the
15   employees and loan officers at Graystone in the year
16   preceding April of 2019?
17         A.   I know that 2018 was a difficult year for
18   Graystone.  It was not a -- it was, you know, a
19   low-volume year.  It was not a very profitable year.
20   That is not unique to Graystone.  That was an
21   industry-wide phenomenon that may have impacted morale.
22         Q.   Other than the economy generally, as it
23   relates to mortgage loans, are you aware of any -- were
24   you privy to the state of morale amongst these loans
25   officers at Graystone in the 12 months proceeding April
```

1  2019?

2              MR. STULTZ:  Objection; asked and answered.

3              THE WITNESS:  Not beyond what I just relayed

4  to you.

5  BY MR. GILSON:

6      Q.   Were you aware of any claims of sexual

7  harassment by Mr. Myers with respect to certain employees

8  as Graystone that may have affected morale?

9      A.   No, not specifically.

10     Q.   Anything at all with regard to sexual

11 harassment?  Are you aware of any issues about that in

12 your analysis?

13     A.   I am trying to remember if I came across

14 anything like that.  I don't think I did.

15     Q.   What was the methodology that you used to

16 fulfill your assignment in this case?

17             MR. STULTZ:  Objection; vague.

18             Go ahead.

19 BY MR. GILSON:

20     Q.   Maybe you could point to me in your report

21 where you describe what your methodology was to calculate

22 the damages that you allege.

23     A.   Okay.  And just a point of clarification,

24 these are not damages that I allege.  These are damages

25 alleged by plaintiff.

1        Q.    Well, you are opining it occurred?

2        A.    On the assumption of liability and causation,

3   yes.

4        Q.    Fair enough.

5        A.    I use a combination of different

6   methodologies.  The general discussion starts on

7   paragraph 70.  So to calculate gross damages, which I am

8   defining as the value of those three branches, I

9   considered the three broad categories of widely accepted

10  valuation approaches:  Income approaches, market

11  approaches and asset approaches.  I discuss them here.

12            And then starting on paragraph 76, I

13  discussed the selection of the valuation methods that I

14  applied.  I selected a version of the capitalized cash

15  flow method, which is a form of income approach, to

16  determine the value of each of the three branches

17  individually, as well as all of Graystone, as of May 31,

18  2019.

19            And I also applied a guideline public company

20  method, which is a form of market approach, to value all

21  of Graystone, and then allocate those damages, or a

22  portion of that value, down to those three branches in

23  question.  And then I applied a mergers and acquisitions

24  method, which is another version of market approach, to

25  value all of Graystone, and then allocate a portion of

1  methodologies, some of which don't rely on cost

2  allocations to the branches.  As a matter of fact, three

3  out of four don't and the fourth one does, and I have

4  compared and contrasted the results.

5  BY MR. GILSON:

6       **Q.   Why did you not do a lost profit analysis to**

7  **calculate the damages in this case?**

8       A.   And I apologize, part of what you were saying

9  cut off.  Could you repeat, please?

10      **Q.   Why did you choose to do a business valuation**

11 **methodology instead of a lost profits methodology in**

12 **rendering your opinion as to the damages in this case?**

13      A.   Okay.  Well, let me start with, there is not

14 a hard line, from my perspective as an expert, between a

15 lost profits methodology and a business valuation

16 methodology.  Because a lost profits methodology is a

17 form of income approach, and one of the commonly used

18 valuation methods to value a business is an income

19 approach.

20           So there is a great deal of overlap between

21 the two, such that I don't think it is useful to try to

22 draw a hard line between the two.

23           Secondly, the reason looking at the entire

24 value of the branches is appropriate here as a starting

25 point only is because, substantially, all the operations

 1  of those branches terminated as a result of defendants'

 2  alleged actions.  So you are in a scenario where you had

 3  a business unit, and then it is gone.  Typically, in

 4  scenarios like that, where a business is completely or

 5  substantially decimated, valuation of that business or

 6  business unit becomes an appropriate measure of damages.

 7          Now my last comment is, I am factoring in

 8  mitigation, and I am factoring in other elements of

 9  damages such as lease expense.  So by the time I am done,

10  it is not a pure business valuation of those three

11  branches.  I am not saying the value of those three

12  branches is equal to the damages.

13          If I was were saying that, the damages number

14  would be much larger, because I am making a number of

15  adjustment to translate the value of those branches into

16  a measure of damages.  I am looking at mitigation.  I am

17  looking at excess lease expense.

18          I am looking at the fact that when defendants

19  departed, defendants didn't take the working capital of

20  the branches with them.  That stayed behind.  Well, the

21  working capital is part of the value of those branches.

22  So I am extracting that from damages, and that is a big

23  deduct.  It is a big reduction.

24          So by the time I am done, I have a measure of

25  damages, and it looks a lot like a lost profit analysis

1 | rather than a pure business valuation.

2 |      **Q.   Did you consider doing a lost profits**

3 | **analysis?**

4 |      A.   Again, I have difficulty seeing the

5 | distinction, because what a lost profit analysis would do

6 | is it would say that there is a stream of income that I

7 | have lost, and then there is a stream of income that I

8 | have kept, and what is the difference between the two?

9 |        That is, essentially, what I did.  I said

10 | there is a business value that I lost, and then there is

11 | a business value that I've kept, and then there are

12 | assets of that business that I've kept, which is working

13 | capital, and I am deducting those two from the business

14 | stream -- the stream of income that I've lost.  So I

15 | don't see a practical distinction, really.

16 |      **Q.   So are you saying there is not a distinction**

17 | **between the two valuation methods because you are going**

18 | **to be taking into account the similar factors under each?**

19 | **You used a market approach, business valuation market**

20 | **approach to value these three branches with the**

21 | **adjustments that you spoke of to mitigation and other**

22 | **adjustments.**

23 |        **But you are saying that you could have**

24 | **achieved the same result using a lost profits**

25 | **calculation?**

1          A.    Let me try to answer this by referring to

2     Exhibit A.  Okay?  If we look at Exhibit A, and we look

3     at the first two values that are referred to as

4     "capitalized cash flow method," one is an income approach

5     to the valuation of all of Graystone, and then allocating

6     a portion of that to the branches based on their relative

7     revenue percentages.  And the other is a valuation of

8     each branch individually based on its own profit stream.

9                And then if we go down to the guideline

10    public company method and the merger and acquisition

11    method, those are market approaches.  Okay?  So what I

12    have done here is I have looked at both income and market

13    approaches, both top-down and bottom-up, to establish the

14    value of those branches.  Then I've said that you need to

15    deduct the working capital that is in those branches,

16    because the defendants didn't take that with them, and

17    you need to deduct the retained stream of income, because

18    that stayed behind at Graystone.  And you need to add to

19    that the excess rent expense minus any income that came

20    in after May, because that's additional damages.

21                So if I had applied a lost profits approach,

22    that would be akin to what I did in my two capitalized

23    cash flow methods.  Right?  Minus mitigation, which I am

24    dealing with here.  So in theory, yes, I would get to the

25    same answer with the same assumptions.  I have gone

1    beyond that.  I haven't just done income approaches minus

2    mitigation.  I have also done market approaches minus

3    mitigation.  Can't do market approaches under a lost

4    profits analysis.

5              So I would argue that what I have done is

6    actually more comprehensive, more thorough, and more

7    complete than the lost profits analysis.

8         **Q.   Are you aware of the publication, Litigation**

9    **Services Handbook, the Role of the Financial Expert?**

10        A.   I am.

11        **Q.   Hold on one moment, please.  Let's go off the**

12   **record for a moment.**

13             (A discussion was held off the record.)

14             (Whereupon, a break was taken.)

15   BY MR. GILSON:

16        **Q.   Mr. Saba, referring to this application that**

17   **Litigation Services Handbook, the Role of the Financial**

18   **Expert --**

19             MR. STULTZ:  Jim, I am sorry, I have to call

20   in again.  I accidentally hung up.

21             Can we go off the record for a minute?  I

22   apologize.

23             (A discussion was held off the record.)

24   BY MR. GILSON:

25        **Q.   We were talking about, before the break, this**

1  publication called, Litigation Services Handbook, the

2  sixth edition, the Role of the Financial Expert, by Roman

3  Weil, Daniel Lentz and Elizabeth Evans.  I am looking at

4  a 2017 date, published by John Wiley & Sons.

5            Are you familiar with that publication?

6       A.   I am.  I don't know if I have the exact same

7  edition that you are citing.

8       Q.   Well we will mark as Exhibit 601 this book,

9  Section 4.2 called, "Fundamentals of Causation."

10           (Deposition Exhibit No. 601 was

11            marked for identification.)

12  BY MR. GILSON:

13       Q.   If you can pull it up, and once you see it --

14       A.   Okay.  I see it.  I think I have to download

15  it.

16           MR. STULTZ:  Yes.  You save it to, like, your

17  desktop, and then you can upload it.

18           THE WITNESS:  Okay.  I have it open.

19  BY MR. GILSON:

20       Q.   Okay.  Would you agree with the statement, at

21  the end of that first paragraph, under "Introduction to

22  causation," that testimony of a qualified expert can help

23  the trier of fact to decide whether the plaintiff has

24  proved this causal link?

25       A.   Yes, I agree it can help the trier of fact.

1          Q.   Do you agree with the preceding statement,

2    that "proof that a defendant's wrongful conduct caused a

3    plaintiff's alleged damages is a key concept in the

4    determination of culpability in civil litigation"?

5          A.   I would agree with that, with the caveat that

6    that doesn't necessarily mean that the damages expert is

7    providing that proof.

8          Q.   Would you agree with the third paragraph that

9    says, "The law follows logic.  It requires that the

10   plaintiff prove more than correlation to establish

11   causation"?

12              Do you agree with that?

13              MR. STULTZ:  Objection; calls for a legal

14   conclusion.

15              But go ahead.

16   BY MR. GILSON:

17         Q.   You need to answer.

18         A.   I agree that correlation, in and of itself,

19   doesn't -- it is helpful towards establishing causation,

20   but it does not alone establish causation.

21         Q.   Do you agree with the next statement,

22   accordingly, "Courts reject expert testimony on causation

23   that identifies merely a correlation between two

24   variables"?

25         A.   I don't necessarily agree, because I

 1  think -- I think how that is interpreted can be very

 2  nuanced.  You can have a scenario where other evidence is

 3  being presented on causation, and an expert is asked, as

 4  part of their assignment, to look at the issue of

 5  correlation to help support causation.  But that is not

 6  the only evidence that is presented to establish

 7  causation.

 8          And in those instances, that expert's

 9  correlation analysis is relevant and is considered by the

10  court.

11      **Q.    The sentence, "that to ensure the credibility**

12  **and sometimes even admissibility of their testimony,**

13  **expert witnesses must understand both the applicable**

14  **causation standards and the relevant facts regarding**

15  **causation"?**

16          MR. STULTZ:  Hold on.  I'm going to object as

17  far as the context here.  It is not clear what portion of

18  this book this is from, "Fundamentals of Causation."

19          MR. GILSON:  It's from the 4.2, page 4.

20          MR. STULTZ:  But, Jim, I don't know if this

21  is for a causation expert of, like, you know, if you have

22  a wreck, and you have an expert to talk about the

23  cause -- who caused a wreck, or if this is economic

24  damages.

25          So I'm just going to make that objection for

1 the record, that I have no idea about the context of this

2 paragraph or whatever.

3        But go ahead, Carl.

4 BY MR. GILSON:

5     **Q.   Do you agree that a financial damages expert**

6 **must understand both the applicable causation standards**

7 **and the relevant facts regarding causation?**

8     A.   I would generally agree with that, but I

9 wouldn't agree if you want to extend that to say that the

10 financial damages expert has to prove causation.

11     **Q.   Do you agree with the sentence, the bottom of**

12 **the next paragraph, that says, "An expert retained to**

13 **measure damages must, therefore, understand and be**

14 **prepared to explain the following," and then it has five**

15 **bullet points:  "The defendant's wrongful conduct."  The**

16 **second bullet point, "How the plaintiff alleges the**

17 **defendant's wrongful conduct caused damages to the**

18 **plaintiff, and how the defendant alleges that it did not**

19 **cause damages."  Next bullet point, "The logic that**

20 **connects the defendant's alleged wrongful conduct and the**

21 **plaintiff's damages."  Next bullet point, "Other factors**

22 **that could have caused or exacerbated the plaintiff's**

23 **damages."  And last bullet point, "Whether the**

24 **plaintiff's damage were reasonably expected to result**

25 **from the defendant's alleged wrongful conduct."**

```
 1              Do you agree with that statement?
 2       A.    I generally do.
 3              MR. STULTZ:  Hold on a second, Carl.
 4              I am going to make my same objection on the
 5    context of this paragraph.
 6              Go ahead.
 7              THE WITNESS:  I generally agree with that
 8    statement, and I think we have discussed all of those
 9    factors today.
10    BY MR. GILSON:
11       Q.    Do you agree that you did not consider
12    alternative causes of damages, in terms of the
13    defendants' positions with respect to causation, in this
14    case?
15       A.    No, I don't think I would agree with that.
16       Q.    Let me rephrase the question.  Isn't it true
17    that you only considered the causation allegations that
18    the plaintiff has made in this case, and you did not
19    consider alternative causation possibilities in rendering
20    your report?
21       A.    I did not come across, in my analysis,
22    significant alternative causal factors that would have
23    led me to believe that there is some significant
24    alternate cause for what occurred.
25              What occurred is defendants left, and there
```

1   was a mass departure from those branches and that's the

2   allegation.  And I will point back to the book that we

3   were just looking at.  The last bullet point is whether

4   plaintiff's damages were reasonably expected to result

5   from defendants' alleged wrongful conduct.

6           It doesn't say that were absolutely 100

7   percent, you know, no matter what else expected to result

8   from defendants' alleged wrongful conduct.  I think in

9   this case, we can say that plaintiff's damages were

10  reasonably expected to result from the alleged wrongful

11  conduct of defendants, which is, that there was

12  solicitation of employees and a mass departure from those

13  branches and termination of the operations of those

14  branches.

15          Q.   But you assume the causation.  Right?  You

16  have already -- as you have testified multiple times

17  today, you assumed the causation allegation that the

18  plaintiff has made?

19          A.   I assume the causation, and I will also say

20  that I have not seen significant evidence that would

21  refute that argument of causation.  And that is in

22  published literature the responsibility of the expert.

23  An expert can assume causation as long as they are not

24  ignoring substantial contrary evidence.  And I am not,

25  and I don't see any.

 1        Q.   What other factors of causation did you

 2   identify in your report to demonstrate that you

 3   considered other factors that could have caused the

 4   damages?  Can you point to any other factors?  I mean,

 5   the bullet point right above this, what other factors

 6   could have caused the damages that you considered and

 7   analyzed and set forth in your report?

 8        A.   Well, but that's precisely the point.  I

 9   don't see significant other factors that came up in my

10   analysis.  Had I seen them, I would have considered them,

11   and I would have addressed them.

12        Q.   How do we know that you even considered them

13   if you didn't put them in your report?

14        A.   Because I analyzed the financial statements

15   and alligations.  What I see is a complete termination of

16   the business in those three branches in a timeline that

17   coincided with the mass departure of the loan officers

18   and support staff in those three branches, which

19   coincides with the departure of the defendants.

20             So the evidence I am seeing is that is the

21   primary causal factor.

22        Q.   But you didn't look at any other evidence.

23   You didn't --

24             (Technical difficulties.)

25   BY MR. GILSON:

1          Q.   My question is:  You did not even consider

2     any other testimony or other evidence other than the

3     plaintiff's alleged causation evidence, so how can you

4     say that you didn't think that it was material if you

5     weren't even aware of it?

6               MR. STULTZ:  Objection; argumentative.

7               THE WITNESS:  You keep referring to other

8     factors that may have caused this, but you haven't -- you

9     haven't articulated to me what those factors are.  They

10    are just these vague, maybe, other factors.

11              I am saying, I don't see any.  If there are

12    specific ones that you want to raise, I am happy to talk

13    about them.

14    BY MR. GILSON:

15         Q.   Are you aware of any other factors that may

16    have contributed to the causation of the damages that you

17    opine occurred here?

18         A.   Well, you've raised the issues of employee

19    morale, and you have raised the issue of the announcement

20    of the merger with -- between Graystone and Network

21    Funding on April 10th of 2019.

22              Are those the other factors that you are

23    asking me about?

24         Q.   Well, it would be some of them.  And you

25    didn't identify that you considered those in your report.

1  Correct?  We have already established that.  You didn't

2  consider and analyze those in your report?

3        A.    No, because --

4              MR. STULTZ:  Objection; misstates prior

5  testimony.

6              Go ahead.

7              THE WITNESS:  I have attempted to explain in

8  regards to the announcement of the merger that it was

9  preceded by defendants' actions, and that that doesn't

10  constitute evidence that that's another significant

11  causal factor in what occurred.

12  BY MR. GILSON:

13        Q.    Let me ask you about some other facts to see

14  if you can tell me where in your report you may have

15  considered these facts.

16              The April 10th meeting, the announcement that

17  was made, did you consider what impact that that

18  announcement had on other employees choosing to leave and

19  join Network Funding, the announcement that Mr. Myers

20  made on April 10th?

21              I think you already testified to that, that

22  you didn't analyze that in your report.  Correct?  You

23  didn't even mention that in the report?

24        A.    I didn't mention it in my --

25              MR. STULTZ:  Objection; misstates testimony.

 1              Go ahead.

 2              THE WITNESS:  I didn't mention it in any

 3    report, but I was aware of it when I was preparing my

 4    report.

 5    BY MR. GILSON:

 6         Q.   **Did you take into account that many Graystone**

 7    **employees were generally unaware of Network Funding**

 8    **before Mr. Myers made that announcement on April 10th?**

 9              MR. STULTZ:  Objection; mischaracterizes the

10    evidence, assumes facts not in evidence.

11              Go ahead.

12              THE WITNESS:  I don't know that to be the

13    case, because the allegations are that possibly

14    Mr. Gautreau and Ms. North spoke to other employees about

15    Network Funding prior to submitting their resignation.

16    So I don't know what you are telling me to be consistent

17    with the allegations that are being made by plaintiff.

18    BY MR. GILSON:

19         Q.   **Okay.  Are you aware that Graystone worked in**

20    **concert with Network Funding and had a hands-on-deck**

21    **approach with the direction of Mr. Myers to give support**

22    **where it needed, to make the combination with Network**

23    **Funding as seamless and as painless as possible for**

24    **everyone and to answer all questions?  Were you aware of**

25    **that?**

1          MR. STULTZ:  Objection; mischaracterizes the

2    evidence, assumes facts not in evidence.

3          Go ahead.

4          THE WITNESS:  I'm aware that Mr. Myers was

5    making a good faith attempt to consummate the merger

6    between Graystone and Network Funding on or about April

7    10th, after defendants had submitted their resignations,

8    which had impacted Mr. Myers' view of the situation of

9    what could reasonably be done under the circumstances.

10   BY MR. GILSON:

11         Q.   Did you undergo any analysis of the effect of

12   efforts by Mr. Myers and others, that Graystone -- to

13   turn over their information and to cooperate with the

14   transitioning of employees to Network Funding on the

15   damages that are alleged in this case?

16         MR. STULTZ:  Objection; vague,

17   mischaracterizes the evidence, assumes facts not in

18   evidence.

19         Go ahead.

20   BY MR. GILSON:

21         Q.   It's not in your report.  Would you agree

22   that that analysis is not in your report?

23         A.   That analysis is not in my report, and it's

24   also, again, not what I was tasked to do.  It's not

25   consistent with plaintiff's allegations.

1          Q.   Okay.  And would you also agree that it's not

2   consistent with plaintiff's allegation that Mr. Myers

3   authorized and facilitated the transfer of Graystone's

4   intellectual technology information to Network Funding?

5               MR. STULTZ:  Objection; mischaracterizes the

6   evidence, assumes facts not in evidence.

7               Go ahead.

8               THE WITNESS:  I don't know, one way or

9   another, whether he authorized the transfer of that

10  information or not.  What I know is that there is a claim

11  by defendants that there was a misappropriation of

12  information that Graystone held.

13  BY MR. GILSON:

14         Q.   You mean an allegation by the plaintiff?

15         A.   Yes.  Did I say something different?

16         Q.   You said, "an allegation by the defendants."

17         A.   I apologize, my mistake.

18         Q.   So --

19         A.   I meant "plaintiff."

20         Q.   Right.  So you did not consider any

21  authorization by Graystone, including Mr. Myers -- that

22  it authorized and facilitated the transfer of that

23  information of Graystone's intellectual technology

24  information to Network Funding; is that correct?

25              MR. STULTZ:  Objection; assumes facts not in

 1  evidence, mischaracterizes evidence.

 2          Go ahead.

 3          THE WITNESS:  Can you clarify what you mean

 4  by "intellectual technology"?  Because that seems very

 5  vague to me.

 6  BY MR. GILSON:

 7      Q.    Information technology, IT information,

 8  including branch financial information.  That is what I

 9  mean by that.

10          MR. STULTZ:  Objection.  Same objection that

11  I just made.

12          Go ahead.

13          THE WITNESS:  It's my understanding that

14  there was a sharing of financial information that

15  occurred around the time period that Mr. Myers is making

16  a good faith attempt to merge with Network Funding.

17  BY MR. GILSON:

18      Q.    And you did not account for that as an

19  alternative factor in causing the -- that has been

20  alleged in this case; is that correct?  You did not

21  account for that in your report as an alternative factor

22  that caused or made plaintiff's damages less?

23      A.    Let me try to follow your question.  Are you

24  saying I did not account for how the sharing of Graystone

25  financial information with Network Funding would impact

1  defendants' actions in causing an alleged mass departure

2  from the three branches?

3          **Q.    Yes, that this factor that the plaintiff**

4  **itself, Graystone itself, helped facilitate the transfer**

5  **of this information, how that impacted your damage**

6  **analysis?  You did not account for that in your report?**

7              MR. STULTZ:  Objection; mischaracterizes the

8  evidence, assumes facts not in evidence.

9              Go ahead.

10             THE WITNESS:  I did not assume that the

11  sharing of Graystone financial information with Network

12  Funding was a causal factor or a significant causal

13  factor in defendants' wrongdoing.  I agree with that.

14  BY MR. GILSON:

15         **Q.    Do you also agree that you did not consider**

16  **whether or not Mr. Myers had authorized and facilitated**

17  **the transfer of information regarding Graystone's lease**

18  **agreements as a causal factor in your analysis?**

19         A.    I was aware that when I prepared this report,

20  that there was an ongoing negotiation and intent for

21  Network Funding to take over the leases in those three

22  locations, even after the merger was no longer going to

23  occur.  I was aware of that.

24             But in regards to damages from excess lease

25  expense, what I'm quantifying is the lease expense that

1  Graystone incurred after May of 2019, that they were not

2  able to mitigate through a sublease and locating a new

3  tenant.  So I don't really see how that has bearing on

4  those damages calculations.

5          Q.   That really wasn't my question, and maybe my

6  question wasn't clear.  I am talking about not the

7  negotiation of a sublease, but that Mr. Myers had

8  authorized Graystone to share the details of its lease

9  arrangements with Network Funding, that that was

10  confidential information that Graystone itself

11  voluntarily shared with Network Funding.  Did you take

12  that into account in your report?

13          A.   I just -- no, because I don't see how that is

14  relevant to the lost business value associated with those

15  three branches.

16          Q.   Did you take into account, in your report

17  anywhere, that Network Funding had offered to enter into

18  a sublease for those three branches, and that Graystone

19  had rejected that sublease option?

20              MR. STULTZ:  Objection; mischaracterizes the

21  evidence.

22              Go ahead.

23              THE WITNESS:  It is my understanding that

24  Graystone rejected those sublease agreements due to the

25  proposed terms around liability claims, so they had a

1  reason why they rejected those claims.  Given that

2  reason, they still suffered an economic loss from having

3  to pay lease expense for a certain period of time, that

4  they couldn't mitigate with a tenant that would sublet

5  those premises under terms that were acceptable to

6  Graystone.

7  BY MR. GILSON:

8      **Q.   Did you consider as a causal factor that both**

9  **Mr. Myers and Wendy Carter, who is Graystone's other**

10 **owner and vice president, that they had given loan**

11 **officers permission to download their customer databases**

12 **and take them to Network Funding?**

13         MR. STULTZ:  Objection; mischaracterizes the

14 evidence.

15         THE WITNESS:  No, because that would be

16 diametrically opposed to the plaintiff's claims that

17 there was a misappropriation of that information.

18 BY MR. GILSON:

19     **Q.   Is that news to you, that Mr. Myers and Wendy**

20 **Carter had to give permission to loan officers to**

21 **download their customer databases?  Is that news to you?**

22         MR. STULTZ:  Objection; mischaracterizes the

23 evidence again.

24         Go ahead.

25         THE WITNESS:  I don't know if that is news to

```
 1   me.  I may have heard that.  I think it depends on the
 2   circumstances.  I think it matters as to whether we're
 3   talking about a time period where there was still an
 4   intent to merge with Network Funding or a time period
 5   when the decision to merge was off because the terms were
 6   not acceptable.
 7   BY MR. GILSON:
 8        Q.   But prior to the letter from Mr. Stultz to
 9   Network Funding demanding the return of that information,
10   were you aware, prior to that time, that Mr. Myers and
11   Ms. Carter had authorized loan officers to download their
12   customer information and take it with them to Network
13   Funding?
14              MR. STULTZ:  Objection; again --
15              THE WITNESS:  Not explicitly.
16              MR. STULTZ:  Hold on a second.
17              Objection; mischaracterizes the evidence.
18              Go ahead.
19              THE WITNESS:  I was not explicitly aware of
20   that.
21   BY MR. GILSON:
22        Q.   Were you aware or did you take into account
23   that Graystone had never negotiated or required a
24   confidentiality or nondisclosure agreement with Network
25   Funding in connection with plans to combine with Network
```

1  Funding?  Were you aware of that?

2      A.   Just as a point of clarification so I can

3  answer your question.  In which time frame?

4      Q.   At any time.

5      A.   No, I was not aware of that.  Not explicitly,

6  no.

7      Q.   Did you have an assumption that there was a

8  nondisclosure or confidentiality agreement between

9  Network Funding and Graystone?

10     A.   No, I did not make an assumption, one way or

11 the other, about that because that relates to a merger

12 that didn't happen, and it doesn't relate to alleged acts

13 by defendants that caused a loss of the business

14 operations and the three branches in question.

15     Q.   Did you consider any evidence as to whether

16 or not Graystone failed to take reasonable steps to

17 preserve the confidentiality of its alleged trade secrets

18 in this matter as a factor in challenging the damages

19 that are alleged as a -- in the damages for the

20 misappropriation of trade secrets in this case?

21     A.   It's my understanding that, for example, the

22 Surefire downloads that we talked about earlier on April

23 23rd was not something that Graystone volunteered.  That

24 is something that those employees engaged in.

25     Q.   Did you take into account the factor that at

1  **no point in time, before May 20th, that Mr. Myers or any**

2  **other Graystone officer instructed loan officers that**

3  **they could not take their customer database to Network**

4  **Funding?**

5           MR. STULTZ:  Objection; mischaracterizes the

6  evidence, assumes facts not in evidence.

7           Go ahead.

8           THE WITNESS:  There are allegations of

9  misappropriation of confidential information that was

10  held by Graystone, that those allegations implicitly

11  assume that Graystone did not volunteer that information

12  willingly, that it was misappropriated.  That's the

13  assumption I'm making.

14  BY MR. GILSON:

15      **Q.  Are you aware or did you consider the factor**

16  **that Graystone offered to sell its customer database**

17  **to -- that contained contact information and customer**

18  **information to Network Funding for $75,000?**

19      A.   I am aware of that, yes, and I was aware of

20  that when I prepared my report.

21      **Q.   Where is that in your report?**

22      A.   It is not my estimate of the economic harm

23  associated with the misappropriation.  I don't know why

24  it would be in my report.

25      **Q.   Well, to show that you considered it and**

1    **rejected it, might be one reason.  To show that you went**

2    **through the steps that -- for causation.  That is why I**

3    **am asking if you put it in your report so that the reader**

4    **would know that you considered it.**

5              A.   I don't -- okay.  So first of all, I don't

6    see that as an issue that relates to causation.  I see

7    that as potential evidence of value.  And the reason I

8    have come up with a different and higher estimate of

9    value associated with misappropriation is because I am

10   looking at the economic loss, that is the lost profits,

11   that Graystone suffered as a result of that

12   misappropriation, rather than, you know, what they could

13   have sold that database for, under duress.

14             **Q.   So it's an alternative of value that you**

15   **don't mention.  Correct?**

16             A.   It's a data point that I don't think is

17   relevant to determining lost profits associated with

18   misappropriation.

19             **Q.   Did you put in your report why that is not**

20   **relevant?  You don't, do you?  You don't mention that in**

21   **your report?**

22             MR. STULTZ:  Could you repeat the question?

23   You're breaking up, Jim.

24   BY MR. GILSON:

25             **Q.   Isn't it true that you do not identify in**

1    **your report anything to do with the $75,000 offer that**

2    **Graystone -- the value that they placed on that database**

3    **in your report?**

4              MR. STULTZ:  Objection; mischaracterizes the

5    evidence.

6              But go ahead.

7              THE WITNESS:  I agree that I have not

8    explicitly mentioned this in my report.  My report is

9    over 100 pages long.  It has considered a lot of

10   information.  It has performed a lot of analysis.  It

11   does not purport to be an exhaustive study of every

12   possible factor and consideration that would have any

13   kind of bearing on the sequence of events that occurred.

14             It's a reasonable estimation of the economic

15   damages suffered by plaintiffs if they prevail on

16   liability and causation.

17   BY MR. GILSON:

18        Q.   **I appreciate that your report is long, and**

19   **that it does not identify every possible causation.**

20             **Can you identify anywhere in your report**

21   **where you identify alternative possible causes of -- or**

22   **factors of causation for damages, or would it be more**

23   **accurate to say that you simply chose to assume the**

24   **causal factors of plaintiff's as set forth in their**

25   **complaint, and you did not address alternative causes in**

Carl Saba
April 09, 2021                                                                Page 137

1  your report?

2         A.   I think the most accurate characterization is

3  that I assumed causation as alleged in plaintiff's

4  complaint.  I conducted some analysis related to

5  causation, which established some correlation and

6  causation evidence.

7              And in reviewing facts and circumstances in

8  all of the documents I received, I did not see

9  significant evidence of alternative causes, which if I

10 had seen such evidence, I would have addressed it.

11        Q.   Would you agree that you did not address any

12 alternative causation factors in your report?

13             MR. STULTZ:  Objection; asked and answered.

14             THE WITNESS:  I disagree with how you are

15 framing your question, because your question implies that

16 I completely ignored the possibility of other causes.

17 And what I am saying is in the totality of the hundreds

18 of documents that I reviewed, I did not see evidence of

19 significant alternative causes, and what I am seeing

20 appears to be consistent with the claims that are being

21 asserted in the complaint and the causal factors that are

22 being asserted in the complaint.

23 BY MR. GILSON:

24        Q.   Can you identify anywhere in your volumus

25 report where you considered alternative causation

1  factors?

2          MR. STULTZ:  Objection; asked and answered.

3          Go ahead.

4          THE WITNESS:  I don't think I have a response

5  for you beyond what I just relayed to you.

6  BY MR. GILSON:

7      Q.   That is a "yes" or "no."

8      A.   There is not a section in my report that does

9  a "what if" scenario of all sorts of alternative causal

10  factors, but I didn't see evidence of that either.

11     Q.   Well, that's because it's possible that that

12  evidence would have been found in the depositions that

13  you didn't look at.  Isn't it possible that other

14  intervening factors could have been contained in the

15  depositions and the exhibits to those depositions that

16  you never looked at?

17          MR. STULTZ:  Objection; argumentative.

18          Go ahead.

19          THE WITNESS:  It's possible that -- it's

20  always possible that there are other factors there.  It

21  is also possible that defendants have a different

22  interpretation of what occurred from plaintiff, and I

23  think going back to where we were at the beginning of my

24  deposition, I am not going to be able to reflect damages

25  claims by plaintiff by taking defendants' interpretation

1  of facts or circumstances that contradict plaintiff's

2  interpretation.

3  BY MR. GILSON:

4      **Q.   Well, I guess my question is simple.  How can**

5  **you consider alternative causation if you don't even open**

6  **your eyes to what those theories might be by reading**

7  **deposition transcripts of the defendants?**

8           MR. STULTZ:  Objection; argumentative.

9           Go ahead.

10 BY MR. GILSON:

11     **Q.   Do you have an answer?**

12     A.   Well, I mean, I think your question is, you

13 know, defendants may be asserting alternative causal

14 factors than plaintiffs, and I acknowledge that that is

15 certainly possible.

16          But I go back to:  I am not going to be able

17 to quantify damages arising out of plaintiff's claims by

18 taking defendants' contradicting interpretation of causal

19 factors.

20     **Q.   I am not just talking about contrary**

21 **interpretations.  I am talking about facts.**

22          MR. STULTZ:  Objection; mischaracterizes the

23 evidence.

24          Go ahead.

25 BY MR. GILSON:

1        Q.    Is what you're assuming is that all the other

2    deposition testimony, besides the two depositions that

3    you read, consisted merely of interpretations of the

4    facts that Mr. Myers and Mr. Stooksbury had alleged?  You

5    are assuming that; is that a fair characterization of

6    what you just said?

7        A.    Well, again, I'm -- to the extent that what

8    Mr. Myers and what Mr. Stooksbury are asserting is

9    consistent with what is in the complaint, then yes.  I'm

10   assuming that the claims made in the complaint regarding

11   wrongful conduct by defendants will prevail, and that

12   causation will be demonstrated.  And assuming that, I'm

13   calculating the damages to plaintiff.

14       Q.    And so you don't think it's your obligation

15   to consider evidence that would challenge the causation

16   that's alleged by the plaintiff?  That was not part of

17   what you were doing in your report.

18            You were just assuming at face value the

19   plaintiff's evidence of causation, and you were not going

20   to concern yourself with alternative or different factors

21   of causation that may be found in deposition transcripts,

22   deposition exhibits, and in answers to the complaints,

23   counterclaims, etc.; is that fair?

24       A.    No, I disagree with your statement.  I will

25   reiterate what I said.  I'm assuming plaintiff's claims

1 regarding causation and liability. However, in reviewing

2 all of the information that I reviewed, including all of

3 the documents cited on Exhibit K, I did keep an eye out

4 as to whether there was contradictory evidence.

5          So I will give you an example. If defendants

6 are -- excuse me, if plaintiff is claiming that

7 defendants' actions substantially damaged those three

8 branches, and I look at the financial statements, and I

9 don't see clear evidence of revenue loss, that would have

10 been a factor that would have indicated to me that

11 there's contradictory evidence as to plaintiff's claims.

12          But that is not what I saw. What I saw is a

13 near complete evisceration of those three business units

14 in short proximity to the time in which defendants

15 departed, and in which, substantially, all of the other

16 employees departed between the months of April and May of

17 2019.

18          And there is significant literature out there

19 regarding the role of an expert, which I would be happy

20 to share, that says that experts -- damages experts often

21 assume causation, as long as it -- and that is acceptable

22 to the courts, as long as they don't ignore evidence that

23 directly contradicts the assertion of causation.

24          It doesn't mean that they should adopt the

25 opposing party's contradicting interpretation of disputed

1   facts.

2          Q.   How do you -- available contradictory

3   evidence without reading the defendants' deposition or

4   the other plaintiff depositions?  I mean, didn't you, in

5   effect, ignore that contradictory evidence by not even

6   reading those depositions and those --

7              MR. STULTZ:  Objection; argumentative.

8              Go ahead.

9              THE WITNESS:  I don't think so, but...

10  BY MR. GILSON:

11         Q.   Okay.  Did you assume in your damage analysis

12  that Graystone could never recover any of its alleged

13  lost income from those three branches?

14         A.   I assumed that there was a piece of that

15  income in those three branches that Graystone had

16  retained, and that the rest of that income was

17  permanently lost.

18         Q.   Did you assume Graystone's alleged diminution

19  value would last forever?

20         A.   If by "last forever," you mean that there

21  would be a permanent difference between the economic

22  returns of those branches in the "but for" scenario and

23  the actual scenario, yes.

24         Q.   Did you assume that Graystone would not be

25  able to hire new loan officers to replace those that

1  chose to leave?

2        A.    No, that's not what I assumed.   What I

3  assumed was that there was a substantial loss of the base

4  of business that was associated with those three

5  branches, because subsequent to May, those three branches

6  were, essentially, shut down, eventually the leases were

7  sublet or terminated, and Graystone no longer operated

8  those branches.

9            And growth that occurred within Graystone

10  occurred in other branches with loan officers that

11  stayed, that were not affiliated with those branches,

12  primarily with borrowers that had no affiliation to those

13  branches, in locations that were not those branches.   So

14  that is -- that is growth that, as far as I can tell,

15  would have occurred anyway.

16        Q.    You don't know, though, if that --

17        A.    It's not a mitigation.

18        Q.    You don't know if that growth that occurred

19  in other branches occurred through using the referral

20  sources that was -- that Graystone still had in its

21  possession.  Correct?  You didn't --

22        A.    I don't know to what extent it -- that

23  business came from referral sources that Graystone still

24  had in its possession, but I think it's very debatable as

25  to whether that's a mitigation.  Those are relationships

1    that Graystone had that were not lost as a part of

2    defendants' actions.

3        **Q.    That is the point, isn't it?  That they would**

4    **be able to continue to mine those referral sources, and**

5    **those loan officers would be even busier because those**

6    **referral sources would be solely for those who remain**

7    **instead of having to split those referrals with the loan**

8    **officers who were in Sugar House or Cottonwood?**

9            MR. STULTZ:  I object as to vagueness on

10    "referral sources."

11            But go ahead.

12            THE WITNESS:  I think -- I think it's -- I

13    think it's very problematic to assume that the growth

14    that occurred in 2020 was some sort of shifting of

15    business from the three branches that were lost to other

16    parts of Graystone.  And I say that for several reasons.

17            First of all, Graystone was experiencing

18    growth leading up to this event.  So in the history of

19    Graystone, there was growth occurring across the company.

20    And so growth that occurs after this event is not -- is

21    not some sort of, necessarily, recovery from this event.

22    It's growth that was going to occur anyway.  Back in --

23    BY MR. GILSON:

24        **Q.    How do you know that?  Where is the analysis**

25    **of that in your report?**

1       A.   Well, I mean, the analysis is my review of

2  historical trends that were occurring in the business.  I

3  discussed that.  There's meaningful growth that was

4  occurring in Graystone leading up to this event.  This

5  was a growing business.  It was not a static business.

6       **Q.   In the years before this event, the numbers**

7  **were not looking good.  It looked as though the year**

8  **after they had better income than the year before.  So I**

9  **don't quite understand your statement, but let me ask**

10 **another question.**

11      **Did you assume that the loan officers who had**

12 **left Graystone would have not left but for the alleged**

13 **acts of the defendants?**

14      MR. STULTZ:  I am going to object as asked

15 and answered.

16      But go ahead.

17      THE WITNESS:  Yes, there is an assumption

18 that the departures that occurred relate to defendants'

19 actions as alleged in the complaint.

20 BY MR. GILSON:

21      **Q.   If one of the loan officers, a leading**

22 **officer in the Cottonwood branch, Cathy Castle, who was**

23 **responsible for over 25 percent of the loan revenue from**

24 **Cottonwood, was planning on leaving regardless -- she had**

25 **plans to leave Graystone regardless of whether or not**

Carl Saba
April 09, 2021                                                      Page 146

1    Cristie and Jason were going to leave, would that be a

2    factor in your damage analysis, had you taken that into

3    account?

4            MR. STULTZ:  Object that it mischaracterizes

5    the evidence and assumes facts not in evidence.

6            Go ahead.

7            THE WITNESS:  In your hypothetical, the

8    answer is yes, I think that would be relevant.

9    BY MR. GILSON:

10           Q.   And in my same hypothetical, if other loan

11   officers chose to follow Jason and Cristie and Cathy

12   Castle, to join another mortgage company without -- just

13   because they wanted to be together, would that be a

14   factor in determining the diminution of value analysis?

15           In other words, regardless of whether or not

16   there was any alleged improper solicitation, was that a

17   factor that you took into account in your analysis?  They

18   would have left anyway, in other words?

19           A.   Well, again, you're giving me a hypothetical

20   where just the two of them were going to leave, and I

21   assume you are asking me to also take into your

22   hypothetical that that departure doesn't involve any

23   wrongful acts; is that right?

24           Q.   Yes.

25           A.   That's -- I mean, that's potentially

1  relevant, but, again, that's not what's alleged.  What is

2  alleged is they did engage in wrongful acts, they did

3  engage in solicitation of employees, and that resulted

4  not just in the departure of the two of them, but,

5  substantially, all of the staffing in those three

6  branches.

7         Q.   That's the question that it goes to, when you

8  say "that resulted in."  If Jason and Cristie decided to

9  leave, didn't say a word to anyone before they quit, how

10  can you assume that it was their alleged wrongful

11  solicitation of those employees which was the cause of

12  those employees joining them?

13              In other words wouldn't those -- that

14  solicitation, that alleged solicitation, wasn't

15  necessarily the causal link to those employees choosing

16  to leave.  Did you consider that, that those employees

17  would have followed Jason and Cristie regardless of

18  whether they had been allegedly solicited prior to Jason

19  and Cristie notifying Graystone that they were

20  terminating their employment?

21         A.   I mean, you are asking me to contemplate a

22  "what if" scenario that didn't occur.  I mean, what I

23  see -- what I see leading up to May is consistent in

24  growing staffing in those three branch locations.  So I

25  don't see evidence that there was going to be some

1  departure or there was some departure that occurred, you

2  know, prior to May.

3         **Q.   Are you saying that Jason and Cristie**

4  **departing from Graystone, that they were dissatisfied and**

5  **they were planning on leaving Graystone?**

6              MR. STULTZ:  There is a lot of echoing.  Did

7  you get it?

8              I need to have it repeated.

9              (The requested portion was read back.)

10             THE WITNESS:  I am aware that they were

11 having conversations as alleged by -- with Network

12 Funding, going back, I think, a number of months.  So

13 that would seem to be consistent with what you might be

14 saying.

15 BY MR. GILSON:

16        **Q.   So let me ask this question.  Assume Jason**

17 **and Cristie are going to -- they wanted to quit**

18 **Graystone, and they did quit Graystone in April of 2019,**

19 **and assume that -- does your damage analysis assume to**

20 **the contrary, that they would have stayed -- does it**

21 **assume that they would have stayed working for Graystone,**

22 **Jason and Cristie?**

23        A.   My "but for" scenario doesn't explicitly

24 assume that Jason and Cristie would have stayed at

25 Graystone and continued to work, you know, at the

1   Cottonwood branch.  What it assumes is that there would

2   not have been a mass departure of employees such that

3   there, basically, was no business unit left in those

4   three branches.

5        **Q.   So if Jason and Cristie left on their own**

6   **accord and people in the other branches choose to follow**

7   **them on their own accord, regardless of whether there was**

8   **any solicitation or not, that was not a factor that you**

9   **considered in terms of determining that the solicitation**

10  **was the causal factor in those other employees leaving?**

11            MR. STULTZ:  Objection, it has been asked and

12  answered many times, I believe.

13            Go ahead.

14            THE WITNESS:  If Mr. Gautreau and Ms. North

15  left, in a hypothetical, and in the same hypothetical,

16  employees decided to follow them such that there were no

17  employees left in any of the branches -- of three

18  branches, and in the same hypothetical, neither Ms. North

19  nor Mr. Gautreau nor any of those employees engage in any

20  sort of wrongful conduct, then it's very simple:

21  Plaintiff will not prevail on their liability and

22  causation claim, and we are back to what we talked about,

23  which is then my damages analysis is not relevant.

24            So I just don't see the point of integrating

25  that into my damage analysis.

1   BY MR. GILSON:

2        Q.   I guess my point is -- and maybe I'm not

3   asking the question correctly, and I apologize I am not

4   being artful in it.  But what analysis, if any, did you

5   make in determining that the alleged improper

6   solicitation was the cause of those employees choosing to

7   follow Jason and Cristie to Network Funding, as opposed

8   to a reason that they would have -- they would have gone

9   regardless of whether they had been solicited to Jason

10  and Cristie.  They would have followed them anyway, just

11  like what had happened when they left Security National

12  to join Graystone several years before.

13            How do you know that the solicitation was the

14  causal link to them choosing to follow Jason and Cristie

15  to Network Funding as opposed to their association, their

16  friendship, their working relationship as being the cause

17  of them leaving?

18            MR. STULTZ:  I am going to object.  Compound,

19  asked and answered, mischaracterizes the evidence,

20  assumes facts not in evidence.

21            Go ahead.

22            THE WITNESS:  Again, I am making an

23  assumption regarding that claim of causation, and I don't

24  think -- again, looking at the claims in this case, it

25  doesn't appear that solicitation is the only one.  There

1  is -- there are claims related to breaches of fiduciary

2  duty and duty of loyalty by Ms. North and Mr. Gautreau

3  while they were still employed.

4          So we could have, I suppose, a hypothetical

5  where they have engaged in those breaches but have not

6  engaged in any solicitation.  And they leave after having

7  engaged in those breaches, and employees decide to follow

8  them, because as you are saying in your hypothetical,

9  they are relationships, and they would have still

10 engaged, I believe, in a wrongful act under the law.

11         So I don't --

12 BY MR. GILSON:

13     Q.  **Don't you have to tie wrongful acts to the**

14 **damages?  Don't you have to connect or show the causal**

15 **link that the wrongful act is what caused the damage?**

16         MR. STULTZ:  Objection; asked and answered.

17 BY MR. GILSON:

18     Q.  **You didn't do that.  Right?  You didn't draw**

19 **the causal link between the bad acts in the damages in**

20 **your report.  You assumed causation.  You're assuming**

21 **that someone else on behalf of the plaintiff will**

22 **establish that causal link; is that fair?**

23         MR. STULTZ:  Objection; asked and answered.

24         THE WITNESS:  I am assuming causation, but I

25 am also looking at the information that is in front of me

Carl Saba
April 09, 2021

Page 163

1  **would have stayed at Graystone.  Right?**

2            MR. STULTZ:  Objection; asked and answered.

3            THE WITNESS:  Again, no, not explicitly,

4  because there was a certain level of turnover that was

5  occurring across Graystone's branches, including those

6  three branches.  However, despite the turnover, there was

7  a stable to rising level of staffing.

8            So I am not making explicit assumptions about

9  explicit individuals and whether they are staying or

10 leaving.  I am making a broader assumption that what I

11 saw for several years leading up to May of 2019, in terms

12 of stable to rising staffing, would have continued but

13 for defendants' actions.

14           So one scenario is Ms. North and Mr. Gautreau

15 leave, don't commit any wrongful acts, and they're

16 replaced by other individuals.  But that's a different

17 scenario than a mass departure where, substantially,

18 everybody leaves at once.

19 BY MR. GILSON:

20      **Q.   But you didn't factor that in about what**

21 **would have happened had they left and had there been no**

22 **allegations of wrongful acts, at least, there would have**

23 **been -- whether or not there would have been a departure,**

24 **a mass departure.  You didn't engage in that kind of**

25 **causation analysis.  Correct?**

1      A.    No, I didn't.  I -- as I stated, I assumed in

2  my "but for" scenario that levels of staffing would have

3  remained stable.  That doesn't mean that I assumed there

4  is no turnover or no specific individuals leave.  I just

5  assumed that you don't go from, you know, 30, 40 people

6  to zero in a two-month period.

7      **Q.    In your damage analysis, did you assume that**

8  **all of Graystone's goodwill is institutional?**

9      A.    I think if by "goodwill," we mean "intangible

10 value," I assumed that a meaningful portion was

11 institutional.  As to whether I assumed all of it, 100

12 percent of it is institutional, not necessarily.

13     **Q.    What portion did you assume was**

14 **institutional, and what portion did you assume resided**

15 **with the loan officers?**

16     A.    I didn't conduct an analysis to try to

17 separate goodwill.  I conducted an analysis that looked

18 at a measure of damages, the difference between a "but

19 for" scenario and what actually happened.

20          In the "but for" scenario, there is

21 intangible value that would have been there from the

22 going concern operations of the business that isn't there

23 in the actual scenario of what happened.

24          And the reason I say it doesn't assume 100

25 percent is -- institutional is in the "but for" scenario,

1  again, you can have a scenario where Ms. North and

2  Mr. Gautreau leave, and they take some business with

3  them, and they don't commence anything -- you know, any

4  kind of wrongful act, and you can call that personal

5  goodwill, but they are replaced by other individuals and

6  the branches continue with the stable level of business.

7          So that's an example where, in my "but for"

8  scenario, there are two individuals who leave and take

9  some personal goodwill, and yet Graystone doesn't suffer

10  the type of economic harm that that occurred here.

11      **Q.   Did you evaluate the amount of goodwill that**

12  **resided in Jason and Cristie?  And in terms of goodwill,**

13  **I mean those intangible values of their contacts, not**

14  **only with customers but with referral sources and with**

15  **other loan officers within Graystone, their personal**

16  **connections and relationships.  Did you evaluate that in**

17  **your damage analysis?**

18      A.   No.  My assignment wasn't to quantify the

19  personal goodwill of Ms. North and Mr. Gautreau.  My

20  assignment was to determine the damages that Graystone

21  suffered as a result of defendants actions.

22      **Q.   Well, assuming that Jason and Cristie were**

23  **going to be leaving regardless, and if they had a lot of**

24  **goodwill in terms of their relationships with customers**

25  **and loan officers and referral sources, and they would be**

1    **leaving regardless, is that not a factor that you took**

2    **into account in calculating the diminution in value of**

3    **the business?**

4                MR. STULTZ:  Objection; asked and answered.

5                THE WITNESS:  It is a factor that I

6    implicitly took into account, not explicitly.  Meaning,

7    again -- I will restate what I said earlier.  When I

8    prepared my "but for" scenario, it wasn't based on

9    specific individuals filling specific employment

10   positions in these three branches, including Ms. North

11   and Mr. Gautreau.

12               It was based on an assumed level of

13   relatively stable staffing with normal turnover.  And if

14   it was just Ms. North and Mr. Gautreau who had left, that

15   would have fallen much more in line with normal turnover

16   for those branches.

17   BY MR. GILSON:

18        **Q.   How do you know that?  Because Ms. North and**

19   **Mr. Gautreau were not normal employees.  She was the**

20   **branch manager, and he was working with her as the**

21   **production manager.**

22               **So are you considering them just like a**

23   **normal loan officer of standard attrition; is that what**

24   **you are saying?**

25        A.   That is not what I am saying.  What I am

1  saying is the impact to a business from having two

2  individuals leave, and what is a viable decision by

3  management after that departure, is quite different when

4  you have two individuals that leave, even if they are in

5  a senior position, as was the case here, then when you

6  have, substantially, all of the staffing leave, including

7  in one of -- in, essentially, your biggest branch.

8         **Q.   Well in that "but for" world, wouldn't you**

9  **have to assume that Cathy Castle was going to leave**

10 **regardless, and that Jason and Cristie were going to**

11 **leave, and that's not standard attrition.  Right?  And**

12 **did you quantify that or try to account for that at all**

13 **in your analysis?**

14         MR. STULTZ:  Object; mischaracterizes the

15 evidence, assumes facts not in evidence, asked and

16 answered.

17         Go ahead.

18         THE WITNESS:  No, I didn't because in my

19 opinion, your hypothetical assumes a sequence of events

20 that there's no clear evidence for, and it makes a series

21 of assumptions upon assumptions of what would have

22 happened.

23 BY MR. GILSON:

24         **Q.   Because you didn't even know who Cathy Castle**

25 **was.  Right?**

Carl Saba
April 09, 2021                                                                Page 168

1      A.   Now that you've mentioned her, I did.  I had

2   just forgotten.  She is a significant producer in that

3   branch.  It is not the first time I have come across her

4   name, today in this in this deposition.

5      **Q.   Where in the past four years of Graystone has**

6   **two individuals -- or three individuals, of Jason and**

7   **Cristie and Cathy Castle's stature, left Graystone that**

8   **would be fair to say that that would be standard**

9   **attrition?**

10     A.   I don't know.  I didn't -- I have information

11  related to staffing levels, and how many people were

12  hired, and how many people left and I see that there is

13  turnover that occurred in those branches.

14          As to what each of those individuals did

15  financially, I didn't get down to that granular type of

16  analysis.  I was valuing a business, not contributions of

17  specific individuals.

18     **Q.   Well, are you aware of the sale of Graystone**

19  **to Evergreen Mortgage?  Are you aware of that failed**

20  **transaction that occurred in November or December of**

21  **2018?**

22     A.   Yes, I am aware of that.  I am also aware of

23  negotiations with Eli Global.  I'm aware of -- my

24  understanding that Graystone was being contacted on a

25  regular basis by other industry participants to gauge

1   interest in selling to those industry participants.

2       Q.   And are you aware of the reason why Evergreen

3   decided not to go through with a purchase of Graystone?

4       A.   No, I don't specifically recall at this

5   point.

6       Q.   Do you know why the president of Evergreen

7   wanted to meet with Jason and Cristie before he made a

8   decision to purchase Graystone?

9            MR. STULTZ:  Objection; mischaracterizes the

10  evidence.

11           Go ahead.

12           THE WITNESS:  No, I don't.

13  BY MR. GILSON:

14      Q.   Do you believe that Jason and Cristie were

15  key employees of Graystone as it relates especially to

16  the Cottonwood branch?

17      A.   Let me just back up to your prior question.

18  I actually think I do know something about that, now that

19  I recall it.  I believe there -- I came across some

20  discussion that Ms. North and Mr. Gautreau were unhappy

21  about the timing of communication to them regarding

22  negotiations with Evergreen.

23      Q.   Evergreen's president was not interested in

24  acquiring Graystone because he felt that Jason and

25  Cristie had too much control over the business in the

1  Cottonwood branch, and he was concerned that because they

2  didn't have a noncompete agreements, that that would be a

3  risky proposition to acquire Graystone without having

4  some assurance that Jason and Cristie would remain in

5  their employ?

6              MR. STULTZ:  Objection; assumes facts not in

7  evidence, mischaracterizes the evidence.

8              Go ahead.

9              THE WITNESS:  I am not aware of everything

10 that you just outlined.

11 BY MR. GILSON:

12     Q.   Are you aware of anything I outlined, that

13 one of the concerns or reasons why Evergreen backed out

14 of the deal was because of not having -- not being

15 convinced that Jason and Cristie would remain with the

16 company after that acquisition?

17             MR. STULTZ:  Objection; assumes facts not in

18 evidence, mischaracterizes the evidence.

19             Go ahead.

20             THE WITNESS:  Not explicitly, no.

21 BY MR. GILSON:

22     Q.   Do you agree that Jason and Cristie were key

23 employees of Graystone, and that they --

24     A.   I think I would agree that they were in

25 senior positions.  As I understand it, Mr. Gautreau was

1    the EVP, and Ms. North was a co-branch manager of

2    Cottonwood, along with Mr. Gautreau.

3            Q.   Do you have any understanding as to the

4    extent of the relationships that those individuals had

5    with other loan officers at the Cottonwood branch?

6            A.   Not beyond what I have come across, that, you

7    know, they had influence over those other employees,

8    particularly when they announce their resignation in

9    terms of encouraging them to follow along.

10           Q.   Do you know who Michael Sorenson or Tina

11   Hogan are?

12           A.   No.

13           Q.   So you don't know what their relationship is

14   at Graystone and whether they were key loan officers in

15   the work that -- in the amount of business that they

16   controlled?

17           A.   No, I don't.

18           Q.   How about Miriam Gioski [sic]?  Do you know

19   anything about her?

20           A.   No.

21           Q.   Did you have an understanding as to whether

22   or not Mr. Myers characterized Jason and Cristie as key

23   members of Graystone because of the loan volume that they

24   controlled?

25                MR. STULTZ:  Objection; mischaracterizes the

1  evidence, assumes facts not in evidence.

2             Go ahead.

3             THE WITNESS:  I don't -- I don't know how

4  Mr. Myers characterized Ms. North and Mr. Gautreau.  I

5  know that they were in a management position at

6  Graystone, and -- in regards to the Cottonwood branch,

7  and the Cottonwood branch was the largest and possibly

8  the most profitable.  But one of the more profitable

9  branches within Graystone.

10        **Q.   Were you advised by anyone on behalf of**

11 **Graystone that when Jason and Cristie came to Graystone,**

12 **back in approximately 2014, that they brought with them a**

13 **number of loan officers from their prior employer,**

14 **Security National?**

15        A.   I'm aware --

16             MR. STULTZ:  Objection; mischaracterizes the

17 evidence.

18             Go ahead.

19             THE WITNESS:  I'm aware that there were other

20 loan officers that joined.

21 BY MR. GILSON:

22        **Q.   Do you have any understanding as to whether**

23 **or not loan officers, such as Jason and Cristie at**

24 **Graystone, wanted to maintain that association together,**

25 **and that they would have likely left as a group**