# EXHIBIT E

1                          CONFIDENTIAL

2

3                  UNITES STATES DISTRICT COURT

4            DISTRICT OF UTAH, CENTRAL DIVISION

5   GRAYSTONE MORTGAGE, LLC, a    ) Videotaped
    Utah limited liability        ) Deposition of:
6   company,                      )
                                  ) KIPP MYERS
7        Plaintiff,               )
                                  ) Case No.
8   vs.                           ) 2:19-cv-00383-JNP-CMR
                                  )
9   NETWORK FUNDING, L.P., a      ) Judge Jill N. Parish
    Texas limited partnership;    )
10  JASON GAUTREAU, an            ) Magistrate Judge
    individual; and CRISTIE       ) Cecilia M. Romero
11  NORTH, an individual,         )
                                  )
12       Defendants.              )

13

14

15            January 23, 2020 * 8:43 a.m.

16         Location:   York Howell & Guymon
           10610 South Jordan Gateway, Suite 200
17            South Jordan, Utah 84095

18

19

20         Reporter:   Lisa Bernardo, CSR, RPR

21

22

23

24

25

1    only liked what they had to say, we saw in them what

2    we considered a company that's basically a big

3    brother."

4            Do you see that?

5        A.    Yes.

6        Q.    Was that true?

7        A.    Again, I wrote this for Evergreen and I

8    just for ease of purposes, utilized it.

9        Q.    I mean, it's a little over the top, isn't

10   it, if you don't even believe it?

11       A.    We were doing the best we could in light

12   of the circumstances we had to deal with.  So this,

13   again, was a -- you know, I didn't have to rethink

14   anything.  I just had to change the names on it.

15       Q.    "After a significant amount of vetting we

16   decided it was time to begin a new chapter.  We're

17   excited to announce we're partnering with Network

18   Funding with headquarters based in Houston, Texas."

19            Do you see that?

20       A.    Yes, I do.

21       Q.    Was that true?

22       A.    They are headquartered in Houston, Texas.

23       Q.    That's your answer?  Is that your answer?

24       A.    You know, with the "significant amount of

25   vetting," that is not a true statement.  We did not

 1   significantly vet them out, so...

 2        Q.    You partnered with them, correct, and you

 3   announced that?

 4        A.    Yes, we did.

 5        Q.    You merged with them, correct, and you

 6   announced that?

 7        A.    Yes, ma'am.

 8        Q.    Did you hear Rick Carter's testimony

 9   yesterday when he said all of this was false?

10        A.    Yeah.  Yes, I did.

11        Q.    What did you think of that?

12        A.    I think he was correct.

13        Q.    You are saying something diametrically

14   opposed to what he said.

15        A.    No.  I'm saying what Rick said.  You said

16   Rick said that this was not true, correct?

17        Q.    No.  Rick said we merged -- we didn't

18   merge and you're saying we merged.

19        A.    Oh, I'm sorry.  I misunderstood that

20   question.  Could you please repeat it?

21        Q.    Let me ask it -- yeah, let me break it

22   down.  Rick Carter testified yesterday the company

23   did not merge --

24             MR. STULTZ:  Objection --

25        Q.    (By Ms. Kitson)  -- with Network Funding,

 1   **correct?**

 2              MR. STULTZ:  Objection, misstates prior

 3   testimony.

 4              THE WITNESS:  At the time of this letter

 5   there had been no formal merging or acquisition or

 6   anything, so Rick's statement stands true that, yes,

 7   we had not merged with Network Funding at the time of

 8   this letter nor any time after.

 9        **Q.    (By Ms. Kitson)  You just testified two**

10   **minutes ago that you did merge.**

11        A.    I'm sorry.  You would need to replay that

12   back about us merging.

13        **Q.    Yes.  Yeah, let's go on back.**

14        A.    Please.

15              MS. KITSON:  I'll have the court reporter

16   read it back.

17              THE REPORTER:  "Question:  You

18              merged with them, correct, and

19              you announced that?"

20              Answer:  "Yes, ma'am."

21              THE WITNESS:  That is an incorrect

22   statement.  And I apologize that I did not stop

23   myself from answering that question.  Could you

24   please ask that question again?

25              MS. KITSON:  No, I can't.  You have

 1    already answered it.

 2                   We can take a break.

 3                   MR. STULTZ:  Okay.

 4                   THE VIDEOGRAPHER:  Going off the record.

 5    The time is 4:41.

 6                   (Break)

 7                   THE VIDEOGRAPHER:  Returning on the

 8    record.  5:03 p.m. is the time.

 9                   Counsel.

10         Q.    (By Ms. Kitson)  Mr. Myers, you understand

11    you are still under oath?

12         A.    Yes, I do.

13         Q.    On April 10, 2019, did you hold an all

14    employee meeting in which you announced the measurer?

15         A.    Before I answer that question, counselor,

16    could I indulge you to allow me to make a change to a

17    previous statement of a question?

18         Q.    Sure.

19         A.    Thank you.  Could I ask the reporter to

20    ask the question about the merger that was did I

21    state that we did merge with Network Funding?

22                   THE REPORTER:  Question:  "You

23                   merged with them, correct, and

24                   you announced that?"

25                   Answer:  "Yes, ma'am."

  1                    THE WITNESS:  I do want to amend that.  I

  2       believe that I was thinking in the context of what

  3       was written here.  So I want to amend that to no, we

  4       did not merge with Network Funding and I was making

  5       the comment in regards to agreeing with what Rick

  6       Carter had said.

  7            Q.    (By Ms. Kitson)  Thank you.

  8                  On April 10th, did you hold an all

  9       employee meeting at which you announced to the

 10       employees that you had merged with Network Funding?

 11            A.    Yes, we did.  We held a meeting, a

 12       companywide meeting.

 13            Q.    Had you merged with Network Funding?

 14            A.    No, we had not merged with Network

 15       Funding.

 16            Q.    Let's listen to the audio.

 17                  (Playing recording)

 18                  "All right, guys.  2:00 almost on the

 19       nose.  Bad news, though.  We did not have an on time

 20       -- we did not have an on time drive, you know how we

 21       were going to do that on this one.  So Amy knows I

 22       know, so (inaudible) sorry about that.

 23                  "First of all, thank you guys for the

 24       short notice of, you know, coming in and, you know,

 25       having this meeting together.  So, you know, as much

1   as I would have loved to have given you a little bit

2   more leeway into it, sometimes you've just got to

3   throw out a little craziness at you guys and see how

4   the response will be, so -- but I do apologize it was

5   such short notice.  I wish we could have given you a

6   little bit more lead time to come in.

7                "Welcome everyone.  So let's cut right to

8   the chase.  I have an announcement that I need to

9   make in regards to Graystone.  So Graystone, we are

10  merging with another company."

11               Is that a true statement?

12       A.    The statement that we are merging?

13       Q.    Yes.

14       A.    That would be a statement implying that

15  something is going to happen.  It doesn't imply that

16  it had happened, so we are merging.

17       Q.    And did you consider yourself to be

18  merging?

19       A.    I considered us to be on the path of

20  aligning with them.

21       Q.    Your words were "we are merging," correct?

22       A.    Yes.

23       Q.    Was that true?

24       A.    That was a true statement as far as what I

25  said, but, again, it hadn't taken place.

```
 1        Q.    Did you believe that to be true, the words

 2   "we are merging"?

 3        A.    I wanted to make the efforts to do so in

 4   light of the circumstances that was there, that was

 5   taking place.

 6        Q.    Was that a false statement or a true

 7   statement, one or the other?

 8        A.    It wasn't an absolute statement at that

 9   time.  When I made the statement of we are going to

10   be -- could you repeat it back?  I'm sorry.

11        Q.    (Playing recording)

12              "Welcome everyone.  So let's cut right to

13   the chase.  I have an announcement that I need to

14   make in regards to Graystone.  So Graystone, we are

15   merging with another company, Network Funding..."

16        A.    Yes.  So I made that statement.  Was it a

17   true statement at that time?  That was at the best of

18   my abilities to present to the company that we were

19   going to be merging.

20        Q.    So when you said it, it was a true

21   statement, correct?  I mean --

22        A.    And, again, counselor, I'm just trying to

23   be not glib or evasive on this question.  I'm trying

24   to answer the question, is it a correct statement,

25   because it hadn't happened.
```

Kipp Myers  01/23/2020                    ConfidentialPage 289
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1          Q.    Let's just leave it at this.

2          A.    Okay.

3          Q.    You said those words that we just listened

4    to --

5          A.    Yes.

6          Q.    -- "we are merging with Network

7    Funding" --

8          A.    Yes.

9          Q.    -- to all of your employees, correct?

10         A.    That is correct.  That was me.

11         Q.    Let's move on.

12         A.    Thank you.

13         Q.    (Playing recording)

14               "... out of Texas.  So this may come as

15    quite a big shock to you guys, because I know a lot

16    of you have always said, hey, you know, is Graystone

17    ever going to be sold.  You know, people, I get asked

18    that a lot.  It's just one of those things that I've

19    always just, you know, we've been courted, we've said

20    nah, not really interested in that.  And so I want to

21    give you a little bit of color, if you will, as far

22    as, you know, arriving at this decision that, you

23    know, Rick, Wendee, Danell and myself made this

24    decision that we made."

25               Is it true that you had made a decision?

1      A.    We had made a decision prior to that, yes.

2      Q.    **To merge, correct?**

3      A.    Again, we didn't know if it was a merge.

4  We didn't know if it was an acquisition.  We didn't

5  know what it looked like, so those were the terms

6  that I used.

7      Q.    (Playing recording)

8            "So, you know, over the past 18 months, a

9  lot of companies have been knocking on our doors

10  saying, hey, we've heard great things about

11  Graystone.  You know, you're the type of company we

12  would love to be associated with.  And, you know,

13  it's flattering, it's nice, you know, to feel wanted

14  and to feel loved, but, you know, we have always

15  been, nah, no thanks, we'll go about our business.

16           "And I have shared this with you guys

17  before, is, you know, when I have been at round

18  tables, when I have been at (inaudible) and I have

19  seen their operations and (inaudible) from an arm's

20  length (inaudible) and that has always been one of

21  those things that I've looked at and said, you know,

22  there's not too many things out there that's better

23  than Graystone.  You know, we've got great

24  leadership.  We've got all the products that we could

25  ever want and hope for to be successful.  You know,

1   we've got a great reputation in our community, so

2   that's why we've always just kind of kept it arm's

3   length.

4             "Well, this last year, as companies were

5   knocking on our doors, and even private equity firms

6   were looking at us, you know, Rick, Wendee, Danell,

7   and myself, we kind of had to start paying attention.

8   You know, there's things in the marketplace that

9   we're starting to see trickling in that were a little

10  eye-raising to us.  What are the trends?

11            "So last year, as you guys know, we had to

12  do some modifications.  We had to do some things with

13  bonuses.  We had to go through some layoffs.  We went

14  through the process of bringing on different

15  technologies in efforts to, obviously, make ourselves

16  a little bit more amenable, bottom line efficiencies,

17  all of those things that can help the employees and

18  help keep the company informed.  But we also are

19  recognizing, hey, there's some forces that are

20  working against us.  Inasmuch as we would love to

21  think that, you know, we're impenetrable to these

22  things, we have to be smart.  We have to be thinking

23  about the bigger picture, as far as the survivability

24  of Graystone.

25            "One of the things that has been a

Case 2:19-cv-00383-JNP    Document 120-5    Filed 06/28/21    PageID.6078    Page 13 of 47

Kipp Myers  01/23/2020                                 ConfidentialPage 292
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1    challenge for a small independent mortgage lender in

2    our environment is just that.  It's challenging.  The

3    cost of doing mortgages these days continues to

4    ratchet up, as the esteemed Phil will nod his head

5    and say yes.

6              "And so, you know, earlier this year or

7    last year, I was talking about margin compression and

8    what we've been experiencing in the cost of

9    manufacturing a loan is more (inaudible) than what

10   we're selling, that becomes problematic.  So we had

11   to look at these situations and not keep our head in

12   the sand, and as leaders and owners of this company

13   it's our responsibility to do that.  We cannot ignore

14   things.

15             "And so one of the things that, you know,

16   Rick, Wendee, and myself and Danell talked about, you

17   know, was should we be paying attention to some of

18   these situations.  So we did.  And we said if we're

19   going to do something, we want to make sure that

20   we're aligned with a company that is a mirror image

21   of us."

22             Did you believe Network Funding was a

23   mirror image of you?

24        A.    No, I did not.

25        Q.    Why did you say those words?

1      A.    I was making the best out of the situation

2   that we had to deal with.

3      **Q.    You were saying something you didn't**

4   **believe, correct?**

5      A.    I was saying something I didn't believe in

6   my heart of hearts.

7      **Q.    To all of your employees?**

8      A.    Yes.

9      **Q.    Who looked up to you and trusted you?**

10     A.    Absolutely.

11     **Q.    (Playing recording)**

12           **"...philosophical, from an idealogy, from**

13   **a servant's heart."**

14           **Did you believe that Network Funding was a**

15   **mirror image of you philosophically, idealogically,**

16   **and from a servant's heart?**

17     A.    I didn't know enough about Network Funding

18   to draw that absolute conclusion.

19     **Q.    Did you believe those words when they came**

20   **out of your mouth?**

21     A.    I didn't have enough information about

22   Network Funding to draw a conclusion whether that was

23   a true statement or a false statement, although I had

24   made those statements.

25     **Q.    You just said that you made the "mirror**

```
 1   image" statement without believing it, correct?

 2        A.   Yes.

 3        Q.   Did you make the "servant's heart"

 4   statement without believing it?

 5        A.   I didn't know enough about them to make

 6   that a, you know, statement of truth, and so I -- you

 7   know, I can truthfully say I didn't believe it in my

 8   heart of hearts.

 9        Q.   But you said it anyway, correct?

10        A.   But I said it anyway.

11        Q.   To your employees who looked up to you and

12   trusted you, correct?

13        A.   That is correct.

14        Q.   Servant's heart, did you have to say

15   something that -- I mean, to me that is just not

16   something you would have to say in order to achieve

17   your purposes of assuring your employee population.

18             MR. STULTZ:  Objection, argumentative.

19             MS. KITSON:  I have not invoked the one

20   speaker rule, by the way, but since your objections

21   are the exact same --

22             MR. DAY:  We've tried to -- we've actually

23   tried not to object very much.

24        Q.   (By Ms. Kitson)  Did you feel like you

25   went a little over the top in this speech?
```

1        A.      When I mentioned servant's heart, since

2    you brought that up, that is something that is a

3    common thread throughout our company that Graystone

4    has a servant's heart, the way that we do business,

5    the way that we work with our clients, work with our

6    personnel.  That we approach it that way, so that

7    would not be a statement that would be an off the

8    wall statement from me.

9        Q.      (Playing recording)

10              "...because it wouldn't do us any good if

11   we were to align with a company that is the alter ego

12   of us.  So at the top of our list was making sure

13   that any time that there was an opportunity to talk

14   to different mortgage companies, that these are what

15   we're looking at.  And so we had the opportunity to

16   meet with Network Funding, and as we went down this

17   process of, okay, let's look at the ownership.  Let's

18   talk to the owners of the company and see where their

19   hearts are at.  See where their vision is at.  See

20   how they approach business.  And we saw in them us,

21   how they..."

22              Did you look at the company's heart,

23   Network Funding's heart?

24       A.      Network Funding.  I go back to my previous

25   testimony where we did not spend -- I mean we as in

1    myself, I did not spend an inordinate amount of time

2    with Buzz.  I had not met with Rex our first meeting.

3    We did talk about beliefs.  Kind of what they -- how

4    they approached business.  And at that time, I

5    appreciated where Buzz's stance was, that they put

6    that on their website, that they serve God.  And so

7    those were things that I looked at that said, yeah, I

8    hope these are true, I hope it's not just

9    windowdressing.

10         Q.    The words that you spoke with respect to

11    "heart and vision," you "saw in Network Funding us,"

12    did you mean those words at the time?

13         A.    You know, again, counselor, it's, you

14    know, the overall theme of my discussion and my

15    announcement was that of we need to stand firm.  We

16    need to stand tall.  We need to present a message of

17    confidence to the employees that they look to me, as

18    you said, as the leader, that they have trust and

19    confidence in and this is what I was invoking was an

20    opportunity to stand in front of them regardless of

21    what was happening internally.  Kind of that duck on

22    the water, everything is good up here, but beneath

23    the surface things were going a little bit nuts.  But

24    we had to project ourselves in light of it.  I

25    certainly wanted to honor Jason and Cristie in that

1  situation that, you know, it wasn't the ideal

2  scenario for us, but we were making the best of it.

3       **Q.    Did you believe the statements with**

4  **respect to "heart and vision," that you "saw in**

5  **Network Funding us," did you believe that when you**

6  **said it?  Yes or no?**

7            MR. STULTZ:  Objection, argumentative.

8       **Q.    (By Ms. Kitson)  Please.**

9       A.    I will say I apologize.  I know you're

10  looking for a yes or no.  Based upon the information

11  that I had with Buzz from our first meeting, I

12  believe that they did have a company with a servant's

13  heart.

14      **Q.    And that's not at all my question.**

15      A.    I'm sorry.  What was your question?

16      **Q.    The question is, with the statement that**

17  **we just listened to --**

18      A.    Yeah.

19      **Q.    -- which is with respect to "heart and**

20  **vision," that you "saw in Network Funding us," did**

21  **you believe that statement when you made it?**

22      A.    I don't think I believed it, simply

23  because I didn't know everything about Network

24  Funding that I needed to know to make a true

25  statement.

```
 1          Q.     Yet you stated it to your employee

 2    population, correct?

 3          A.     Yes.

 4          Q.     The employees who looked up to you and

 5    trusted you, correct?

 6          A.     That is correct.

 7          Q.     You thought this was okay to lie to your

 8    employees; is that right?

 9               MR. STULTZ:  Objection, argumentative.

10               Go ahead.

11               THE WITNESS:  I don't believe it's ever

12    right to lie.  I believe that in a circumstance like

13    this that we had to paint a picture that was, again,

14    strength, that it was confident, in the way that it

15    was presented.

16          Q.     (Playing recording)

17               "...could mirror and how we compare them.

18               "The other thing is that what we bring to

19    the table our strength, our knowledge, our moxie, how

20    we do business.  We looked at that and said, you know

21    what, with Network Funding, this could be the same.

22    Bringing strength, bringing more opportunity,

23    bringing different products to us from a sales

24    standpoint that could enhance us and make us even

25    better.  And vice versa, that it just isn't a one-way
```

Kipp Myers  01/23/2020                    ConfidentialPage 299
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1    street, that we bring value to that organization

2    because of who we are and our reputations and what

3    we've built up for the last 22 years (inaudible).

4              "So, again, with that said, that's a quick

5    little snippet of, you know, us merging with Network

6    Funding."

7              "That's a quick little snippet, you know,

8    of us merging with Network Funding."

9    A.    Yes.

10   Q.    Were you merging with Network Funding?

11             MR. DAY:  Objection, asked and answered.

12             THE WITNESS:  At that time we were doing

13   the best we could to move down that path, however, it

14   hadn't taken place.

15   Q.    (By Ms. Kitson)  That statement, "that's a

16   quick, little snippet of, you know, us merging with

17   Network Funding," did you believe that statement when

18   you made it?

19   A.    I don't recall, you know, the question you

20   asked me, did I believe it at that time.  I wasn't

21   sitting up there saying, oh, my gosh, this is not a

22   true statement, but I'm spewing it out.  So in a

23   general term, at that time, I was presenting under

24   the situation at hand -- you have to remember,

25   counselor, that, you know, this was all happening

1    within less than 48 hours of Jason and Cristie's

2    departure.  They had already made the announcement to

3    their group the week before.  So the audience was

4    comprised of individuals who already knew the

5    intentions of Jason and Cristie going to Network

6    Funding.  The other group had no idea.  So we were

7    talking and I was speaking knowing that.  So, again,

8    trying to honor Jason and Cristie over here by

9    speaking this of, hey, our confidence and this is

10   what we believe in Network Funding, that served a

11   purpose of the audience that already knew what Jason

12   and Cristie were doing and where they were going, to

13   Network, and it served a purpose over there to the

14   individuals that this was brand-new to them.

15        **Q.    Do you believe that all of this justified**

16   **a boldface lie to your employees?**

17             MR. STULTZ:  Objection, argumentative.

18             THE WITNESS:  Do I believe that all of

19   that justifies, in your terms, a boldface lie?  I

20   wouldn't characterize it as a boldface lie.  I would

21   say, under the circumstances, we had to present

22   ourselves as a united front and confidence that this

23   is what was taking place.

24        **Q.    (By Ms. Kitson)  You just -- we've gone**

25   **through this audiotape in painstaking detail,**

1   correct?

2          A.    Yes, we have.

3          Q.    And you stated on several occasions that

4   you did not believe the statements you were making

5   were true at the time, correct?

6                MR. STULTZ:  Objection, misstates prior

7   testimony.

8                Go ahead.

9                THE WITNESS:  Yes.

10         Q.    (By Ms. Kitson)  And you feel that it is

11  justified for you to make statements you do not

12  believe because you had 48 hours to make a decision;

13  is that right?

14         A.     In the framework of the circumstances that

15  we had in front of us, that was the best that we

16  could do in light of that circumstance.  So if it

17  came off as anything other, we just wanted to, again,

18  give confidence to the audience that this is what was

19  taking place and that they believed in us.

20         Q.    (Playing recording)

21                "So, again, what we're going to do is

22  Graystone is going to continue for all intents and

23  purposes as we are.  The name Graystone is still

24  Graystone Mortgage.  You know, that's an important

25  brand in our community.  It's an important reputation

1    that we adhere to that other people recognize our

2    name and they say, yes, that's it.  That's a solid

3    company.  That's a company that we trust.  So it's

4    very important to us and (inaudible) as we go through

5    the process of decision-making was can we retain

6    Graystone?  Can we retain who we are?  And the answer

7    is yes."

8              You stated to your employees there that

9    you would continue doing business as Graystone; is

10   that correct?

11        A.   Yes, I did.

12        Q.   That's something that had been decided,

13   correct?

14        A.   I don't know if it was decided.  Again,

15   this was very fluid.  We didn't have any absolutes.

16   We did not have a contract.  We had nothing in front

17   of us.  Of what the name was going to be.  How that

18   was going to play itself out.

19        Q.   But that basic fact that you are going to

20   be doing business as Graystone had been established?

21        A.   No.  It had not been established yet.

22        Q.   Then why did you say it?

23        A.   That was my belief that that would be a

24   true statement.  That was one.  Conversations that I

25   believe Jason and Cristie and I had that, you know,

 1   Graystone could keep its name.

 2        Q.    Is it your testimony that Jason Allen's

 3   branch knew that Jason and Cristie were leaving?

 4        A.    I do not believe that I have said that.

 5        Q.    Is that your testimony?

 6        A.    Will you please state that again?

 7        Q.    Yes.  Let me ask it to you this way.  Do

 8   you have any personal knowledge -- and you have been

 9   here through the past testimony so you know, right?

10   Outside of the context of this lawsuit and before

11   this lawsuit ever began, did you have any personal

12   knowledge of Mr. Gautreau soliciting employees to

13   leave Graystone before he left?

14        A.    Not that I'm aware of.

15        Q.    The same question with respect to

16   Ms. North.  Outside of the context of this lawsuit

17   and before this lawsuit even began, did you have any

18   personal knowledge of Ms. North soliciting employees

19   to leave before she herself left Graystone?

20        A.    Not that I'm aware of.

21        Q.    Do you have any personal knowledge of

22   either Mr. Gautreau or Ms. North taking trade secret

23   information with them?

24        A.    Outside of the discovery, no.

25        Q.    You mentioned that, sitting in this room,

1   your employees knew that Jason and Cristie were

2   leaving.  Is that what you said?

3        A.    Yes.

4        Q.    So you don't actually have any personal

5   knowledge of that, correct?

6        A.    You asked me the question if there was

7   knowledge outside of this suit.  I believe that was

8   the question.

9        Q.    Put yourself back in that room.

10       A.    Okay.

11       Q.    So you're standing in that room.

12       A.    Uh-huh (affirmative).

13       Q.    Do you have any knowledge or evidence that

14   Mr. Gautreau or Ms. North had already told these

15   employees about the fact that they were leaving?

16       A.    Cristie's resignation letter specified

17   that she would most likely -- I would need to

18   paraphrase, and if we have it as an exhibit, we can

19   reference it, but I do believe there was a reference

20   that Cristie would be taking her branch.

21       Q.    She didn't say in that email she had

22   communicated that to them, did she?

23       A.    I would need to reread that.

24       Q.    Let me put it this way.  Other than her

25   resignation letter, did you have any other reason to

1    believe, as you were standing there in that meeting,

2    that these employees already knew?

3          A.    Yes.  Based upon the conversations that

4    Jason and Cristie and I had on Monday, the day of her

5    resignation, they did say that they had told people

6    in the Cottonwood branch.

7          Q.    Okay.  Tell me specifically what they said

8    about that.

9          A.    That they had told people in the branch

10   that they would be leaving.  That Cristie had

11   resigned.  Again, paraphrasing, trying to remember

12   the exact context, but that was part of the

13   conversation.  Which if we go back to my testimony

14   and try -- and Rick's testimony where we were

15   scrambling, trying to figure out what we could do,

16   making phone calls, that was all part of, you know,

17   what was revealed to us.

18         Q.    Other than the Cottonwood branch, do you

19   have any reason to believe, as you are standing in

20   that meeting on April 10th, that Ms. North or

21   Mr. Gautreau had told any other employees that they

22   were leaving?

23         A.    I cannot think of any off the top of my

24   head, counselor, at this time.

25         Q.    (Playing recording)

```
 1                    "Yes.  Absolutely.  And, you know, from an

 2      LOS standpoint, you know, there is a different

 3      platform for that, but, you know, I've always been --

 4      you guys know my love/hate -- a lot of you guys may

 5      know my love/hate relationship with Encompass.  We

 6      were going to be the next leader of at least looking

 7      at getting out of their LOS systems next year when we

 8      exit out of Encompass.  And I was going to do

 9      everything in my power to exit out of Encompass, so,

10      you know, that was already on the radar.

11                    "So, yeah, there's going to be some little

12      rule changes, but as far as, you know, our

13      operations, how we do things, that's who we are.

14      We're the R. Graystoners.  And so, you know, we --

15      you know, we love the way we do things.  We love the

16      people that we have, and we just are aligning

17      ourselves with a mirror image of us and it will give

18      us the opportunity to face the headwinds of all of

19      the things that come at us in the marketplace,

20      today's marketplace.  We have to position ourselves.

21      That's our job as owners, that we're (inaudible) is

22      to make sure we adapt to things, that we make sure

23      that we insolate ourselves and protect ourselves so

24      we can maintain, you know, the way we do business.

25                    "So (inaudible) with Network Funding is
```

1    going to give a little bit of an introduction to

2    Network and then we'll have a few questions and a few

3    answers that you guys might have for us.  I will tell

4    you that some of the questions that you might bring

5    up are relating to HR questions.  We can, I believe,

6    Wendee, is that -- is that call tomorrow?"

7              "Yes."

8              "So, Wendee will be able to touch on HR

9    questions, but a lot of these questions and answers

10   that you bring up, a couple of those questions she

11   might defer that to..."

12             Did you, in fact, give HR information to

13   the employees?

14        A.    I don't recall what was in -- I believe

15   that Cristie had put together a package that included

16   the benefits.  I don't recall exactly what was in

17   that.

18        Q.    I don't know if I have that in my stack,

19   but, yeah, I think I remember Ms. North put together

20   a list of instructions for each employee to follow to

21   go through the application process and become Network

22   employees; is that correct?

23        A.    I believe so.

24             MS. KITSON:  I want to introduce Exhibit

25   51.

```
 1                  (EXHIBIT 51 WAS MARKED.)

 2        Q.     (By Ms. Kitson)  Is Exhibit 51 a true and

 3   correct copy -- actually, strike that.

 4               What is Exhibit 51?

 5        A.     This was regarding IT information.  This

 6   was on Wednesday, April 10, 2019, that I had provided

 7   to -- yes, I sent this to Cristie and Jason just

 8   giving them, hopefully, some roadmaps to the IT

 9   infrastructure of Graystone IP addresses, et cetera,

10   domains.

11        Q.     Did you give Network's IT department

12   access to Graystone's computer systems?

13        A.     As part of the transition, that would have

14   been part of the interaction between Network's IT, as

15   well as Graystone's IT.  They talk, you know, their

16   languages, and so, you know, I just provided the

17   information.

18        Q.     And did Graystone's -- strike that.

19               Did Network's IT have access to

20   Graystone's IT, to your knowledge?

21        A.     I don't know that as an absolute other

22   than we provided the information.  The interaction

23   between Network, Network's IT and Protec, who is our

24   third-party vendor who handles our IT, that's where

25   the communication would have been handled, so I don't
```

1   have firsthand knowledge of what they did or didn't

2   do.

3        Q.    But you provided this information in

4   Exhibit 51; is that correct?

5        A.    Yes, I did.

6              MS. KITSON:  This is Exhibit 52.

7              (EXHIBIT 52 WAS MARKED.)

8        Q.    (By Ms. Kitson)  Do you recognize Exhibit

9   52 as an email that Brett Snortland sent to you on

10  April 11, 2019?

11       A.    Yes, I do.

12       Q.    He says, "Kipp, looks like I land at 9:47.

13  Can you meet at the Cottonwood office or maybe

14  offsite lunch?  11:30/12?"

15             Do you see that?

16       A.    Yes.

17       Q.    Did you meet with Mr. Snortland?

18       A.    I believe we did get together for lunch.

19  This is, then, the Thursday.  I don't remember the

20  specifics about it, but I'm sure if we scheduled

21  something, we did get together.

22       Q.    This is the day after you announced the

23  merger, correct?

24       A.    Yes, it would be.

25       Q.    And you met Mr. Snortland at the

 1   Cottonwood office; is that correct?

 2        A.    We met at the Cottonwood office, or maybe

 3   off-site lunch.  I don't remember where we met, if it

 4   was at Cottonwood or somewhere else.

 5        Q.    Did you meet with any employees with

 6   Mr. Snortland on that trip of his?

 7        A.    Any of the employees of Graystone?

 8        Q.    At the Cottonwood branch.

 9        A.    At the Cottonwood branch.  On that

10   Thursday.  I do not recall.

11        Q.    You can set that aside.

12              Mark this as Exhibit 53.

13              (EXHIBIT 53 WAS MARKED.)

14        Q.    (By Ms. Kitson)  Exhibit 53 is a letter

15   from Network Funding, LP, Brett Snortland, to you

16   dated April 11, 2019.  This is the same date on which

17   you met Mr. Snortland in person, correct?

18        A.    Yes.

19              MR. STULTZ:  I want to do a quick

20   objection on foundation.  I know this is something we

21   produced.  It's alone, so I'm not sure if it was part

22   of an email or if it was actually sent.

23              Go ahead.

24        Q.    (By Ms. Kitson)  That's actually a good

25   point.  If you look in the lower right-hand corner of

```
 1    the document, Mr. Myers.

 2         A.    Yes.

 3         Q.    You will see a stamp that says Graystone

 4    and then a number.  Do you see that?

 5         A.    Yes.

 6         Q.    That indicates, I can represent to you as

 7    an attorney, that this came from Graystone's files.

 8    Do you understand that?

 9         A.    Okay.

10         Q.    Do you have any reason to believe that

11    this was not in Graystone's files?

12         A.    No.

13         Q.    Do you remember receiving this letter?

14         A.    Yes, I do.

15         Q.    And did Mr. Snortland send it to you,

16    email it to you, do you know?

17         A.    Whew, I don't know how I got it.

18         Q.    But you got it somehow, correct?

19         A.    Yes.

20         Q.    It says, "Dear Kipp, on behalf of Network

21    Funding...subject to the terms stated in this letter,

22    I am pleased to offer you employment at Network

23    Funding as a Regional Manager.  The Company will

24    assign you to a branch which is referred to as your

25    branch below."
```

1              Do you see that?

2       A.     Okay.

3       Q.     Was this an offer that Network Funding put

4    together for you?

5       A.     Yes.  This came from Network Funding.

6       Q.     And similar to the first offer on March 7,

7    2019 that says, "The Company agrees to pay you a draw

8    of $5,000 per month."

9       A.     Yes.

10      Q.     Do you see that?

11      A.     Yes.

12      Q.     Did you understand this to be a term and

13   condition that Network was offering to you?

14      A.     A draw of $5,000 a month?

15      Q.     Yes.

16      A.     Yes.

17      Q.     It says, "For each of the first 24 months

18   of your employment, the Company agrees to contribute

19   to your branch account the sum of 25 basis points

20   multiplied by the total closed and funded first lien

21   loan volume excluding construction, broker, bond, and

22   jumbo loans and the production of the branch(es)

23   under Jason Gautreau and Cristie North (Cottonwood

24   branch)."

25              Do you see that?

 1        A.    Yes.

 2        Q.    And at this point in time, did you have

 3   any discussions with Mr. Snortland about what your

 4   branch would look like?

 5        A.    This -- you know, this document spelled

 6   out a little bit more clear that my branch, if you

 7   will, would be comprised of any other branches except

 8   for Jason and Cristie's.

 9        Q.    So of the legacy Graystone branches, you

10   would have these basis points on all production other

11   than Cottonwood; is that correct?

12        A.    Yes.

13        Q.    And then you also would get basis points

14   on Cottonwood as well, correct?

15        A.    No.  Let's -- where it talks --

16        Q.    Oh, it's with the exception of.  Got it.

17        A.    Yes.

18        Q.    Sorry about that.  Let me ask that again.

19        A.    Okay.

20        Q.    So you were to be paid basis points on

21   production for every branch except for Cottonwood,

22   correct?

23        A.    That's correct.

24        Q.    The next sentence says, "In the third year

25   of your employment, each month the Company agrees to

Kipp Myers  01/23/2020                    ConfidentialPage 317
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

 1    tired.  Let me start that again.

 2            The March offer included a component of

 3    you being paid basis points based on the production

 4    of the branches, correct?

 5        A.    All production.

 6        Q.    But production, correct?

 7        A.    Production.

 8        Q.    And this April 2019 offer also is based on

 9    you being paid basis points on production of the

10    branches, correct?

11        A.    Excluding the production of Jason and

12    Cristie and other identified loans?

13        Q.    Yes.

14        A.    Yes.

15        Q.    I had a chance to go back and look at the

16    Complaint.  We had been talking about it earlier and

17    I had not had an exhibit copy.  I can represent to

18    you that it states that 65 to 75 percent of the

19    production was leaving because of Jason and Cristie.

20    Is that your understanding?

21        A.    Would you -- I would ask us to go back to

22    what the framework of that whole statement and that

23    question was so I can answer that appropriately.  I

24    appreciate you bringing that up of the 65 to 75, but

25    I would need to understand it in --

1        Q.    I will get the exact language for you --

2        A.    Thank you.

3        Q.    -- before we wrap today.

4        A.    Thank you.

5        Q.    Did you reject this offer?

6        A.    I do not recall that I called up Brett and

7   said I'm rejecting this offer.  I think there still

8   needed to be some things that needed to be worked

9   out, flushed out, so that, you know, an offer was

10  acceptable.

11       Q.    Did you counter?

12       A.    I don't remember if I discussed

13  countering, although we did discuss that we needed to

14  set up a meeting that we could hash everything out.

15  And so that would have been born from this that I

16  believe the following week, if I'm not mistaken, we

17  did get together, and I think Rick Carter mentioned

18  it in his testimony of getting together with Matt

19  Kiker.  Brett did talk about things.

20       Q.    And that leads us to --

21             MR. STULTZ:  Excuse me.  I want to make an

22  objection for the record.  Exhibit 53, which is the

23  offer letter dated April 11th.

24             MS. KITSON:  Yes.

25             MR. STULTZ:  That was attached to an email

Kipp Myers  01/23/2020                    ConfidentialPage 319
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1    from Brett Snortland to Jason Gautreau and Cristie

2    North and Kipp was not copied.  That was produced as

3    Graystone 39.

4         Q.   (By Ms. Kitson)  But you recall receiving

5    this offer, correct?

6         A.   I'm going to have to potentially amend my

7    thing on that based upon my counsel's discovery that

8    if this was a communiqu, between Jason, Cristie and

9    Brett Snortland, that I may or may not have received

10   this exact one or a potential edited version of it.

11        Q.   You received an offer on April 11th,

12   correct?

13        A.   Now --

14        Q.   Nevermind.

15        A.   -- I question it.

16        Q.   Whatever suits you, Mr. Myers, at any

17   particular time you happen to be talking about.

18             MR. STULTZ:  Objection, argumentative.

19   You are the one that misrepresented the document

20   without providing the underlying email and tried to

21   lead my client down a road.  Okay.

22             MS. KITSON:  Exhibit 54.

23             (EXHIBIT 54 WAS MARKED.)

24             THE WITNESS:  Thank you.

25        Q.   (By Ms. Kitson)  Do you recognize Exhibit

1    54 as an email that Brett Snortland sent to Cristie

2    North and Jason Gautreau on April 11th?

3         A.    Yes, I do.

4         Q.    And Mr. Snortland says, "Guys.  I am

5    flying in next Tuesday, Wednesday and want the 4 of

6    us to sit down and go through and finalize the

7    following areas.  Severance; equipment, et cetera;

8    transition; roles; pipeline, more.

9              "I land around noon and leaving Wednesday

10   around 3 p.m.  I would love to meet Tuesday 2 to 4.

11   And see what time is needed Wednesday."

12             Do you see that?

13        A.    Yes.

14        Q.    Did you, in fact, sit down Tuesday and

15   Wednesday and go over these various topic items?

16        A.    Yes, I believe that we did sit down with

17   Brett, and I believe that Mike Kiker was part of that

18   as well, as I remember.

19        Q.    I've got the language from the Complaint

20   up and here is the allegation.

21             "The conversion of Graystone's Sugarhouse,

22   Cottonwood and Denver branches resulted in the loss

23   of approximately 65 to 75 percent of Graystone's

24   business."

25             Is that true, to your knowledge?

 1      A.    That was a true statement, yes, to the

 2  best of my knowledge.

 3            MS. KITSON:  We'll mark Exhibit Number 55.

 4            (EXHIBIT 55 WAS MARKED.)

 5      Q.    (By Ms. Kitson)  I believe this might be

 6  at least some of the correspondence that we referred

 7  to earlier regarding Ms. North setting up

 8  instructions for employees to follow; is that

 9  correct?

10      A.    Yes, it is.

11      Q.    And she says in an April 11th email, again

12  the day after you have announced the merger, correct?

13      A.    Yes.

14      Q.    She says, "Team, some of you should have

15  received an email with links for you to complete your

16  application.  These are coming out in phases so do

17  not be alarmed if you have not seen one yet.  It is

18  very important that you complete the application

19  process immediately to ensure the timing of your

20  training over the next 3 weeks.  We are coordinating

21  the on boarding and training in 3 phases which we

22  anticipate will be completed by April 30th."

23            Do you see that?

24      A.    Yes.

25      Q.    And it goes on from there, correct?

 1          A.    Yes.

 2          Q.    You say back, "Did you talk with them

 3     about timeline hitting April 30th date and the

 4     concerns with it?"

 5                Do you see that language?

 6          A.    Yes.

 7          Q.    She responds, "Yes, that is why this email

 8     is so late.  I've been doing that for past 4 hours."

 9          A.    Okay.

10          Q.    Unhappy face.  And then you say back,

11     "Still think that is tight timeline.  I would try to

12     hit it, but put out May 15th?"

13                Do you see that?

14          A.    Yes.

15          Q.    Finally, I'm wrapping up, she says back to

16     you, "I have a 4th phase but I am not disclosing it.

17     I don't want people dragging their feet."

18                Do you see that?

19          A.    Okay.

20          Q.    And then you say at the top, "K.  Content

21     looks good."

22                Do you see that?

23          A.    Yes.

24          Q.    Did you improve the content of this to go

25     out?

```
 1          A.    Cristie had put this together.  She was

 2   taking point on putting out a timeline agenda and so

 3   I agreed with her advice on it.

 4          Q.    Did this email go out to the employees?

 5          A.    I do not know that.

 6          Q.    Do you have any reason to believe it

 7   didn't?

 8          A.    No.

 9          Q.    And at least initially, here, it looks

10   like everybody is getting an offer, they're going to

11   apply, they're going to transition, they're moving

12   their licenses; is that correct?

13          A.    Can you say where the offer is?

14          Q.    Let's take a look at it in a little bit

15   more detail.

16          A.    Okay.

17          Q.    So on the next page it says, "For

18   Operations Staff" at the top.

19          A.    Okay.

20          Q.    Do you see that?

21          A.    Yes.

22          Q.    And it looks like it is split out here,

23   Operations Staff and then Loan Officers.

24          A.    Yes.

25          Q.    Is that right?
```

 1      A.    Yes.

 2      Q.    And Operations Staff it says, "Once your

 3  application is completed and submitted there will be

 4  approximately 48 to 72 hours until you receive your

 5  Paycom email."

 6            Do you see that?

 7      A.    Yes.

 8      Q.    "Once Paycom is received you must complete

 9  the checklist items that are provided within that

10  system."

11            Do you see that?

12      A.    Yes.

13      Q.    And then, "As soon as Paycom is finalized

14  we can include you into the onboarding phase.  An

15  email will be coming from Ashley with this update."

16            Do you see this?

17      A.    Yes.

18      Q.    And Loan Officers, a series of additional

19  similar steps, correct?

20      A.    Yes.

21      Q.    And then it says, "As soon as Paycom is

22  finalized we will advise you based on training

23  schedules we will advise you to fully transfer your

24  license."

25            Do you see that?

Kipp Myers  01/23/2020                    ConfidentialPage 325
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1      A.    Yes.

2      Q.    So it looks like you're moving employees

3   through this transition phase.  Is that what this is

4   aimed toward?

5      A.    You had asked me about an offer letter

6   that the employees would receive and so I do not

7   believe that was addressed, so I wouldn't answer yes

8   to your question about an employment offer.

9      Q.    Well, these are instructions to tell

10  employees how to transition over, correct?

11     A.    Yes, they are.

12     Q.    And you say you want to hit a timeline of

13  May 15th for that, correct?

14     A.    Yes.

15     Q.    So you are moving forward, correct?

16     A.    We are moving forward, yes.

17           MS. KITSON:  Mark 56.

18           (EXHIBIT 56 WAS MARKED.)

19     Q.    (By Ms. Kitson)  Do you recognize Exhibit

20  56 as an email from Brett Snortland to yourself and

21  Matt Kiker sent on April 11, 2019?

22     A.    Yes, I do.

23     Q.    And it looks here like --

24           MR. DAY:  Counsel, I would just like to

25  point out that this, likewise, doesn't have a Bates

 1    stamp on it.  Do you know why that would be?

 2                  MS. KITSON:  No, I don't.  I believe that

 3    everything here has been produced, but I would have

 4    to double-check with my office.

 5                  MR. STULTZ:  That's fine.

 6         Q.    (By Ms. Kitson)  The original email on

 7    this string is you saying to Phil Stooksbury, "Can

 8    you get me 3/31/2019 of this?"  And then there's a

 9    series of items listed here including tangible

10    personal property, computer hardware, it looks like,

11    leasehold improvements, furniture, equipment, and a

12    number of other items.  Do you see that?

13         A.    Yes.

14         Q.    What is this email?

15         A.    This is a breakdown of our equipment, both

16    our computer systems, of the accounting of how many

17    laptops, desktops we have, our servers, and then what

18    was on our financials as part of depreciated assets,

19    as well as security deposits of current leases.

20         Q.    So this is information you are providing

21    to Network to facilitate the transition, correct?

22         A.    Yes.

23         Q.    So you are moving forward?

24         A.    To the best of our ability.

25         Q.    With respect to the April 11th letter that

1  **we looked at -- and by the way, I did not state that**

2  **you received this or that -- I stated only that it**

3  **had a Graystone Bates stamp and came from Graystone's**

4  **file.**

5          MR. STULTZ:  My point was that it was

6  actually attached to an email.

7          MS. KITSON:  I understand.

8          MR. STULTZ:  So it's really difficult to

9  look at that letter when my client would have no way

10  of remembering or even seeing that email because it

11  was with Brett Snortland and Jason and Cristie.

12          MS. KITSON:  You accused me of

13  misrepresenting something, Mr. Stultz, and all I said

14  is that it came from Graystone's files.  That's all I

15  said.  In any event --

16          MR. STULTZ:  It's still a

17  misrepresentation because it's not attached to the

18  actual email.  I consider that to be --

19          MS. KITSON:  It still came from

20  Graystone's files.

21          MR. STULTZ:  I consider that to be a

22  misrepresentation.

23      **Q.   (By Ms. Kitson)  That letter, I believe,**

24  **was presented to you at Elixir; is that correct?**

25      A.    At Elixer on the next day.  I don't

 1   recall.

 2              MS. KITSON:  Actually, I need to take a

 3   quick break.  We've got about 23 more minutes.

 4              Let's go off the record.

 5              THE VIDEOGRAPHER:  Going off the record.

 6   The time is 5:56.

 7              (Break)

 8              THE VIDEOGRAPHER:  We are back on the

 9   record.  6:18 is the time.

10              Counsel.

11        Q.   (By Ms. Kitson)  Mr. Myers, do you

12   understand you are still under oath?

13        A.   Yes, I do.

14        Q.   We have been talking about offers from

15   Network Funding and we were looking at Exhibit 53.

16   Do you recall that?

17        A.   Yes.

18        Q.   At some point in time, you had a meeting

19   with Matt Kiker in which you accepted an offer; is

20   that correct?

21        A.   I do not recall any such meeting that I

22   accepted an offer.

23        Q.   Did you have a meeting with Mr. Kiker?

24        A.   I had a meeting with Matt on different

25   occasions.

Kipp Myers  01/23/2020                      ConfidentialPage 329
GRAYSTONE MORTGAGE v. NETWORK FUNDING, ET AL.

1        Q.    Did you have a meeting with Mr. Kiker in

2    which he made you an offer and you accepted it?

3        A.    I do not recall that.  If there's an offer

4    document, I would need to review it and see if that

5    jogs my memory.

6        Q.    On April 16th, did you have a meeting at

7    the restaurant bar Elixir?

8        A.    Yes, we did.

9        Q.    And who was there?

10       A.    At that, I believe Jason, Cristie, Matt

11   Kiker.  I believe Brett was there, Snortland, and

12   Danell Myers.

13       Q.    Did you say at that meeting, "I'm in"?

14       A.    I don't recall saying anything that said

15   "I'm in."

16       Q.    Did you say anything along those lines?

17       A.    The conversations that we had that I

18   recall at that meeting, we were discussing, again,

19   moving parts.  We were discussing severance.  We were

20   discussing still the benefits.  Some of the things

21   that were up in the air.  And so that meeting

22   actually was not, in Danell's and my viewpoint, a

23   very productive meeting.  Actually, we walked away

24   more upset than what we felt.  There was just -- we

25   felt like it was an inconvenience for them to be