FILED
2021 SEP 29 PM 1:53
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GRAYSTONE FUNDING COMPANY, LLC, | **MEMORADUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| NETWORK FUNDING, L.P.; JASON GAUTREAU; and CRISTIE NORTH, | Case No. 2:19-cv-00383-JNP-CMR |
| Defendants, | District Judge Jill N. Parrish |
| NETWORK FUNDING, L.P.; JASON GAUTREAU; and CRISTIE NORTH, | |
| Third-Party Plaintiffs, | |
| v. | |
| KIPP V. MYERS, | |
| Third-Party Defendant. | |

Jason Gautreau ("Gautreau") and Cristie North ("North") were high-level employees at Graystone Funding Company, LLC ("Graystone"), a mortgage lending company. Gautreau and North subsequently left Graystone to join a different mortgage lending company, Network Funding, L.P. ("NFLP"), and many of Gautreau and North's subordinates at Graystone followed them to NFLP. Graystone sued Gautreau, North, and NFLP (collectively, "Defendants"), alleging that Defendants misappropriated trade secrets, that Gautreau and North breached their fiduciary duty and duty of loyalty to Graystone, that NFLP induced such breaches, that Defendants engaged

in a civil conspiracy, and that Gautreau and North tortiously interfered with business relationships. Graystone also brought a claim for "Injunction."

Before the court is Defendants' motion for summary judgment. [ECF No. 78]. Defendants argue that they are entitled to summary judgment on all of Graystone's claims.

The court GRANTS IN PART and DENIES IN PART the motion for summary judgment. The court grants summary judgment in favor of Defendants on Graystone's tortious inference with business relationships and injunction claims. The court grants in part and denies in part summary judgment on Graystone's misappropriation of trade secrets and breach of fiduciary duties claims. Finally, the court denies summary judgment on Graystone's claims that NFLP induced Gautreau and North to breach their fiduciary duties to Graystone and that Defendants engaged in a civil conspiracy.

## BACKGROUND[1]

In December 2018, Gautreau was Graystone's Executive Vice President of Production and, along with North, Co-Branch Manager of Graystone's Cottonwood branch, which was Graystone's flagship office, accounting for 47% of Graystone's revenue in 2018. As employees of Graystone, Gautreau and North had signed an Employee Handbook, in which they agreed to ensure the protection of Graystone's confidential information and trade secrets and to not use or disclose any proprietary information except for the benefit of Graystone. Additionally, as high-level employees, Gautreau and North had access to confidential company information, such as branch financials and employee compensation information, which was maintained in password-protected systems.

During December 2018, Gautreau and North began secret discussions with NFLP about potentially bringing Graystone's Cottonwood branch to NFLP. During these discussions, Gautreau

---

[1] The court recites the facts in the light most favorable to the nonmoving party, Graystone.

shared Graystone financial information with NFLP, which he did not have permission to share. On January 14, 2019, Gautreau and North traveled to NFLP's headquarters in Houston, Texas, and met with NFLP executives, including its owner, president, and executive vice president.

In mid- to late-January 2019, Gautreau and North asked Kipp Myers ("Myers"), Graystone's President, CEO, and 90% owner, whether he was still interested in selling Graystone or merging Graystone with another company. Myers had then recently negotiated the sale of Graystone to Evergreen Home Loans ("Evergreen"), but Evergreen had called off the deal on November 21, 2018. Gautreau and North suggested that Myers speak with NFLP and, on February 3–4, 2019, Gautreau, North, and Myers traveled to NFLP's Houston office to meet with NFLP executives and discuss NFLP's potential acquisition of Graystone or a potential merger between Graystone and NFLP.

Following this meeting, Myers told Gautreau and North that neither he nor Graystone had any interest in NFLP. Accordingly, Myers's subsequent contact with NFLP was essentially limited to a pro forma that NFLP sent to Myers on March 10, 2019. The pro forma contained the proposed terms of Myers's employment with NFLP, and Myers ignored it. Gautreau and North, on the other hand, continued communicating with NFLP. Neither Myers nor Graystone was aware of these discussions, and neither Gautreau nor North had permission to share Graystone information with NFLP.

During these communications, Gautreau, North, and NFLP discussed offering employment at NFLP to current Graystone employees. In one email thread between North and NFLP on February 26, 2019, North—while on a Graystone-funded trip intended to reward the company's top producers—negotiated employment terms at NFLP for the top producer at Graystone's Cottonwood branch, who closed 26.5% of the branch's total loan volume in 2018. For other

Graystone employees, Gautreau, North, and NFLP developed a system whereby Gautreau and North would send NFLP the employees' personal email addresses and compensation information so that NFLP could send the employees either applications for employment or offers of employment at NFLP. In at least some instances, NFLP emailed the offer letters directly to North, who subsequently forwarded them to the employees' personal email addresses. On March 29, 2019, North wrote to NFLP, "6 down 19 to go HA," and NFLP responded, "You are doing great. Way better than most." North and NFLP also coordinated renting a space so that Graystone employees could be introduced to and trained by NFLP.

In other communications, some of which predated when Myers met with NFLP in Houston, Gautreau, North, and NFLP discussed establishing various loan products and programs at NFLP, such as the Utah Housing program. On February 22, 2019, Gautreau contacted a loan product provider on behalf of NFLP and asked the provider to send product information to NFLP. It was important for NFLP to have these products and programs in place since loan officers at the Cottonwood branch relied on them to conduct business, and, without such products and programs in place, Cottonwood employees may have been discouraged from following Gautreau and North to NFLP.

On April 8, 2019, Gautreau and North announced that they were resigning from Graystone and joining NFLP. North also informed Myers that she anticipated that most of the loan officers and staff within the Cottonwood branch would be leaving as well. Given the implications of potentially losing Graystone's flagship branch, Myers asked Gautreau and North whether the payment terms in the pro forma that he received from NFLP in March would still be available if Graystone merged or joined with NFLP. When Gautreau informed Myers that NFLP agreed to this, Graystone agreed to merge with NFLP.

On April 10, 2019, Myers held a company-wide meeting in which he announced that Graystone was merging with NFLP. Even though NFLP had not yet given Graystone an official merger offer—or even a letter of intent or memorandum of understanding—Graystone instructed its employees to work to make the merger "as seamless and as painless as possible for everyone," and Graystone shared with NFLP its employee payroll and benefits information, as well as information regarding its office leases and information technology. Graystone did not negotiate or require a confidentiality or non-disclosure agreement from NFLP, and none of the information that Graystone shared with NFLP was marked as confidential or subject to other means to protect its secrecy. In addition, although Graystone never shared any customer data with NFLP or affirmatively authorized loan officers to download customer data and take it to NFLP, Wendee Carter, Graystone's Vice President and 10% owner, authorized John Parker, a marketing assistant, to download and distribute customer data to at least one loan officer who was transitioning from Graystone to NFLP.

Then, on April 19, 2019, Myers called off the merger with NFLP. Myers was disappointed with the payment terms in the offer that he received from NFLP the previous day, and he did not believe that he could trust NFLP. But it was not until a month later, on May 20, 2019, that Graystone demanded that NFLP and former Graystone employees who joined NFLP return and destroy any Graystone information in their possession. During the period between the announced merger and May 20, 2019, approximately 50 former Graystone employees joined NFLP.

Based on the foregoing, Graystone sued Defendants, asserting seven causes of action: 1) that Defendants misappropriated trade secrets under both the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b), and Utah Uniform Trade Secrets Act (UTSA), UTAH CODE § 13-24-1 *et seq.*; 2) that Gautreau and North breached their fiduciary duty to Graystone; 3) that

Gautreau and North breached their duty of loyalty to Graystone; 4) that NFLP induced Gautreau and North to breach their fiduciary duty and duty of loyalty to Graystone; 5) that Defendants engaged in a civil conspiracy; 6) that Gautreau and North tortiously interfered with business relationships; and 7) a claim for injunction.

Defendants moved for summary judgment on all of Graystone's claims.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

"At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted). However, summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS

### I.     Misappropriation of Trade Secrets

Defendants move for summary judgment on Graystone's claims that Defendants misappropriated Graystone's trade secrets. Defendants argue (1) that Graystone's efforts to maintain the secrecy of its alleged trade secrets while Gautreau and North negotiated with NFLP prior to April 8, 2019, were not reasonable as a matter of law; (2) that, even if such efforts were reasonable, Graystone waived any misappropriation claims by voluntarily transferring its information to NFLP after April 8, 2019; and (3) that the undisputed facts demonstrate that Defendants did not use Graystone's customer information to close loans.

   *A.     Reasonableness of Graystone's Efforts to Maintain Secrecy of Alleged Trade Secrets*

To establish a claim for misappropriation of trade secrets under both the DTSA, 18 U.S.C. § 1836(b), and UTSA, UTAH CODE § 13-24-1 *et seq.*, the proponent of the trade secret must first demonstrate the existence of a trade secret. *See Water & Energy Sys. Tech., Inc. v. Keil*, 974 P.2d 821, 822–23 (Utah 1999); *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 323 (Utah Ct. App. 2012); *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, No. 2:19-cv-00496-JNP-CMR, 2020 WL 6940736, at *21 (D. Utah Nov. 25, 2020). "What constitutes a trade secret is a question of fact," and "[t]he burden of demonstrating the existence of a trade secret is on the plaintiff, and there is no presumption in his or her favor." *Envirotech Corp. v. Callahan*, 872 P.2d 487, 494 (Utah Ct. App. 1994). Under both the DTSA and UTSA, information qualifies as a trade secret only if the owner has taken reasonable efforts to keep such information secret. *See* 18 U.S.C. § 1839(3)(A); UTAH CODE § 13-24-2(4)(b). "[R]easonable efforts does not mean 'all conceivable efforts,' nor are '[h]eroic measures' required. Thus, a plaintiff can meet this requirement even though a defendant 'manage[s] to point out aspects of plaintiff's procedures that

could have been stronger.'" *See John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1296–97 (D. Utah 2020) (internal citations omitted).

Defendants argue that Graystone's claims of misappropriation of trade secrets under the DTSA and UTSA must fail as a matter of law because Graystone did not take reasonable efforts to maintain the secrecy of its alleged trade secrets while Gautreau and North engaged in discussions with NFLP prior to April 8, 2019. Specifically, Defendants assert that Myers was aware that Gautreau and North were discussing potential opportunities with NFLP—and that Myers even participated in some of these discussions—but Myers did not object to these discussions, did not request an NDA from NFLP, and did not prohibit Gautreau and North from engaging in these discussions or sharing information about Graystone's business, even though Myers was aware that information regarding compensation and benefits would likely be involved in these discussions.

Defendants further contend that when Myers received an offer letter from NFLP in March 2019 with a pro forma indicating what his compensation could be if he joined NFLP and brought Graystone branches with him, Myers could see that the pro forma may have reflected Graystone information—including branch, products, and pricing information—but Myers did not act on this potential awareness.

Furthermore, Defendants contend that Graystone cannot maintain trade secret protection of its customer databases and various product offerings and pricing during this period because, in part, Graystone permitted departing loan officers to access, download, and take their customer databases with them when they left the company, and information regarding Graystone's loan products and pricing was available to any potential customer who called Graystone to inquire about financing.

In response, Graystone asserts that it took reasonable steps to protect the secrecy of its financial, pricing, and compensation information during the period prior to April 8, 2019. Specifically, Graystone has produced evidence that neither Myers nor Graystone was aware that Gautreau and North were still engaged in discussions with NFLP after the February trip to Houston, and that neither Myers nor Graystone "ever gave permission to Gautreau or North to share any Graystone information with NFLP," including Graystone's financial and employee compensation information. In addition, Graystone produced evidence that both Gautreau and North signed Graystone Employee Handbooks, in which they agreed to ensure the protection of Graystone's confidential information and trade secrets and to not use or disclose any proprietary information except for the benefit of Graystone.

Moreover, Graystone contends that the pro forma that Myers received along with an offer letter from NFLP in March 2019 could not have alerted Myers to the fact that Gautreau and North had been sharing Graystone information with NFLP. Graystone has produced evidence that Myers did not believe that the pro forma contained Graystone financial information and that the pro forma was accompanied by an email stating that "assumptions on rent and mix of business" were made in preparing the pro forma.

Graystone further contends that it took reasonable measures to protect the secrecy of its financial, pricing, and compensation information during this period because, in part, it was maintained in password-protected systems requiring unique usernames; only high-level employees could access much of this information; and, although loan officers had access to certain customer data, "[l]oan officers were not allowed to download customer information or data" per Graystone's privacy policy and "Graystone did not have a policy of allowing departing employees to take customer information with them."

Given this conflicting evidence and the fact that "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment," *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991), the court concludes that Graystone has shown that there is a genuine issue for trial regarding whether it took reasonable steps to maintain the secrecy of its alleged trade secrets during the period prior to April 8, 2019. *See Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178, 1185–86 (D. Utah 2007) (concluding that the plaintiffs "raised genuine disputes of material fact regarding whether [they] took reasonable steps to maintain the secrecy of [their] alleged trade secrets," which included customer lists and information relating to compensation and commission rates).

B.    *Waiver of Trade Secret Protection*

Defendants argue that, even if there is a genuine dispute regarding the reasonableness of Graystone's efforts to maintain the secrecy of its alleged trade secrets while Gautreau and North engaged in discussions with NFLP prior to April 8, 2019, Graystone waived any potential trade secret claims when it voluntarily disclosed such information to NFLP after April 8, 2019.

"First and foremost, trade secret law protects only information that is kept secret." *Flotec, Inc. v. S. Rsch.*, 16 F. Supp. 2d 992, 999–1000 (S.D. Ind. 1998). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *see also Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1109 (10th Cir. 2009) ("[I]ndispensable to an effective allegation of a trade secret is proof that the matter is, more or less, secret.") (citation omitted); *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 892 (E.D. Ky. 2003) (collecting cases reaching similar conclusion when applying the UTSA).

1)      Graystone's Voluntarily Disclosed Information

It is undisputed that, after Graystone agreed to merge with NFLP on April 8, 2019, Graystone provided NFLP with "information regarding Graystone's employee compensation, health insurance, 401k benefits, information technology, and certain other financial information (financial information on employee income and items related to leases and deposits)," as well as information regarding Graystone's equipment and leases.[2] It is also undisputed that Graystone provided this information to NFLP without negotiating or requiring a confidentiality or non-disclosure agreement from NFLP for any of this information, despite having previously done so with Evergreen.

Because Graystone disclosed this information to NFLP when NFLP was under no obligation to protect the confidentiality of the information, the court agrees with Defendants that this information lost any trade secret protections *at that time*. *See Ruckelshaus*, 467 U.S. at 1002; *Hertz*, 576 F.3d at 1109; *BDT Prods.*, 274 F. Supp. 2d at 892; *Flotec*, 16 F. Supp. 2d at 999–1000. Accordingly, to the extent that Graystone's claims are premised on the alleged misappropriation of this information *after* it was voluntarily disclosed, the claims fail as a matter of law.

However, to the extent that Graystone's claims are based on the alleged misappropriation of this information—including employee compensation and benefit information—*prior to* its voluntary disclosure after April 8, 2019, the subsequent voluntary disclosure of the information does not destroy the trade secret protection that existed at the time the information was allegedly misappropriated. *See Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, Nos. 96-1062, 96-1083,

---

[2] The parties dispute whether Graystone transferred its branch financials to NFLP after April 8, 2019. However, because "Graystone alleges that its financial . . . information was misappropriated and the resulting damages occurred *prior* to April 8, 2019," (emphasis in original), the court grants Defendants' motion for summary judgment to the extent that Graystone's misappropriation claims are based on the alleged misappropriation of branch financial information *after* April 8, 2019.

1997 WL 258883, at *2 (Fed. Cir. May 16, 1997) ("[T]he disclosure of a trade secret in a patent places the information comprising the trade secret into the public domain . . . and the trade secret is extinguished." Therefore, the defendant "could only be liable on [the plaintiff's] trade secret claims for products incorporating the trade secret that were sold by [the defendant] before the date the patent was issued."). Accordingly, such claims are not foreclosed as a matter of law.[3]

2)      Graystone's Customer Databases

Defendants further argue that Graystone waived any trade secret protections of its customer databases after it agreed to merge with NFLP on April 8, 2019. Specifically, Defendants have produced evidence that both Myers and Wendee Carter (Graystone's Vice President and 10% owner) authorized Graystone employees to download customer databases after April 8, 2019, so that they could be taken to NFLP. In particular, one employee testified that between April 8 and April 20, 2019, Myers told him that he could take his database with him, and another employee, John Parker, testified to the following: "[A]t some point I remember calling Wendee to ask her if it's okay for me to download databases and give them to loan officers and she said yes."[4] Defendants have produced evidence that Parker's conversation with Carter occurred on April 8, 2019.

Defendants also produced evidence that loan officers had the ability to download certain customer information from Graystone's system and that it was Graystone's practice, and common

---

[3] While the court agrees with Defendants that almost all of the damages that Graystone alleges that it suffered as a result of Defendants' alleged misappropriation of trade secrets ("the loss of Graystone employees, clients, and customers and the loss of goodwill") occurred after April 8, 2019, this does not foreclose Graystone's claims since Graystone produced evidence that the alleged misappropriation of trade secrets that allegedly caused these damages occurred prior to April 8, 2019.

[4] These statements would likely be admissible at trial as non-hearsay given that Myers and Carter were representatives of Graystone and Myers is a party opponent in this action. *See* FED. R. EVID. 801(d)(2)(A); *Peyton v. Kellermeyer Co.*, 115 F. App'x. 825, 829 n.2 (6th Cir. 2004).

in the mortgage industry, to "release the database to the departing loan officer." Indeed, Defendants produced evidence that Graystone's system had a feature enabled so that loan officers could export and take their customer databases with them when they left Graystone. Defendants further produced evidence that, despite knowing that loan officers could access customer data and previously encouraging all Graystone employees (including loan officers) to facilitate the transition to NFLP, at no point between April 8 and May 20, 2019, did Myers or any other Graystone officer instruct loan officers that they could not take customer databases to NFLP.

In response, Graystone argues that neither Myers, Carter, nor Graystone ever gave loan officers permission to download customer data from Graystone's system, including after the merger with NFLP was announced. In support of this argument, Graystone has produced a declaration from Myers, in which Myers states that "Graystone never gave Graystone loan officers permission to download or take customer data from Graystone's Surefire system, even after the merger with NFLP was announced." In the declaration, Myers further states that "Graystone never transferred to NFLP or shared with NFLP any information, data, or documents contained within Graystone's Surefire (Top of Mind) customer relationship management software system." Moreover, Myers also asserts that "[l]oan officers were not allowed to download customer information or data from Surefire as per Graystone's privacy policy," and that "Graystone did not have a policy of allowing departing employees to take customer information with them from the Surefire system," with only two instances in which loan officers were permitted to take their customer information with them. Graystone also points to the confidentiality and non-disclosure provisions that Graystone's employees were required to agree to in the Employee Handbook.

However, Graystone has failed to point to any evidence that directly disputes that Wendee Carter, Graystone's Vice President and only other owner, gave John Parker—a Graystone

marketing employee (not a loan officer)—permission to download and distribute loan officers' customer databases during the period after Graystone agreed to merge with NFLP. Indeed, at oral argument on this motion, Graystone's counsel conceded that there was evidence in the record suggesting that, on April 8, 2019, Parker asked Carter for permission to download a loan officer's customer database and then subsequently downloaded it.

In addition, Graystone does not dispute that neither Myers nor any other Graystone officer made any affirmative efforts between April 8, 2019, and May 20, 2019, to instruct loan officers that they could not take customer databases to NFLP, even though Graystone knew that loan officers could access and download their customer databases and had been encouraging loan officers to work towards a "seamless and . . . painless" transition to NFLP.

Because Graystone did not sufficiently protect its customer databases from disclosure to NFLP after Graystone agreed to merge with NFLP, the court agrees with Defendants that, to the extent Graystone's customer databases were protected trade secrets, such protection was extinguished at that time. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189–90 (10th Cir. 2009) (reversing district court's determination that information constituted a trade secret when the information was known outside of the company and the company took no measures to prevent the information's dissemination). Accordingly, to the extent that Graystone's misappropriation of trade secrets claims are founded on the misappropriation of its customer databases after Graystone agreed to merge with NFLP on April 8, 2019, the claims are foreclosed.

C.    *Defendants' Use of Graystone's Trade Secrets to Close Loans*

Defendants further argue that they did not use Graystone's alleged trade secrets to close loans. At bottom, Defendants argue that Graystone has produced no actual evidence that Defendants used Graystone's customer information to close loans after May 20, 2019. Given the

court's conclusion that Graystone's customer information lost any trade secrets protection after Graystone agreed to merge with NFLP on April 8, 2019, the court need not—and does not—address whether there is evidence that Defendants used Graystone's customer information to close loans after May 20, 2019.

In sum, the court grants in part and denies in part Defendants' motion for summary judgment on Graystone's misappropriation of trade secrets claims. Specifically, to the extent that Graystone's misappropriation claims are based on Defendants' alleged misappropriation of trade secrets before Graystone agreed to merge with NFLP on April 8, 2019, Defendants' motion for summary judgment is denied. However, to the extent that Graystone's misappropriation claims are based on Defendants' alleged misappropriation after April 8, 2019, of the information that Graystone undisputedly provided to NFLP or Graystone's customer or branch financial information, Defendants' motion for summary judgment is granted.

## II.    Breach of Gautreau and North's Fiduciary Duties

Defendants move for summary judgment on Graystone's claims that Gautreau and North breached their fiduciary duty and duty of loyalty to Graystone. Because the court agrees with Defendants that the duty of loyalty is a component of an employee's fiduciary duties, *see Resol. Tr. Corp. v. Hess*, 820 F. Supp. 1359, 1365 (D. Utah 1993), the court treats these two claims as a single claim that Gautreau and North breached their fiduciary duties to Graystone.

Defendants argue that they are entitled to summary judgment on Graystone's breach of fiduciary duties claim because (1) the claim is preempted by the UTSA; (2) "the evidence is undisputed that Gautreau and North did not breach any duty to Graystone"; and (3) "even if disputed facts exist as to the alleged breach, Graystone's own conduct is a superseding cause of its alleged damages thereby cutting off any purported liability."

15

A.      *Preemption Under the UTSA*

The UTSA has a preemption provision that provides:

(1) Except as provided in Subsection (2), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

(2) This chapter does not affect:

   (a) contractual remedies, whether or not based upon misappropriation of a trade secret;

   (b) other civil remedies that are not based upon misappropriation of a trade secret; or

   (c) criminal remedies, whether or not based upon misappropriation of a trade secret.

UTAH CODE § 13-24-8.

In interpreting the scope of the UTSA's preemption provision, the Utah Court of Appeals held that "a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information." *CDC Restoration*, 274 P.3d at 331. Accordingly, "if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective o[f] whatever surplus elements of proof were necessary to establish it." *Id.* (citation omitted). "Stated differently, if the [non-UTSA] claim fails without the allegations regarding misuse of information, the UTSA preempts it." *Giles Constr., LLC v. Tooele Inventory Sol., Inc.*, No. 2:12-cv-37, 2015 WL 3755863, at *6 (D. Utah June 16, 2015). "However, to whatever extent that a claim is 'based upon wrongful conduct independent of the misappropriation of trade secrets' or otherwise confidential information, it is not preempted." *CDC Restoration*, 274 P.3d at 331 (citation omitted). This interpretation of the preemption provision "preserves the UTSA as the sole noncontractual civil remedy for misappropriation of a trade secret, while preserving tort, restitutionary, and other causes of action that 'seek[ ] to remedy an injury caused not by the misappropriation of proprietary information, but by separate conduct." *Id.* (citation omitted).

16

Defendants argue that Graystone's claim that Gautreau and North breached their fiduciary duties is preempted by the UTSA because the core of the claim is "allegations of misappropriation," and the claim is "premised on the same allegations [as the misappropriation of trade secrets claims] that Gautreau and North disclosed Graystone's trade secrets and confidential information to NFLP." In response, Graystone argues that its breach of fiduciary duties claim is "not based solely on [its] claim[s] for misappropriation of its trade secrets, nor [does it] depend on or necessarily involve the misappropriation claim[s]." In particular, Graystone asserts that it has produced evidence of wrongful conduct that is independent of the misappropriation claims and, therefore, the UTSA does not preempt the breach of fiduciary duties claim.

Graystone contends that the evidence that it has produced establishes that Gautreau and North breached their fiduciary duties to Graystone in three ways: (1) by secretly recruiting and soliciting Graystone employees to leave Graystone and join them at NFLP; (2) by assisting NFLP in "putting Graystone loan programs in place to ensure that NFLP had the proper infrastructure to entice Graystone employees to go with" them to NFLP; and (3) by sharing Graystone's confidential information. The court concludes that Graystone's breach of fiduciary duties claim survives UTSA preemption to the extent that it is premised on Gautreau and North's alleged secret recruitment and solicitation of Graystone employees and assistance to NFLP in putting in place Graystone loan programs. However, the court also concludes that the claim is precluded by the UTSA to the extent that it is premised on Gautreau and North's alleged disclosure of Graystone's confidential information.

Specifically, as stated previously, "to whatever extent [ ] a claim is 'based upon wrongful conduct independent of the misappropriation of trade secrets' or otherwise confidential information, it is not preempted" by the UTSA. *CDC Restoration*, 274 P.3d at 331 (citation

omitted). While other state courts have held that the UTSA preempts all claims that are factually related to the alleged misappropriation of trade secrets, the Utah Court of Appeals has specifically rejected this interpretation. *GeometWatch Corp. v. Hall*, No. 1:14-cv-00060-JNP-PMW, 2017 WL 1136946, at *18 (D. Utah Mar. 27, 2017) (citing *CDC Restoration*, 274 P.3d at 330–31). Accordingly, if the claim survives even without the allegations regarding misuse of information, it is not preempted by the UTSA. *See Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, No. 2:20-cv-00062-JNP-JCB, 2021 WL 1192579, at *5 (D. Utah Mar. 30, 2021); *Giles Constr.*, 2015 WL 3755863, at *6.

Here, Graystone's claim that Gautreau and North breached their fiduciary duties to Graystone by recruiting and soliciting Graystone employees to join them at NFLP survives even without the allegations regarding the misuse of Graystone's information. Specifically, Graystone has produced evidence that, while employed by Graystone, Gautreau and North acted as intermediaries between Graystone employees and NFLP to assist NFLP in acquiring Graystone's employees. In one instance, North, while still employed by Graystone, negotiated, on behalf of NFLP, employment terms at NFLP with the Cottonwood branch's top producer. In another instance, Gautreau provided NFLP with the personal email addresses of Cottonwood employees and asked NFLP to send them links so that the employees could apply for employment at NFLP. For other Cottonwood employees, NFLP emailed offer letters for the employees to North, who subsequently forwarded them to the employees' personal email addresses. In addition, Graystone has produced evidence that, while North was still employed by Graystone, she was coordinating with NFLP to provide opportunities for Graystone employees to be introduced to and trained by NFLP, with such opportunities to take place after she resigned from Graystone. None of this allegedly wrongful conduct depends on the alleged misuse of Graystone's information.

Much of the evidence that Graystone has produced to support its allegation that Gautreau and North inappropriately recruited and solicited Graystone employees involves information that Graystone alleges was misappropriated confidential information, particularly employee compensation information (e.g., "On March 19, 2019, North sent an NFLP offer letter from her personal email to [an employee's] personal email, saying 'Take a look and we can make changes.' Before North sent [the employee] the offer letter, she first corresponded with NFLP to set the terms of his offer. The commission rate in NFLP's offer was the same as [the employee] made at Graystone because North gave that information to NFLP."; "On March 29, North sent an email to NFLP with the personal email and compensation for another Cottonwood employee [ ] and instructed NFLP to email her an application."). However, the fact that Graystone's breach of fiduciary duties claim has some factual overlap with its misappropriation of trade secrets claims is not sufficient to preclude the claim under the UTSA. As previously discussed, Graystone has produced sufficient evidence of allegedly wrongful solicitation and recruitment that does not depend on the misuse of confidential information. Thus, the claim survives UTSA preemption.

Similarly, Graystone's allegation that Gautreau and North breached their fiduciary duties to Graystone by assisting NFLP in putting in place Graystone loan programs does not depend on the alleged misuse of confidential information. Rather, at its core, the evidence that Graystone has produced to support this allegation suggests that Gautreau and North communicated with NFLP regarding various loan products and programs and encouraged NFLP to add these products and programs to make it easier to recruit Graystone employees to NFLP. Graystone does not contend that these communications involved confidential information or trade secrets. Accordingly, to the extent that Graystone's breach of fiduciary duties claim is based on such conduct, it is not preempted by the UTSA. *See Premier Sleep Sols.,* 2021 WL 1192579, at *5.

In contrast, Graystone's allegation that Gautreau and North breached their fiduciary duties to Graystone by sharing Graystone's confidential information "fails without the allegations regarding misuse of information." *See Giles Constr.*, 2015 WL 3755863, at *6. Indeed, in its opposition to Defendants' motion for summary judgment, Graystone presented its arguments regarding this claim and its misappropriation of trade secrets claims as one and the same. Thus, to the extent that Graystone's breach of fiduciary duties claim is based on Gautreau and North's alleged disclosure of Graystone's confidential information, it is preempted by the UTSA.

In sum, the court concludes that Graystone's breach of fiduciary duties claim survives UTSA preemption to the extent that it is based on Gautreau and North's alleged secret recruitment and solicitation of other Graystone employees and assistance to NFLP in establishing Graystone loan products and programs. But the court also concludes that the claim is precluded by the UTSA to the extent that it is based on Gautreau and North's alleged disclosure of Graystone's confidential information.

B.    *Evidence of Breach of Fiduciary Duties*

Defendants further argue that Graystone's claim that Gautreau and North breached their fiduciary duties to Graystone fails because "the evidence is undisputed that Gautreau and North did not breach any duty to Graystone." In particular, Defendants argue that Gautreau and North's conduct was mere preparation to compete—rather than inappropriate solicitation or recruitment—and that "Gautreau and North did not take any improper steps to set up an infrastructure with NFLP to facilitate the transition of [Graystone] employees . . . to NFLP." But the evidence suggests otherwise.

In support of their arguments, Defendants primarily rely on case law establishing that "actions prior to termination of an [employment] relationship that constitute mere preparation for

competition . . . do not contravene an employee's or other agent's duty to the [employer]." *See Premier Sleep Sols.*, 2021 WL 1192579, at *7 (quoting RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. c (Am. Law Inst. 2006)); *see also Scenic Aviation, Inc. v. Blick*, No. 2:02-cv-01201-PGC, 2003 WL 26060445, at *12 (D. Utah Aug. 4, 2003); *Crawford & Co. v. M. Hayes & Assocs., L.L.C.*, 13 F. App'x. 174, 176–77 (4th Cir. 2001). However, this case law also acknowledges that "an agent's duty as a fiduciary is to act loyally for the principal's benefit in all matters connected with the agency relationship," and that, "[t]hroughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors." *Premier Sleep Sols.*, 2021 WL 1192579, at *7 (quoting RESTATEMENT (THIRD) OF AGENCY §§ 8.01, 8.04).

### 1) Improper Solicitation and Recruitment of Graystone Employees

Here, with respect to Graystone's allegation that Gautreau and North improperly solicited and recruited Graystone employees, Graystone has produced evidence that, while still employed by Graystone, Gautreau and North negotiated, on behalf of NFLP, employment terms at NFLP with the top producer at Graystone's Cottonwood branch (while North and the Cottonwood branch's top producer were on a Graystone-funded trip intended to reward the company's top producers no less); acted as an intermediary between NFLP and other Graystone employees by sending contact information to NFLP and then emailing NFLP offer letters to current Graystone employees; and arranged for Graystone employees to be introduced to and trained by NFLP. This alleged conduct far exceeds "discussions with fellow co-workers" or "simply answer[ing] questions from coworkers about the employee's future plans or employer."

In addition, although Defendants contend that Graystone's evidence merely shows that Gautreau and North facilitated opportunities with NFLP for Graystone employees only after the employees independently expressed interest in following Gautreau and North and joining NFLP,

Graystone has produced evidence that suggests otherwise. Specifically, in his declaration, John Parker, a former marketing assistant at Graystone, testified that "[o]n Wednesday, April 3, 2019 or Thursday, April 4, 2019, Jason Gautreau initiated one or more conversations with me at Graystone's Cottonwood Heights office where Mr. Gautreau told me that the entire Cottonwood Heights branch was leaving Graystone to join Network and asked me if I wanted to leave Graystone to also join Network." Similarly, a reasonable jury could infer that Gautreau and North engaged in inappropriate solicitation and recruitment of Graystone employees based on the numerous contacts between Gautreau and North and NFLP regarding offering employment at NFLP to Graystone employees, and particularly North's messages to NFLP that she would have "a few more trail tomorrow"—after  providing NFLP with the contact information of Graystone employees to whom NFLP should send offer letters—and "6 down 19 to go HA," in reference to the number of people she "had put offers to in the branch."

Accordingly, although Defendants have produced evidence from former Graystone employees who maintain that they were not solicited to join NFLP by Gautreau or North, the court concludes that a reasonable jury could infer that such solicitation and recruitment occurred and that, consequently, Gautreau and North breached their fiduciary duties to Graystone. *See Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 31 (D.D.C. 2019) ("[W]hether or not a departing employee accused of soliciting employees merely presented his colleagues with an opportunity for employment elsewhere, or crossed the line into 'solicitation' in violation of a fiduciary duty, is a fact question that is generally for the jury to decide.") (quoting *Cent. States Indus. Supply, Inc. v. McCullough*, 279 F. Supp. 2d 1005, 1044 (N.D. Iowa 2003)); *see also Farm Bureau*, 505 F. Supp. 2d at 1188–89 (concluding that the evidence supported a reasonable inference of unlawful

recruitment even though former employees testified that the defendant did not cause them to leave).

>    2)    Improper Assistance to NFLP in Establishing Graystone Loan Products

Moreover, in support of its allegation that Gautreau and North assisted NFLP in setting up Graystone loan products and programs, Graystone has produced evidence that, while Gautreau and North were still employed by Graystone, they provided to NFLP, a potential competitor of Graystone, contact information for a representative of the Utah Housing Corporation and worked with NFLP to get Utah Housing set up at NFLP. Viewing the evidence in the light most favorable to Graystone, *see Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1313 (10th Cir. 1999), Graystone has also produced evidence that North wanted to keep these conversations secret; that setting up Utah Housing at NFLP would be important in order to recruit other Graystone employees to join NFLP since 8 to 10 percent of the loans closed at Graystone's Cottonwood branch used the Utah Housing program; and that Gautreau had further communications with NFLP about other loan products that were of interest to loan officers at Graystone's Cottonwood branch. Graystone also produced evidence that, on February 22, 2019, Gautreau contacted a loan product provider and requested that the provider send product information to NFLP, and that, on February 8, 2019, North emailed Graystone marketing materials to NFLP so that they could be rebranded.

Given this evidence, the court concludes that Graystone has produced sufficient evidence to raise a reasonable inference that Gautreau and North breached their fiduciary duties to Graystone by assisting NFLP, a potential Graystone competitor, while still employed by Graystone. *See Farm Bureau*, 505 F. Supp. 2d at 1188–89 (denying summary judgment because defendants' numerous contacts raised a reasonable inference that one of the defendants breached his fiduciary duties to his former employer); *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1114

(D. Colo. 2016) ("Whether an employee's actions constitute a breach of his or her duty of loyalty is generally a question of fact based on consideration of all the circumstances of the case.").

    C.    *Graystone's Conduct as a Superseding Cause*

Defendants further argue that, "even if disputed facts exist as to the alleged breach, Graystone's own conduct is a superseding cause of its alleged damages thereby cutting off any purported liability."

As an initial matter, the court agrees with Defendants that, in order to establish a claim for breach of fiduciary duties, the plaintiff must demonstrate that "the plaintiff's damages were actually and proximately caused by the defendant's breach." *Giles v. Min. Res. Int'l, Inc.*, 338 P.3d 825, 827 (Utah Ct. App. 2014). Accordingly, if Defendants are able to identify a sufficient intervening cause that breaks "the thread of causation" between Defendants' alleged breach and Graystone's alleged damages, Defendants will be relieved of any liability for the alleged breach. *See Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292–93 (Utah Ct. App. 1996). "An intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and damages." *Id.* at 1293.

Because the issues of proximate cause and intervening cause are issues of fact, Utah courts have recognized that they should generally be determined by the jury. *See Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992) ("Because proximate cause is an issue of fact, we refuse to take it from the jury if there is *any* evidence upon which a reasonable jury could *infer* causation.") (emphasis added); *Trujillo v. Utah Dep't of Transp.*, 986 P.2d 752, 764 (Utah Ct. App. 1999) ("[T]he issue of proximate cause is a question of fact for the jury to determine in all but the clearest cases."); *Kilpatrick*, 909 P.2d at 1293 ("Utah courts have always recognized the fact-intensive nature of intervening cause inquiries."). "For a trial court to rule there is no proximate cause as a

matter of law it must determine that: '(1) there is no evidence to establish a causal connection, thus leaving causation to jury speculation,' or (2) 'reasonable persons could not differ on the inferences to be derived from the evidence on proximate causation.'" *Jacobs-Peterson v. United States*, 219 F. Supp. 3d 1091, 1095 (D. Utah 2016) (citation omitted).

Defendants argue that Myers's conduct after Gautreau and North informed him that they were leaving Graystone to join NFLP was a sufficient, unforeseeable intervening cause that completely broke the connection between Gautreau and North's alleged breach of their fiduciary duties and Graystone's alleged damages. Specifically, Defendants assert that it was unforeseeable that Myers would decide that Graystone should merge with NFLP, initially facilitate the planned merger, and then pull the plug on the merger approximately ten days later, and that these actions were the true cause of Graystone's alleged damages. Defendants further argue that all of Graystone's alleged damages occurred after Myers initially decided that Graystone would merge with NFLP, which highlights the pivotal role that Myers's actions played in Graystone's alleged damages. The court does not find Defendants' arguments persuasive.

First, Defendants' emphasis on the fact that all of Graystone's alleged damages occurred after Myers initially decided that Graystone would merge with NFLP on April 8, 2019, is misplaced. Although the court agrees with Defendants that almost all of Graystone's alleged damages—the loss of employees and branches, monetary losses from monthly lease payments, loss of business and future business, and loss of goodwill—occurred after April 8, 2019, Gautreau and North's alleged breach of fiduciary duties occurred *prior* to April 8, 2019. Therefore, as explained next, a reasonable jury could infer that such damages flowed from conduct that pre-dated Myers's decision that Graystone would merge with NFLP.

Second, with respect to the Cottonwood branch, Graystone has produced evidence that multiple Cottonwood employees were already planning to follow Gautreau and North and join NFLP *prior* to April 8, 2019, when Myers decided that Graystone would merge with NFLP. Accordingly, while a reasonable jury could infer that Gautreau and North's alleged solicitation and recruitment of Graystone employees and assistance to NFLP in setting up Graystone loan products caused these employees to leave Graystone and join NFLP, the inference that Myers's actions *after* April 8, 2019, caused such departures is less tenable. In addition, Defendants' own evidence that "[i]t is common in the mortgage industry for teams of loan officers and staff to move together from one mortgage company to another" casts further doubt on the role that Myers played in causing the alleged damages associated with the Cottonwood branch, while strengthening the inference that Gautreau and North's alleged actions that facilitated the employees' departures caused such damages. Thus, the court concludes that a reasonable jury could infer that Gautreau and North's alleged breach of their fiduciary duties proximately caused Graystone's alleged damages associated with the Cottonwood branch, and that Myers's actions after April 8, 2019, did not break the chain of causation.

Whether Myers's actions were a sufficient intervening cause with respect to the Sugarhouse and Denver branches is a much closer question. Defendants forcefully argue that Graystone has not cited any evidence that Gautreau or North "had *any* contact with any employees from the Sugarhouse or Denver branches about NFLP prior to Myers'[s] April 8 decision" (emphasis in original), and that it was Myers's own actions, "announcing that Graystone was merging with NFLP and encouraging employees to transition," that caused Graystone's Sugarhouse and Denver employees to join NFLP, even after Myers called off the merger. Even so, the court concludes that a reasonable jury could find that Myers's actions after April 8, 2019, were a foreseeable

consequence of Gautreau and North's alleged breach of fiduciary duties and, thus, that such actions do not cut off Defendants' liability with respect to the Sugarhouse and Denver branches as a matter of law.

Specifically, because Graystone's Cottonwood branch accounted for 47% of Graystone's revenue in 2018, a reasonable jury could conclude that it was foreseeable that Myers would respond to the imminent loss of the branch by seeking a merger partner, especially since Myers, as recently as November 2018, had planned to sell Graystone to Evergreen. Indeed, Graystone has presented evidence that Gautreau "expected that Graystone would fall to pieces" without the Cottonwood branch. Similarly, given Graystone's experiences with Evergreen and the fact that Evergreen backed out of the deal, a reasonable jury could find that it was foreseeable that Myers would work doubly hard to facilitate a successful merger, but also that the deal would ultimately fall through. Although the court acknowledges that the jury would be required to work through a chain of inferences to find that Myers's actions were not a sufficient intervening cause to relieve Defendants of any liability with respect to the Sugarhouse and Denver branches, the court declines to take the issue from the jury at this stage. *See Butterfield*, 831 P.2d at 106; *Kilpatrick*, 909 P.2d at 1293; *Jacobs-Peterson*, 219 F. Supp. 3d at 1095.

In sum, the court grants in part and denies in part Defendants' motion for summary judgment on Graystone's claim that Gautreau and North breached their fiduciary duties to Graystone. The court grants the motion to the extent that Graystone's claim is based on Gautreau and North's alleged disclosure of Graystone's confidential information. However, the court denies the motion to the extent that Graystone's claim is based on Gautreau and North's alleged (1) solicitation and recruitment of Graystone employees to leave Graystone and join them at NFLP and (2) assistance to NFLP in establishing Graystone loan products and programs at NFLP.

### III.    Inducing Gautreau and North to Breach Their Fiduciary Duties

Defendants move for summary judgment on Graystone's claim that NFLP induced Gautreau and North to breach their fiduciary duties to Graystone. In support of their motion, Defendants merely argue that, because Graystone cannot establish an underlying breach by Gautreau and North, Graystone's further claim that NFLP induced such a breach also fails as a matter of law.[5]

However, as explained above, the court concludes that Graystone has presented sufficient evidence to raise a genuine dispute of material fact regarding whether Gautreau and North breached their fiduciary duties to Graystone by soliciting and recruiting Graystone employees to join them at NFLP and assisting NFLP in establishing Graystone loan programs at NFLP. Accordingly, the court concludes that Defendants' argument is unavailing. Moreover, because Graystone has produced evidence of numerous communications between Gautreau and North and NFLP regarding offering employment at NFLP to Graystone employees and establishing various loan products and programs at NFLP, the court concludes that Graystone has raised a genuine issue

---

[5] In their reply brief, Defendants also note that "the gravamen of the claim of aiding and abetting a breach of fiduciary duty is the defendant's knowing participation in the fiduciary's breach," *Mower v. Simpson*, 278 P.3d 1076, 1088 (Utah Ct. App. 2012) (internal alterations omitted), and they argue that "[t]here is no evidence that NFLP engaged in 'fraudulent acts' or 'knowingly participated' in Gautreau's and North's alleged breaches." But Graystone has produced evidence of the numerous communications between Gautreau and North and NFLP regarding offering employment at NFLP to current Graystone employees and of Gautreau and North's assistance to NFLP in establishing Graystone loan products and programs. The evidence also suggests that NFLP knew that Gautreau and North were employed by Graystone while these communications were taking place. Thus, the court is not persuaded by Defendants' argument that "[t]here is no evidence that NFLP . . . 'knowingly participated'" in the alleged breach. In addition, the court further rejects Defendants' argument for this claim that was first raised in their reply because "[t]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief. The waiver rule is particularly appropriate when applied to motions for summary judgment because the nonmoving party is deprived of an opportunity to cite evidence creating a dispute of material fact." *See Rodriguez v. Cascade Collections LLC*, No. 2:20-cv-00120-JNP-DBP, 2021 WL 1222147, at *12 (D. Utah Mar. 31, 2021) (internal citations omitted).

for trial regarding whether NFLP induced Gautreau and North to breach their fiduciary duties to Graystone. *See Farm Bureau*, 505 F. Supp. 2d at 1189–90 (denying summary judgment because defendants' communications raised genuine disputes of material fact regarding whether one defendant had been induced to breach his fiduciary duties to the plaintiffs by other defendants).

Thus, the court denies Defendants' motion for summary judgment on Graystone's claim that NFLP induced Gautreau and North to breach their fiduciary duties. However, because Graystone's allegation that Gautreau and North breached their fiduciary duties to Graystone by disclosing confidential information did not survive UTSA preemption, Graystone's inducement claim similarly cannot be premised on that alleged breach. *See Premier Sleep Sols.*, 2021 WL 1192579, at *5, *8.

## IV.   Civil Conspiracy

Defendants move for summary judgment on Graystone's civil conspiracy claim. "In order to prove a civil conspiracy, [Graystone] must establish the following five elements: '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'" *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1141 (10th Cir. 2006) (quoting *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993)).

Defendants argue that they are entitled to summary judgment on the claim because (1) it is preempted by the UTSA; (2) Graystone has failed to present evidence "that there was ever a meeting of the minds between Gautreau, North, and NFLP to steal Graystone's employees and branches"; (3) "[t]here was nothing covert or illegal about Defendants' conduct"; (4) Defendants did not commit an underlying tort; and (5) Graystone's conduct was a superseding cause of any of its alleged damages.

A. *Preemption Under the UTSA*

Defendants argue that Graystone's claim that Gautreau, North, and NFLP conspired to "carr[y] out the theft of essentially 65-75% of Graystone's business" is precluded by the UTSA. Specifically, Defendants present the same argument that they presented regarding the breach of fiduciary duties claim—that is, that the conspiracy claim is "premised on the same allegations that Gautreau and North disclosed Graystone's trade secrets and confidential information to NFLP."

However, as explained previously, if the claim survives even without the allegations regarding misuse of information, it is not preempted by the UTSA. *See Premier Sleep Sols.*, 2021 WL 1192579, at *5; *Giles Constr.*, 2015 WL 3755863, at *6. This is true even if the claim is factually related to the alleged misuse of confidential information. *See GeometWatch Corp.*, 2017 WL 1136946, at *18. Here, although factually related to Defendants' alleged misuse of Graystone's information, Graystone's civil conspiracy claim survives even without the allegations regarding misuse of information. In particular, Graystone asserts that the object of the alleged conspiracy was "to secretly recruit and take as many Graystone employees and branches as possible without having to compensate Graystone's owners for its valuable businesses." This alleged object of the conspiracy does not depend on the misuse of confidential information.

Similarly, Graystone contends that the numerous contacts between Gautreau and North and NFLP in which they coordinated offering employment at NFLP to current Graystone employees demonstrates a meeting of the minds among the Defendants to accomplish the conspiracy's alleged object. Although many of these contacts involved allegedly confidential information, others did not, such as when North helped negotiate employment terms for the Cottonwood branch's top producer to join NFLP, and when, on March 29, 2019, North emailed NFLP "6 down 19 to go HA," and NFLP responded, "You are doing great. Way better than most."

Moreover, as demonstrated above, Graystone has produced evidence that raises a genuine dispute of material fact regarding whether Gautreau and North breached their fiduciary duties to Graystone (i.e., committed underlying torts), independent of any alleged misuse of information.

Accordingly, Graystone's civil conspiracy claim can survive even without its allegations regarding misuse of information and, consequently, the claim is not preempted by the UTSA.

B.      *Meeting of the Minds*

Defendants next argue that they are entitled to summary judgment on Graystone's civil conspiracy claim because Graystone has failed to present evidence "that there was ever a meeting of the minds between Gautreau, North, and NFLP to steal Graystone's employees and branches." Specifically, Defendants contend that Graystone's allegation that there was a meeting of the minds is based on conjecture and speculation since all Graystone has done is "identif[y] a number of actions allegedly taken by only Gautreau and North and then conclude[] that Gautreau and North '*apparently*' came to a deal with NFLP." (Emphasis in original.) The court disagrees.

To prove a meeting of the minds, it is not necessary "to prove that the [alleged co-conspirators] actually came together and entered into a formal agreement to do the acts complained of by direct evidence." *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987). Rather, "conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators." *Id.*

Here, Graystone has produced sufficient circumstantial evidence from which a reasonable jury could infer that there was a meeting of the minds. In particular, Graystone has produced evidence of numerous communications between Gautreau and North and NFLP regarding offering employment to Graystone employees. Perhaps most suggestive of a meeting of the minds is the email chain between North and NFLP on March 29, 2019, in which North wrote, "6 down 19 to

31

go HA," and NFLP responded, "You are doing great. Way better than most." Graystone has produced evidence that North's comment referred to the number of employees at the Cottonwood branch to whom she had sent NFLP offer letters at that time.

In addition, Graystone has produced evidence that, on April 4, 2019, Gautreau emailed NFLP with the personal email addresses of current Graystone employees so that NFLP could email them links to applications for employment at NFLP; that, while still employed by Graystone, North negotiated employment terms at NFLP for the Cottonwood branch's top producer; and that NFLP sent to North's personal email address letters offering employment at NFLP to current Graystone employees, and then North forwarded these letters to the employees' personal email addresses. Graystone has also produced evidence that North, while still employed by Graystone, worked with NFLP to rent a space so that Graystone employees could be introduced to and trained by NFLP after she resigned from Graystone.

That being said, the court recognizes that Graystone must demonstrate a meeting of the minds "by evidence that is clear and convincing," *World Wide*, 450 F.3d at 1141, and agrees with Defendants that this evidence also allows one to infer that there was no meeting of the minds among Defendants to "steal" Graystone's employees and branches (as opposed to lawfully recruit at-will employees). However, at this stage, "the court must examine the record and draw all reasonable and justifiable inferences in the light most favorable to [Graystone] as the nonmoving party." *Transp. All. Bank v. Helping Hands Hous. I*, No. 1:13-cv-46, 2015 WL 3453762, at *4 (D. Utah May 29, 2015). Accordingly, the court concludes that a reasonable jury could infer from the circumstantial evidence that there was a meeting of the minds and, thus, declines to take the issue away from the jury at this time. *See id.* ("This fact-intensive question is best resolved at trial.").

### C.      Covert or Illegal Conduct

Defendants next argue that Graystone's civil conspiracy claim fails because "[t]here was nothing covert or illegal about Defendants' conduct." Because "covert conduct" is not an essential element of a civil conspiracy claim, the court need not, and does not, address whether Defendants engaged in any covert conduct. Illegal conduct, however, is an essential element of a civil conspiracy claim, and it is discussed next.

### D.      Underlying Tort

"The claim of civil conspiracy 'requires, as one of its essential elements, an underlying tort.'" *Puttuck v. Gendron*, 199 P.3d 971, 978 (Utah Ct. App. 2008) (internal alterations and citation omitted). Defendants argue that they are entitled to summary judgment on Graystone's civil conspiracy claim because Defendants did not commit an underlying tort. However, as discussed previously, the court concludes that there is sufficient evidence to create a genuine dispute of material fact regarding whether Gautreau and North breached their fiduciary duties to Graystone by either inappropriately soliciting and recruiting Graystone employees to join them at NFLP or assisting NFLP in establishing Graystone loan products and programs. Thus, the court rejects Defendants' argument regarding the absence of an underlying tort.

### E.      Graystone's Conduct as a Superseding Cause

Finally, Defendants argue that, even if the other elements of a civil conspiracy claim are satisfied, Defendants are relieved of any liability because Graystone's own conduct was a superseding cause of its alleged damages. The court disagrees.

Specifically, as discussed more fully above, with respect to the Cottonwood branch, Graystone has produced evidence that multiple Cottonwood employees were already planning to follow Gautreau and North and join NFLP *prior* to April 8, 2019, when the allegedly superseding

conduct began. Accordingly, the court concludes that a reasonable jury could infer that Graystone's alleged damages were proximately caused by Defendants' allegedly unlawful acts, rather than Graystone's conduct.

With respect to the Sugarhouse and Denver branches, the court again acknowledges that the chain of causation from Defendants' allegedly unlawful acts to Graystone's alleged damages related to those branches is somewhat attenuated. That being said, the court similarly declines to take the issue from the jury, since a reasonable jury could infer that Graystone's conduct after April 8, 2019, was a foreseeable consequence of Defendants' allegedly unlawful conduct.

Thus, the court denies Defendants' motion for summary judgment on Graystone's civil conspiracy claim.

## V. Remaining Claims

Defendants move for summary judgment on Graystone's tortious interference with business relationships claim against Gautreau and North. Because Graystone "has decided not to pursue this claim based on the evidence available," the court grants Defendants' motion. Additionally, because the court agrees with Defendants that a request for injunctive relief is a request for a remedy—rather than a separate cause of action—the court similarly grants summary judgment in favor of Defendants on Graystone's "Injunction" claim. *See Springfield Hosp. v. Hofmann*, No. 5:09-cv-254, 2011 WL 3421528, at *2 (D. Vt. Aug. 4, 2011) ("[A] request for injunctive relief is not a separate cause of action."); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) ("Injunction is not a separate cause of action; it is a remedy.").

## CONCLUSION AND ORDER

The court rules as follows:

The court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment. [Docket 78]. The court grants summary judgment in favor of Defendants on Graystone's

tortious interference with business relationships and injunction claims. The court grants summary judgment in favor of Defendants on Graystone's misappropriation of trade secrets claims to the extent that they are premised on the alleged misuse after April 8, 2019, of Graystone's customer information, branch financials, and the information that Graystone undisputedly disclosed to NFLP. The court denies summary judgment on Graystone's misappropriation of trade secrets claims to the extent that they are premised on the alleged misuse of Graystone's alleged trade secrets prior to April 8, 2019. Furthermore, the court grants summary judgment in favor of Defendants on Graystone's breach of fiduciary duties claim to the extent that it is based on Gautreau and North's alleged disclosure of confidential information. The court denies summary judgment on Graystone's breach of fiduciary duties claim to the extent that it is based on Gautreau and North's alleged solicitation and recruitment of Graystone employees to join NFLP and alleged assistance to NFLP in establishing loan products and programs at NFLP. Finally, the court denies summary judgment on Graystone's claims that NFLP induced Gautreau and North to breach their fiduciary duties to Graystone and that Defendants engaged in a civil conspiracy.

DATED September 29, 2021.

BY THE COURT

Jill N. Parrish
United States District Court Judge

35