FILED
2022 APR 8 PM 3:52
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GRAYSTONE FUNDING COMPANY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> NETWORK FUNDING, L.P.; JASON GAUTREAU; and CRISTIE NORTH, <br><br> Defendants, | **MEMORADUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00383-JNP-CMR <br><br> District Judge Jill N. Parrish |
| NETWORK FUNDING, L.P.; JASON GAUTREAU; and CRISTIE NORTH, <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> KIPP V. MYERS, <br><br> Third-Party Defendant. | |

Graystone Funding Company, LLC ("Graystone") sued Jason Gautreau, Cristie North, and Network Funding, L.P. ("NFLP") for misappropriation of trade secrets, breach of fiduciary duties, and various other claims. ECF No. 2. In response, Gautreau, North, and NFLP (collectively, "Counterclaimants") brought counterclaims against Graystone and a third-party complaint against Kipp Myers, Graystone's CEO and 90% owner, alleging that Graystone violated the Utah Payment of Wages Act ("UPWA"), breached its contractual obligations to Gautreau and North, breached sublease agreements, engaged in mail fraud, and violated the Utah Truth in Advertising Act and

Lanham Act, and that both Graystone and Myers made fraudulent and negligent misrepresentations and should be held liable under the doctrine of promissory estoppel. ECF Nos. 13, 63–65.

Before the court is Graystone and Myers's motion for partial summary judgment. ECF No. 96. Graystone and Myers argue that they are entitled to summary judgment on all of Counterclaimants' claims except for the claim against Graystone for breach of sublease agreements. Oral argument on the motion was held on November 30, 2021.

The court GRANTS IN PART and DENIES IN PART the motion for partial summary judgment. The court grants summary judgment in favor of Graystone on Counterclaimants' UPWA claim, mail fraud claim, Utah Truth in Advertising Act damages claim, and Lanham Act damages claim. The court also grants summary judgment in favor of Graystone and Myers on Counterclaimants' claims that Graystone fraudulently and negligently misrepresented that it had already merged with NFLP and that it intended to merge with NFLP, as well as Counterclaimants' promissory estoppel claim. But the court denies summary judgment on Counterclaimants' claims that Graystone breached its contractual obligations to Gautreau and North and that both Graystone and Myers fraudulently and negligently misrepresented Graystone's liquidity and ability to pay a penalty associated with breaking a lease.

## BACKGROUND[1]

On May 31, 2019, Graystone sued Counterclaimants for misappropriation of trade secrets, breach of fiduciary duties, civil conspiracy, and other claims. ECF No. 2. The background for those claims is detailed at length in the court's Memorandum Decision and Order Granting In Part and Denying In Part Counterclaimants' Motion for Summary Judgment. *See* ECF No. 164. In response to Graystone's suit, Counterclaimants filed counterclaims against Graystone and a third-party

---

[1] The court recites the facts in the light most favorable to the nonmoving parties, Counterclaimants.

complaint against Myers. ECF Nos. 13, 63–65. The counterclaims and claims raised in the third-party complaint arise from five distinct episodes, which the court describes in turn.[2]

## I.    North Serves as Graystone's Operations Manager

In December 2014, Graystone hired North to manage Graystone's branch in Sandy, Utah. Around July 2015, North switched positions and became the branch manager for Graystone's branch in Cottonwood Heights, Utah ("Cottonwood"). In addition, North was asked to fill the role of Graystone's operations manager. Graystone agreed to compensate North for the work that she performed as operations manager, but the terms for such additional compensation were left unspecified. North served in that position—in addition to her role as Cottonwood's branch manager—until December 2015, when Graystone hired a new operations manager. Although North was being compensated for her work as Cottonwood's branch manager, she did not receive any additional compensation for the work that she performed as operations manager.

In June 2016, Graystone's operations manager quit and, once again, North was asked to fill that role, with Graystone and North again agreeing that North would receive unspecified additional compensation for her work as operations manager. For this iteration, North served as Graystone's operations manager until August 2016, at which point Graystone hired a new operations manager. As in 2015, during this period, North was compensated for the work that she performed as Cottonwood's branch manager, but she did not receive any extra compensation for her additional duties and responsibilities as operations manager.

_____

[2] In addition to the claims discussed below, NFLP also sues Graystone for breach of contract regarding sublease agreements (claim III). ECF No. 63. Because Graystone and Myers did not move for summary judgment on that claim, it is not addressed in the Background section or any other part of this decision.

In March 2017, North, for a third time, was asked to step in as Graystone's operations manager, and she served in that role until approximately December 2017. This time, though, Graystone paid North an additional $5,000 per month for the work that she performed as operations manager, on top of her usual compensation as manager of the Cottonwood branch.

Based on the foregoing, North sued Graystone for allegedly violating the UPWA, UTAH CODE §§ 34-28-1 *et seq.*, when it did not compensate her for the additional work that she performed as Graystone's operations manager from July 2015 to December 2015 and June 2016 to August 2016 (claim I).

## II.     Graystone's Lease Penalty

In or around July 2018, Myers informed Gautreau and North, then co-managers of the Cottonwood branch, that Graystone was going to be charged a penalty of approximately $100,000 "for terminating a letter of intent on additional office space Graystone had contracted to lease intended for the Cottonwood branch." ECF No. 112 at Ex. R ¶ 11, Ex. U ¶ 3. Consistent with Myers's repeated representations throughout 2018 that Graystone was struggling financially, Myers told Gautreau and North that Graystone did not have sufficient cash flow to pay the penalty. Accordingly, Myers stated that Gautreau and North should contribute their own money to pay the penalty, especially because Gautreau "had led the efforts to secure additional office space and the space was going to be used for the Cottonwood branch." *Id.* at Ex. R ¶ 14, Ex. U ¶ 7. Myers indicated that he believed that it was Gautreau's and North's fault that Graystone was being forced to pay the penalty.

Based on Myers's representation that Graystone did not have sufficient liquidity to pay the penalty, Gautreau and North agreed to together pay $25,000 towards the penalty. Over the following two or three pay cycles, both Gautreau and North had a total of $12,500 deducted from

their paychecks. If Myers had not represented that Graystone lacked the funds to pay the penalty, Gautreau and North would not have contributed $25,000 of their own money towards the penalty. Gautreau and North subsequently sued Graystone and Myers for fraudulently (claim IV) and negligently (claim V) misrepresenting Graystone's ability to pay the penalty.

### III.    Myers's Announcement That Graystone was Merging with NFLP

In February 2019, Gautreau, North, and Myers traveled to NFLP's Houston office to meet with NFLP executives and discuss NFLP's potential acquisition of Graystone or a potential merger between Graystone and NFLP. Following this meeting, Myers had little interest in pursuing something with NFLP because he "saw some red flags" and did not "feel confident in that [it] would be a good move[] for [Graystone]." *Id.* at Ex. B at 165:22–23, 166:23–24. Accordingly, when NFLP sent Myers an offer in March 2019, Myers discarded it without acting on it.

Then, on April 8, 2019, Gautreau and North announced that they were resigning from Graystone and joining NFLP. North also informed Myers that she anticipated that most of the loan officers and staff within the Cottonwood branch, which accounted for 47% of Graystone's revenue in 2018, would be leaving as well. Facing the potential loss of the Cottonwood branch, Myers asked Gautreau and North whether the payment terms in the offer that he received from NFLP in March would still be available if Graystone merged or joined with NFLP. When Gautreau informed Myers that NFLP agreed to this, Graystone agreed to merge with NFLP.

On April 10, 2019, Myers announced Graystone's decision to merge with NFLP to Graystone employees, with some NFLP representatives in the audience. In his announcement, Myers made the following statements: "[W]e are merging with another company, Network Funding"; "[W]e saw in them us"; and "[W]e just are aligning ourselves with a mirror image of us." *Id.* at Ex. B at 288:14–15, 295:20, 306:16–17. Graystone also distributed an informational

packet to its employees, which included a letter from Myers and other Graystone executives in which they stated that, "[a]fter a significant amount of vetting[,] we decided it was time to begin a new chapter. We're excited to announce we're partnering with Network Funding . . . . Network Funding was the right fit for us for so many reasons." *Id.* at Dep. Ex. 433.

Following the April 10 announcement, Myers met with NFLP executives and assured them that Graystone was "all in" on the planned merger or combination with NFLP. *Id.* at Ex. C at 120:17–21. Even though there was no official merger offer—or even a letter of intent or memorandum of understanding—Graystone shared with NFLP its employee payroll and benefits information, as well as information regarding its office leases and information technology. However, on April 19, 2019, following days of negotiations with NFLP, Myers called off the merger.

In depositions conducted for this case, Myers admitted that statements in his April 10 announcement and the informational packet were untrue. Specifically, Myers admitted that, when he made the statements, he did not actually believe that NFLP was a mirror image of Graystone; he did not see Graystone in NFLP; and he knew that Graystone's decision to merge with NFLP did not occur after a significant amount of vetting. In addition, when Myers was asked whether Graystone had "made the decision [to merge with NFLP] definitively," Myers responded, "Our heart wasn't in it." *Id.* at Ex. B at 276:4–5. However, Myers followed up this response by saying, "We made the decision." *Id.* at Ex. B at 276:8.

Based on the foregoing, NFLP sued Graystone and Myers for fraudulently (claim IX) and negligently (claim X) misrepresenting that Graystone had merged with NFLP and that it intended to merge with NFLP. NFLP also sued Graystone and Myers under a theory of promissory estoppel (claim XI).

## IV.    Gautreau's and North's Commissions

Following Gautreau's and North's resignations from Graystone, Gautreau emailed Wendee Carter, Graystone's Vice President and 10% owner, to inquire about their commissions for the month of April 2019. After some dispute as to what Gautreau and North were owed under their employment agreements, Myers emailed Gautreau and stated that Graystone "would agree to pay a bonus override of the EVP [Executive Vice President] position for loans funded between April 1, 2019 and April 19, 2019 and to pay the regular branch manager bonus for loans closed for the month of April." ECF No. 115 at Dep. Ex. 65. In return, Gautreau and North would be required to "waive or relinquish all claims to any further wages, overrides, bonuses, or any other compensation from Graystone Mortgage, LLC for any positions held at Graystone or any employment at Graystone and sign a release to that effect." *Id.* In the email, Myers also noted that the Branch Volume was "13,318,283.00" (for a bonus override of $13,318.28) and the Company Volume was "17,492,037.00" (for a bonus override of $26,238.06). *Id.*

After discussing the offer with North, Gautreau accepted the offer on behalf of both of them. However, unbeknownst to Gautreau and North, the actual Branch Volume and Company Volume values for April 2019 were 15,372,034 and 36,353,625, respectively. Consequently, Gautreau and North sued Graystone for breach of contract for unpaid commissions (claim II).

## V.    Graystone's Mailers

In 2016, Graystone entered into an agreement with a third-party vendor to send mailers to certain Graystone customers. These mailers contained short messages, such as "Happy Birthday!" or "Happy 4th of July," as well as the name, image, and Nationwide Mortgage Licensing System and Registry ("NMLS") number of a Graystone employee.

7

Even though numerous employees left Graystone to join NFLP in April and May 2019, the third-party vendor continued to send these mailers. As a result, at least some mailers were sent with the names, images, and NMLS numbers of *former* Graystone—and *current* NFLP— employees. Thus, the mailers indicated that such individuals were still employed by Graystone, even though they were actually employed by NFLP at the time.

Of the numerous individuals who were targeted with the mailers, five of them closed loans with Graystone in 2020, with the gross revenue of such loans totaling approximately $45,000. Based on these circumstances, NFLP sued Graystone for mail fraud (claim VI), violating the Utah Truth in Advertising Act, UTAH CODE §§ 13-11a-1 *et seq*. (claim VII), and violating the Lanham Act, 15 U.S.C. § 1125(a) (claim VIII).

***

Graystone and Myers moved for summary judgment on all of these claims.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

8

"At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted). However, "an inference is unreasonable if it requires 'a degree of speculation and conjecture that renders [the fact-finder's] findings a guess or mere possibility,'" *Pioneer Ctrs. Holding Co. ESOP & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (citation omitted), and summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case," *Celotex*, 477 U.S. at 322.

## ANALYSIS

### I.      Claim I: Violation of Utah Payment of Wages Act

Graystone moves for summary judgment on North's claim that Graystone violated the UPWA, UTAH CODE §§ 34-28-1 *et seq.* Graystone argues that the UPWA claim fails as a matter of law because, in part, there was no agreement between Graystone and North to pay her additional money for filling the operations manager role in 2015 and 2016 and North voluntarily resigned from Graystone. Specifically, Graystone contends that an employee has a private right of action under the UPWA only if he or she is involuntarily terminated by his or her employer, and that North voluntarily left Graystone to join NFLP in April 2019.

In response, North concedes that she voluntarily ended her employment with Graystone when she resigned on April 8, 2019, but she argues that she "was terminated from her position as operations manager each time Graystone hired a new operations manager to replace her." ECF No. 111 at 34. North further argues that, although she remained employed by Graystone each time she

was replaced as operations manager, such a change in her job responsibilities qualified as "termination" and, thus, triggered Graystone's obligation to pay her unpaid wages under the UPWA.

Moreover, North asserts that she has, in fact, produced evidence that Graystone agreed to compensate her for the work that she performed as operations manager in 2015 and 2016 because "[she] identified W-2s issued by Graystone during the March 2017 to December 2017 time period that she was employed as Graystone's operations manager that reflect the additional $5,000 per month Graystone paid her for taking on that position." *Id.* at 35. North contends that this evidence of additional payment in 2017, coupled with her testimony on the matter, is evidence that Graystone agreed to compensate her for the work that she performed in 2015 and 2016 as operations manager, thereby giving rise to a dispute of material fact precluding summary judgment.

As an initial matter, although the court is not convinced that North was "terminated" each time she was replaced as operations manager but remained on Graystone's payroll, the court disagrees with Graystone's assertion that an employee has a private right of action under the UPWA only if he or she was involuntarily terminated by his or her employer. To support its argument, Graystone cites a District of Utah case from 2008, *Sweat v. Batelle Mem'l Inst.*, No. 2:07-CV-401 TS, 2008 WL 4526021, at *3 (D. Utah Oct. 1, 2008), which, in turn, cites a Utah Supreme Court case from 1997, *Zoll & Branch, P.C. v. Asay*, 932 P.2d 592 (Utah 1997). However, UTAH CODE § 34-28-9.5, which is titled, "Private cause of action," became effective on May 9, 2017. Section 34-28-9.5(2)(a) provides that "[a]n employee may file an action for a wage claim in district court . . . if . . . the employee's wage claim is over $10,000," and § 34-28-5(2) provides that "[i]f an employee does not have a written contract for a definite period and resigns the employee's

10

employment, the wages earned and unpaid . . . become due and payable on the next regular payday."

Accordingly, an employee who resigns, rather than is terminated, may maintain a UPWA claim for "wages earned and unpaid" that remain unpaid "on the next regular payday," if the claim is for over $10,000. *See* UTAH CODE §§ 34-28-5(2), 9.5(2)(a); *Gutierrez v. Summit Mt. Holding Grp.*, No. 1:17-cv-00049, 2018 U.S. Dist. LEXIS 192532, at *18 (D. Utah Nov. 9, 2018) ("The amendment [adding § 34-28-9.5(3)(a) to the UPWA] added language providing a private right of action for 'actual damages' in certain circumstances. . . . [The amendment] indicates the legislature's understanding that such a right of action did not previously exist, implicitly or otherwise."). Because it is undisputed that North resigned from Graystone and that her claim is for over $10,000—she alleges that "Graystone owed her $50,000 in wages for her work as interim Director of Operations" at the time of her resignation, ECF No. 63 at 30—the court concludes that North may pursue her claim under the UPWA.[3]

---

[3] Following oral argument, the court permitted the parties to submit simultaneous briefs on the issue of whether North's UPWA claim was time-barred. North's counterclaim and opposition to the present motion suggested that her claim was brought pursuant to UTAH CODE § 34-28-5(1), which is relevant when an employee is terminated by her employer, *Zoll & Branch*, 932 P.2d at 594–95. Based on North's argument that she was "terminated" each time that she was replaced as operations manager, the court had concerns that her claim was precluded by the three-year statute of limitations applicable to UPWA claims because North claimed that the relevant "terminations" occurred in December 2015 and August 2016, and her UPWA claim was not filed until September 30, 2019, more than three years after the alleged terminations. *See Scholzen v. Scholzen Prods. Co.*, No. 4:20-cv-00019-DN-PK, 2020 WL 7630801, at *6 (D. Utah Dec. 22, 2020) (holding that a three-year statute of limitations applied to a UPWA claim seeking reimbursement of unpaid wages that were allegedly unlawfully withheld); *see also* UTAH CODE § 78B-2-305(4) ("An action may be brought within three years . . . for a liability created by the statutes of this state."). However, the court concludes that § 34-28-5(2) is the provision of the UPWA that is actually applicable to the current situation. Under § 34-28-5(2), the limitations period begins "on the next regular payday" after the employee resigns. Because it is undisputed that North resigned in April 2019 and that North filed her UPWA claim on September 30, 2019, the court concludes that North's claim is not time-barred, regardless of whether Graystone waived or preserved that affirmative defense.

That said, the court concludes that North's UPWA claim fails as a matter of law because North has failed to provide sufficient evidence that she was entitled to additional compensation for her work as operations manager in 2015 and 2016. The UPWA defines "wages" to mean "the amounts *due* the employee for labor or services, whether the amount is fixed or ascertained on a time, task, piece, commission basis or other method of calculating such amount." UTAH CODE § 34-28-2(1)(i) (emphasis added). To state a wage claim under the UPWA, the employee must present evidence of unpaid wages. *See, e.g.*, UTAH CODE § 34-28-5(1)(a) ("When an employer separates an employee from the employer's payroll the *unpaid wages* of the employee become due immediately." (emphasis added)); UTAH CODE § 34-28-5(2) ("If an employee . . . resigns the employee's employment, the *wages earned and unpaid* . . . become due and payable on the next regular payday." (emphasis added)). Therefore, the employee must demonstrate, in part, that there were "amounts due [to him or her] for labor or services," and that those amounts went unpaid. *See* UTAH CODE §§ 34-28-2(1)(i), 5. To determine amounts due, courts look to employment agreements. *See Action Elec. Co., Inc. v. Indus. Comm'n of Utah*, 636 P.2d 474, 477 (Utah 1981).

Here, North has presented insufficient evidence that Graystone agreed to compensate her for the work that she performed as operations manager in 2015 and 2016. As North concedes, there is no written record of the alleged agreement, and there also are no emails that support her allegation that Graystone agreed to provide her with additional compensation for her work as operations manager. ECF No. 112 at Ex. Q at 29:17–30:2. Rather, to establish the alleged agreement, North primarily relies on the fact that subsequently, in 2017, she was paid an additional $5,000 per month for the work that she performed as operations manager. However, even viewing such evidence in the light most favorable to North, *see Fisher v. City of Las Cruces*, 584 F.3d 888, 893 (10th Cir. 2009), it neither establishes that Graystone agreed to compensate North for her work

12

as operations manager in 2015 and 2016 nor establishes that the agreed upon compensation rate during those periods was $5,000 per month. Indeed, North's deposition testimony, on which she also relies, suggests that no such agreement was in place in 2015 and 2016 and, to the extent that there was an agreement, the amount of compensation to which she was entitled was unspecified. In particular, North testified that:

> In 2015, approximately July through, I want to say, December, I came in and helped fill the role of operations manager alongside Kipp in doing operational roles. And during that point in time, I was not paid as an operations manager. . . . I came back into the role from June until approximately December of 16 where I was then again unpaid. . . . [A]gain, in 2017, approximately February of 2017, we lost our operations manager for the third time. I came in and filled that role, *and I was offered a salary during that time frame*. So in 2017 I did receive income for that role.

ECF No. 112 at Ex. Q at 25:18–26:9 (emphasis added). Another exchange from North's deposition further suggests that North and Graystone did not even discuss pay for her work as operations manager in 2015 and 2016:

> Q: Okay. But this compensation agreement wasn't in writing, was it?
> A: There was no – there was just no pay, and it was not deferred as much as it was just not discussed.
> Q: Okay. So you're changing – so you're changing again – right? – because in your counterclaim you said it was deferred. Now you're saying it wasn't deferred; it just wasn't given?
> A: They didn't pay me for that role.
> Q: So was it deferred or was it not deferred?
> A: I don't recall if it was deferred. I was not paid for the – that time.

*Id.* at 27:6–18. North further testified that, apart from "conversations with Jason Gautreau expressing that [she] was doing dual roles and that [she] was not receiving compensation for them," she could not recall mentioning to anyone at Graystone between October 2016 and April 8, 2019 that she wanted to get paid the $50,000 that she now alleges she is owed. *Id.* at 30:23–31:10.

The only actual evidence that Graystone agreed to compensate North for her work as operations manager in 2015 and 2016 is North's subsequent declaration in which she testified that

"[d]uring [her] time at Graystone, [she] was also asked to fill the role of operations manager on three separate occasions with the agreement that [she] would be compensated for doing so." *Id.* at Ex. R ¶ 3. However, this statement, which in no way specifies the terms of the alleged agreement—including the amount that Graystone agreed to compensate North in 2015 and 2016—is insufficient to establish that there was an enforceable agreement pursuant to which Graystone agreed to compensate North. *See Bloom Master Inc. v. Bloom Master LLC*, 442 P.3d 1178, 1182 (Utah Ct. App. 2019) ("To form an enforceable contract, the parties must have a meeting of the minds on the essential terms of the contract. So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a contract." (internal quotation marks, citations, and alterations omitted)); *Diston v. EnviroPak Med. Prods.*, 893 P.2d 1071, 1075 (Utah Ct. App. 1995) (noting that, even if parties "believed they had an agreement, that agreement must be definite enough to perform and enforce. The requirement that a contract be sufficiently definite is a functional requirement from the parties' perspective in terms of whether it can be performed, and from the courts' perspective in terms of whether it can be enforced" (internal citation omitted)).

Because North has failed to demonstrate that Graystone was obligated to compensate her for her work as operations manager in 2015 and 2016, she correspondingly has failed to establish that there were "amounts due [her] for labor or services" as operations manager in 2015 and 2016. Such a showing is an essential element of a wage claim under the UPWA. *See* UTAH CODE § 34-28-5(1)(a), (2). Therefore, North's UPWA claim fails as a matter of law, *see Celotex*, 477 U.S. at 322, and the court grants summary judgment in favor of Graystone on the claim.

## II.   Claim II: Breach of Contract

Graystone next moves for summary judgment on Gautreau and North's breach of contract claim for unpaid commissions. Graystone argues that Gautreau and North's claim for unpaid commissions "fail[s] because of the legal principle of accord and satisfaction." ECF No. 96 at 36. "Under Utah law, an accord and satisfaction, which creates a new contract between parties, occurs when there is . . . '(1) a bona fide dispute over an unliquidated amount, (2) a payment made in full settlement of the entire dispute, and (3) acceptance of the payment.'" *Cook v. Chase Manhattan Mortg. Corp.*, 509 F. Supp. 2d 986, 992 (D. Utah 2007) (quoting *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1158 (Utah 2003)). Graystone contends that there was a dispute between Graystone, Gautreau, and North regarding the amount of money that Gautreau and North were owed in commissions for April 2019 under their employment agreements; that Graystone "offered to pay Gautreau and North the overrides or bonuses they normally received for applicable loans funded at Graystone between April 1 and April 19, 2019 and the branch manager bonus override they normally received for loans closed at Cottonwood for April 2019"; and that Gautreau and North accepted this offer. ECF No. 96 at 36–37. In response, Gautreau and North argue that the accord and satisfaction was invalid because "Myers intentionally or mistakenly understated the April 2019 volume numbers" and, therefore, their acceptance of Graystone's offer "was either based on a unilateral or mutual mistaken belief that the April 2019 volume numbers represented by Myers were accurate." ECF No. 111 at 37.

"Where the defendant seeks summary judgment on the basis of affirmative defenses, the defendant 'must demonstrate that no disputed material fact exists regarding the affirmative defense asserted.'" *Cook*, 509 F. Supp. 2d at 992 (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)). Here, a disputed material fact exists regarding the alleged accord and satisfaction. In particular, Gautreau and North contend that, when Myers proposed the resolution to the

15

commissions dispute, he made a material misrepresentation or mistake, stating that the "Branch Volume" for the Cottonwood Branch and "Company Volume"—which together were the basis for calculating the commission payments for Gautreau and North—were 13,318,283 and 17,492,037, respectively, when, in fact, they were 15,372,034 and 36,353,625, respectively. *See* ECF No. 114 at 37. In response, Graystone argues that the numbers Myers presented to Gautreau and North were accurate because, under Graystone's compensation agreements with Gautreau and North, certain loans should have been excluded from the "Branch Volume" and "Company Volume" calculations and, based on the clear language of Myers's offer, Graystone only offered to pay a commission on the "Company Volume" for the period from April 1 to April 19, 2019, not the entire month of April 2019. Graystone contends that when these adjustments are made to the numbers presented by Gautreau and North, they result in the numbers that Myers originally presented.

As Graystone's counsel essentially conceded at oral argument, whether the "Branch Volume" and "Company Volume" values that Myers presented to Gautreau and North were "correct" is a question of fact that the court cannot resolve on summary judgment. *See A.P. Moller-Maersk A/S v. W. Hay Co.*, No. 1:06CV9DAK, 2007 U.S. Dist. LEXIS 90041, at *8 (D. Utah Dec. 6, 2007) ("Accordingly, the court concludes that questions of fact preclude summary judgment."). Because this question of fact has a bearing on whether the alleged accord and satisfaction on which Graystone relies is valid, *see Ralph A. Badger & Co. v. Fid. Bldg. & Loan Ass'n*, 75 P.2d 669, 678 (Utah 1938) ("Where the accord and satisfaction relied upon was procured by fraud or misrepresentation or by mutual mistake, it is not binding."), the court cannot, at this time, conclude that Graystone has established its affirmative defense of accord and satisfaction "beyond peradventure," *see Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is

asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."). Thus, the court denies Graystone's motion for summary judgment on Gautreau and North's claim that Graystone breached its contractual obligations regarding their commissions.

### III.   Claims IV and V: Fraudulent and Negligent Misrepresentation Regarding Graystone's Financial Status and Ability to Pay Lease Penalty

Graystone and Myers move for summary judgment on Gautreau and North's claims that Myers made a fraudulent (claim IV) and negligent (claim V) misrepresentation when he told them that Graystone did not have sufficient cash or liquidity to pay a penalty for breaking a lease, which caused them to contribute $25,000 toward payment of the penalty. Graystone and Myers argue that they are entitled to summary judgment on these claims because (1) "Myers never told Gautreau and North that Graystone needed them to pay or reimburse Graystone $25,000.00 because Graystone did not have sufficient cash or liquidity to pay the entire penalty of $96,889.21"; and (2) Gautreau and North "cannot show a required element, that they reasonably relied on Myers' alleged misrepresentation." ECF No. 96 at 38–40. Specifically, Graystone and Myers argue, in part, that a reasonably prudent employee does not agree to pay a portion of a company's penalty because the company is struggling financially, especially without first requesting evidence of the illiquidity or determining whether a loan would be sufficient. Graystone and Myers further argue that "it is preposterous to allege they could have been induced to pay a part of the penalty based on the alleged misrepresentation that Graystone was short of cash" because Graystone paid the penalty upfront and, only then, reduced Gautreau and North's paychecks until such reductions covered $25,000 of the penalty (i.e., Graystone had sufficient cash and liquidity to pay the penalty, even without any contribution from Gautreau and North). *See id.* at 39.

In response, on the question of whether Myers represented to Gautreau and North that Graystone needed them to pay part of the penalty because of Graystone's financial struggles, Gautreau and North have produced evidence that Myers told them that "Graystone did not have sufficient cash flow to pay the penalty." ECF No. 112 at Ex. R ¶ 13, Ex. U ¶ 6. They assert that "[t]his conflicting testimony presents a genuine issue of material fact which may not appropriately be resolved through summary judgment." *Mahaffey v. City of Vernal*, No. 2:13-cv-4 DN, 2014 WL 7369837, at *6 (D. Utah Dec. 29, 2014).

On the question of reasonable reliance, Gautreau and North contend that "a fact dispute exists whether [they] reasonably relied on Myers['s] representations given what Myers told them and what they understood about Graystone's financial condition in 2018." ECF No. 111 at 33. Gautreau and North specifically rely on their testimony that Myers represented to them "on many occasion[s] through 2018 that Graystone was struggling financially." *See* ECF No. 112 at Ex. R ¶ 12, Ex. U ¶ 5.

"Reasonable reliance must be considered with reference to the facts of each case, and is usually a question for the jury to determine." *Conder v. A.L. Williams & Assocs.*, 739 P.2d 634, 638 (Utah Ct. App. 1987). However, "there are instances where courts may conclude that as a matter of law, there was no reasonable reliance." *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996) (holding that plaintiff did not reasonably rely on defendants' oral promise because subsequent written clarifications repeatedly contradicted the promise). Although it is a close question, the court declines to conclude at this point that Gautreau and North's reliance on Myers's alleged representation was unreasonable as a matter of law.

Gautreau and North were high-level employees at Graystone. It does not strike the court as necessarily unreasonable for a high-level employee to help cover a company's expenses, especially

when the company is allegedly struggling financially and needs such assistance to remain in business. *See, e.g.*, Dan Price, *My Employees Took Pay Cuts Instead of Layoffs. We're Doing Better Than Ever.*, WASH. POST (Aug. 12, 2020), https://www.washingtonpost.com/outlook/2020/08/12/employees-pay-cuts-productivity/ (noting that "98 percent of [company's] employees volunteered to temporarily cut their pay by anywhere from 5 to 100 percent" in order to save the company); Niraj Chokshi, *94 Percent of U.S. Teachers Spend Their Own Money on School Supplies, Survey Finds*, N.Y. TIMES (May 16, 2018), https://www.nytimes.com/2018/05/16/us/teachers-school-supplies.html.

Moreover, although it may be prudent for an employee to both request evidence of the company's financial troubles and initially offer only a loan before agreeing to pay a company penalty out-of-pocket, Graystone and Myers point to no authority suggesting that, as a matter of law, such steps must be taken before an employee can reasonably rely on a company's representation that it is struggling financially.

Finally, if Myers's alleged statement "that Graystone did not have sufficient cash flow to pay the penalty" is taken literally, *see* ECF No. 112 at Ex. R ¶ 13, Ex. U ¶ 6, the court agrees that it was unreasonable for Gautreau and North to rely on the statement because, at the time they contributed $25,000, Graystone had already paid the penalty. Thus, Graystone obviously had sufficient cash flow to pay the penalty. But such a strict, literal interpretation of the statement is inappropriate. *See State v. Martinez*, 452 P.3d 496, 501 (Utah Ct. App. 2019) (noting that a reasonable jury may have interpreted certain words in a non-literal fashion); *see also Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 321 (D.C. Cir. 1987) (Bork, J., dissenting) ("It is, of course, true that the context in which a statement appears may alter or even reverse the literal meaning the statement would have if it stood alone."). Indeed, in context, Myers's alleged

19

statement could be reasonably interpreted to mean that, without Gautreau and North's assistance, Graystone would struggle to both pay the penalty and survive financially. Whether that is the appropriate interpretation of Myers's alleged statement, and whether Gautreau and North reasonably relied on the alleged statement, are questions that are properly left to the jury to resolve. *See Gold Standard*, 915 P.2d at 1067 ("[T]he question of reasonable reliance is usually a matter within the province of the jury."); *Conder*, 739 P.2d at 638.

Thus, the court denies Graystone and Myers's motion for summary judgment on Gautreau and North's claims that Graystone and Myers fraudulently (claim IV) and negligently (claim V) misrepresented Graystone's ability to pay the lease penalty.

## IV.     Claim VI: Mail Fraud

On December 8, 2021, the parties stipulated to the voluntary dismissal with prejudice of NFLP's mail fraud claim. ECF No. 169. Thus, the court grants Graystone's motion for summary judgment on NFLP's mail fraud claim.

## V.     Claim VII: Violation of the Utah Truth in Advertising Act

Graystone moves for summary judgment on NFLP's claim that Graystone violated the Utah Truth in Advertising Act, UTAH CODE §§ 13-11a-1 *et seq*. Specifically, Graystone argues that it is entitled to summary judgment "because NFLP has no evidence that it was injured by the mailers, a requirement of the Act." ECF No. 96 at 33. In particular, Graystone contends that "it is uncertain which mailers were sent by [the third-party vendor] and which mailers were received. Moreover, there is no evidence that an individual's receipt of a mailer caused direct, economic damage to NFLP." *Id.*

In response, NFLP argues that summary judgment is precluded because it has "demonstrated evidence sufficient to establish and create a genuine factual dispute regarding its

claimed damages that at least $45,000 in gross revenue went to Graystone that should have gone to NFLP." ECF No. 111 at 40. To support its argument that it was harmed by the mailers that depicted former Graystone—and current NFLP—employees as still employed by Graystone, NFLP primarily relies on two pieces of evidence: (1) a spreadsheet that identifies the numerous mailers that were sent as part of Graystone's marketing efforts and (2) Myers's testimony that five consumers included in the spreadsheet and targeted with these marketing materials closed loans with Graystone in 2020, with the gross revenue of such loans totaling approximately $45,000.

"Importantly, in opposing a motion for summary judgment, the non-moving party cannot rest on ignorance of facts, on speculation, or on suspicion." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (internal quotation marks and citation omitted); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."). "Rather, the nonmoving party must set forth specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002) (internal alteration omitted). Here, even viewing the evidence in the light most favorable to NFLP, *see Fisher*, 584 F.3d at 893, the claim that NFLP was injured by Graystone's mailers is based entirely on speculation. Because injury is an essential element of a damages claim under the Utah Truth in Advertising Act, *see Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1242 (D. Utah 2018), Graystone is entitled to summary judgment on this claim.

Although NFLP has produced evidence that five consumers who were targeted with mailers closed loans with Graystone in 2020, NFLP has produced no evidence—and, at oral argument, NFLP's counsel conceded that it had no evidence—that these consumers were sent the mailers,

that these consumers received the mailers, that these consumers read the mailers, or that the misrepresentations on the mailers that the loan officers were still employed by Graystone caused these consumers to close the loans at Graystone.[4] Moreover, NFLP has presented no evidence that, if these consumers had not received the mailers and had not closed loans at Graystone, they would have closed loans at NFLP. Absent such crucial evidence, the inference that Graystone's mailers injured NFLP is decidedly speculative. At oral argument, NFLP's counsel attempted to persuade the court that—if the court allowed the claim to survive summary judgment—he was confident that the relevant consumers would testify at trial, and that they would testify that their loan decisions were affected by the mailers. But, NFLP "may not escape summary judgment [by relying on] the mere hope that something will turn up at trial." *See Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). NFLP has had ample time to produce evidence from these five consumers that links the allegedly deceptive mailers to the loans that they closed at Graystone, but NFLP has not produced—and concededly does not have—such evidence. Thus, the court grants Graystone's motion for summary judgment on NFLP's claim that Graystone violated the Utah Truth in Advertising Act and injured NFLP as a result.[5]

## VI.    Claim VIII: Violation of the Lanham Act

---

[4] NFLP argues that *Graystone* "has produced no evidence to suggest that the other mailers that were sent out were not ultimately received." ECF No. 111 at 40. However, as the party with the burden of proof at trial, NFLP—rather than Graystone—has the burden to "present affirmative evidence." *See Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

[5] In its counterclaim, NFLP seeks both damages and injunctive relief from Graystone's alleged violations of the Utah Truth in Advertising Act. ECF No. 63 at 39. Because Graystone's motion for summary judgment does not appear to address NFLP's entitlement to injunctive relief, NFLP's claim under the Utah Truth in Advertising Act survives summary judgment to the extent it seeks an injunction.

Graystone also moves for summary judgment on NFLP's claim that Graystone violated the Lanham Act, 15 U.S.C. § 1125(a). Graystone presents nearly identical arguments against NFLP's Lanham Act claim as it presented against NFLP's Utah Truth in Advertising Act claim (claim VII). Specifically, Graystone argues that NFLP's Lanham Act claim fails as a matter of law because "there is no evidence that a mailer caused even a single customer to close a loan at Graystone or to not close a loan at NFLP." ECF No. 96 at 34. In response, NFLP presents the same argument that it presented with respect to the Utah Truth in Advertising Act claim (claim VII)—that is, evidence that the spreadsheet listing individuals targeted by the mailers included five who closed loans with Graystone in 2020 is sufficient to raise a genuine dispute for trial as to whether NFLP was injured by the allegedly false advertising.

Proof that the plaintiff has been injured is an essential element of a damages claim for false advertising under the Lanham Act. *Nunes*, 299 F. Supp. 3d at 1239–40 (citing *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002)); *see also Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 709 (Fed. Cir. 2005) ("[F]alse advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising."); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977) ("In order to recover damages for a section 1125(a) violation, the aggrieved party must show that it suffered actual harm to its business."). As discussed previously with respect to the Utah Truth in Advertising Act claim (claim VII), NFLP has failed to produce any evidence that it was injured by Graystone's allegedly false advertising. Accordingly, the court grants Graystone's motion for summary judgment on NFLP's claim for damages under the Lanham Act.[6]

---

[6] According to its counterclaim, NFLP also "seeks injunctive relief to prevent Graystone from engaging in further unlawful acts" in violation of the Lanham Act. ECF No. 63 at 40. Because "[e]vidence of damages is not required to obtain injunctive relief for false advertising," *Nunes*, 299

23

**VII.   Claim IX: Fraudulent Misrepresentation Regarding Whether Graystone Had Merged and Intended to Merge with NFLP**

Graystone and Myers move for summary judgment on NFLP's claim that Graystone and Myers fraudulently misrepresented that Graystone had merged with NFLP and that Graystone intended to merge with NFLP. Graystone and Myers assert that they are entitled to summary judgment on this claim "because NFLP cannot show the following required elements: (1) that Myers misrepresented [to NFLP] that Graystone had merged with NFLP; (2) that Myers intentionally misrepresented [to NFLP] that Graystone intended to merge with NFLP when Myers knew that Graystone had no such intent at the time; (3) that NFLP reasonably relied on the alleged misrepresentations; and (4) that NFLP suffered damages due to the alleged misrepresentations." ECF No. 96 at 16–17.

Under Utah law, the essential elements for an intentional misrepresentation claim are: "(1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representer either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage." *Kuhre v. Goodfellow*, 69 P.3d 286, 291–92 (Utah Ct. App. 2003) (citation omitted). All of these elements "must be established by clear and convincing evidence." *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986).

---

F. Supp. 3d at 1239 (citing *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)), and Graystone's motion for summary judgment does not appear to address NFLP's entitlement to such relief, NFLP's claim under the Lanham Act survives to the extent that it seeks injunctive relief.

With respect to the allegation that Graystone and Myers misrepresented that Graystone had merged with NFLP, NFLP has produced evidence that, during his April 10 announcement, Myers told Graystone employees that "we are merging with another company, [NFLP]," ECF No. 112 at Ex. B at 288:14–15, "we saw in them us, how they . . . could mirror and how we compare [to] them," *id.* at 295:20–21, 298:17, and "we just are aligning ourselves with a mirror image of us," *id.* at 306:16–17. NFLP has produced further evidence that, in the informational packet that was distributed to Graystone employees on April 10, Myers represented that Graystone "determined it was time to partner with a company whose ideals and philosophies mirrored those of Graystone," that "[a]fter a significant amount of vetting [Graystone] decided it was time to begin a new chapter," that "[w]e're excited to announce we're partnering with Network Funding," and that "Network Funding was the right fit for [Graystone] for so many reasons." ECF No. 112 at Ex. 433. Moreover, NFLP has produced evidence that, after the April 10 announcement, Myers met with NFLP executives and told them that Graystone was "all in." *Id.* at Ex. C at 120:17–21.

As an initial matter, the court is not convinced that any of Myers's statements identified by NFLP qualify as a representation that Graystone *had* merged with NFLP. "The present participle of any verb . . . paired with *is* creates a continuous tense. And *continuing* means *ongoing*, or still in progress." *Scott v. Scott*, 423 P.3d 1275, 1281 (Utah 2017) (internal citations, quotation marks, and alteration omitted); *see also* Bryan A. Garner, *Garner's Modern English Usage* 1020 (4th ed. 2016) (defining "present participle" as "[a] nonfinite verb form ending in *-ing* and used in verb phrases to signal the progressive aspect."); *State ex rel. CNN, Inc. v. Bellbrook-Sugarcreek Local Sch.*, 170 N.E.3d 748, 759 (Ohio 2020) (Kennedy, J., dissenting) ("Use of the present participle denotes present and continuing action."). Therefore, Myers's statements that "we are merging,"

"we just are aligning," and "we're partnering" with NFLP, from both a strict linguistic and everyday perspective, indicated "present and continuing" action, not completed action.

Moreover, although NFLP has produced evidence suggesting that representatives of NFLP were present during Myers's announcement on April 10, virtually all of the statements that NFLP has produced as evidence that Myers fraudulently misrepresented to NFLP that Graystone had merged with NFLP were directed to *Graystone employees*, not *NFLP*. The only statement on which NFLP relies that was explicitly directed to NFLP—that Graystone was "all in" with respect to the merger—clearly was not a representation that Graystone had already merged with NFLP.

Finally, NFLP has failed to convincingly explain to the court how it—as the other party to the purported merger, and a sophisticated business entity—could reasonably rely on a representation that Graystone had merged with NFLP when it is undisputed that there was no official merger offer, letter of intent, or other document detailing the terms of the merger, and negotiations between Myers and NFLP were still ongoing. Thus, the court concludes that NFLP's claim that Graystone and Myers fraudulently misrepresented that Graystone had merged with NFLP fails as a matter of law.

Next, with respect to the allegation that Graystone and Myers fraudulently misrepresented that Graystone intended to complete a merger with NFLP, a statement of future intent can be fraudulent if the statement is made by an individual who, at the time the statement is made, actually intends the opposite. *See Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 804–05 (Utah 1980) ("To profess an intent to do or not to do, when the party intends the contrary, is as clear a case of misrepresentation and fraud as could be made." (citation omitted)). Here, NFLP alleges that "Myers told [NFLP] that Graystone intended to complete a merger with [NFLP]" when, in fact,

26

"Graystone never intended to complete a merger with [NFLP]." ECF No. 63 at 40–41. In support of this allegation, NFLP relies entirely on Myers's deposition testimony.

Specifically, NFLP contends that the following testimony from Myers's deposition demonstrates that, even as Myers repeatedly indicated that Graystone intended to merge with NFLP, Graystone never *actually* intended to merge with NFLP: (1) "that [Myers] did not fully believe in NFLP and that he did not trust NFLP"; (2) "that [Myers] noticed 'red flags' that gave him concerns about joining NFLP as early as his first meeting with NFLP and that he did not 'feel confident' that joining NFLP 'would be a good move[]'"; (3) "that even after announcing to the company that Graystone would be joining NFLP, Graystone management's 'heart wasn't in it'"; (4) "that [Myers] lied to Graystone employees regarding various statements made during his April 10 announcement and in the subsequent Informational Packet"; and (5) "that [Myers] was waiting for NFLP to confirm the terms of the March 7 offer were still on the table," even though, when he originally received the offer in March, he was disappointed with the terms of the offer and "'had no desire to take [negotiations] any further.'" ECF No. 111 at 26–27. In response, Graystone and Myers argue, in part, that this testimony "is not evidence that [Myers] intentionally lied about the merger *on April 10*." ECF No. 135 at 22. The court agrees.

First, when Myers testified that he "saw some red flags" with respect to NFLP and did not "feel confident in that this would be a good move[] for [Graystone]," ECF No. 112 at Ex. B at 165:22–166:24, Myers was testifying about his impression of NFLP and the possibility of Graystone merging with NFLP in *February 2019*. However, by April 10, 2019—when the alleged

misrepresentations occurred[7]—much had changed for Graystone. As NFLP acknowledges,[8] Graystone was facing the imminent loss of most of its Cottonwood branch, which was the company's most productive branch, accounting for 47% of the company's revenue in 2018. Accordingly, what Myers thought in February 2019 about the possibility of Graystone merging with NFLP has little bearing on what he subsequently thought about that possibility in April 2019. Indeed, such testimony has little to no probative value with respect to Myers's actual intentions when he represented that Graystone intended to merge with NFLP in April 2019.

Similarly, Myers's testimony that he "had no desire to take [negotiations] any further," ECF No. 112 at Ex. B at 219:21–220:4, and that he was disappointed by the terms of the offer that he received in *March 2019* is not significantly probative of his intentions in April 2019. As discussed previously, and as NFLP acknowledges, Graystone's circumstances and business outlook changed

---

[7] Admittedly, from the face of the counterclaim—as well as NFLP's opposition to Graystone and Myers's motion for partial summary judgment—it is not entirely clear which specific representations NFLP is alleging were fraudulent and when such statements were made. Indeed, in the relevant portion of the counterclaim, the only representations that are accompanied by the date on which they were made were made to Gautreau and North, ECF No. 63 ¶¶ 33, 37, and Graystone's employees, *id.* ¶¶ 35, 37, 39. However, it does not appear that these are the operative misrepresentations because NFLP—rather than Gautreau and North or Graystone employees—brought the fraudulent misrepresentation claim. Indeed, had Graystone and Myers challenged NFLP's fraud claim under Rule 9(b) of the Federal Rules of Civil Procedure for lack of particularity, it is likely that such a challenge would have been successful. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir. 2006) ("At a minimum, Rule 9(b) [of the Federal Rules of Civil Procedure] requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud[,] and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." (internal citation and quotation marks omitted)). However, because Graystone and Myers did not challenge NFLP's pleading on that basis, the court assumes that the relevant alleged misrepresentations occurred on April 10, 2019, the day on which Myers announced to Graystone employees that Graystone was merging with NFLP.

[8] In its opposition to Graystone and Myers's motion for partial summary judgment, NFLP states that "[t]he evidence supports the conclusion that Myers and Graystone wanted to save face, knowing that Gautreau and North were leaving and *understanding that the majority of Graystone's most productive branch, Cottonwood, would leave as well*." ECF No. 111 at 27 (emphasis added).

28

significantly between March and April 2019. Thus, what once was a disappointing offer may have subsequently appeared significantly more attractive, given Graystone's changed circumstances. In short, Myers's testimony regarding his reactions to the March offer letter does not constitute evidence that Graystone did not actually intend to merge with NFLP in April 2019.

Moreover, the testimony on which NFLP relies that is most probative of whether Graystone actually intended to merge with NFLP in April 2019—that is, Myers's testimony regarding the decision to join NFLP and the April 10 announcement to Graystone employees—similarly does not establish that Myers fraudulently misrepresented Graystone's intentions. Although it is true that Myers has admitted that he lied to Graystone employees during the April 10 announcement and in the informational packet that was distributed to Graystone employees, none of the admitted falsehoods indicate that Graystone did not actually intend to merge with NFLP at that time. Rather, as Myers intimates in his testimony, his pronouncements that NFLP was "a mirror image of [Graystone]," that NFLP had "a servant's heart," that he "saw in [NFLP, Graystone]," and that "thoughtful and reflective contemplation" occurred before the merger decision was made—even when he did not actually believe those statements or knew that they were false—appear to have been calculated to instill Graystone employees with continued confidence in Graystone as it pursued the merger with NFLP. *See id.* at Ex. B at 275:2–277:22, 292:15–301:19. If anything, Myers's statements during the April 10 announcement and in the informational packet suggest that, at that time, Myers and Graystone fully intended to merge with NFLP and, although they had some misgivings about NFLP, they wanted to put a positive spin on the situation.

The following exchange from Myers's deposition does not suggest otherwise:

> Q: Had you made the decision [to merge with NFLP] definitively?
> A: Our heart wasn't in it.
> Q: But you made the decision and that's what –
> A: We made the decision.

*Id.* at 276:4–8. Consistent with Myers's lies to Graystone employees, this testimony indicates that, although Graystone and Myers were not enthusiastic about merging with NFLP, they had made that decision. To conclude that this testimony evinces Graystone's intention, all along, to not merge with NFLP would require the court to engage in "speculation, conjecture, or surmise," which it will not do at the summary judgment stage.[9] *See Bones*, 366 F.3d at 875.

Similarly, Myers's testimony that he "couldn't trust" NFLP, *see id.* at Ex. F at 186:5–19, 191:20–192:13, does not support NFLP's fraudulent misrepresentation claim. Specifically, this testimony relates to Myers's feelings towards NFLP *on or after* April 18, 2019, which is after the allegedly fraudulent statement or statements were made and after Graystone and NFLP had engaged in negotiations and NFLP gave Myers an employment offer that contained terms that were different from those that he was expecting. Because of these changed circumstances, the testimony lacks probative value with respect to Myers's and Graystone's intentions *at the time* that the allegedly fraudulent misrepresentation was made.

Thus, the court concludes that NFLP has failed to produce "significant probative evidence" that would permit a reasonable jury to find, by clear and convincing evidence, that Myers or Graystone made a false representation regarding Graystone's intentions to merge with NFLP. *See Schneider*, 717 F.3d at 767; *Trainor*, 318 F.3d at 982; *see also Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1091 (D.N.M. 2020) ("[T]he ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the

---

[9] The court further notes that NFLP has failed to adequately explain why Graystone and Myers would share with NFLP its employee payroll and benefits information, as well as information regarding Graystone's office leases and information technology, if Graystone had no intention of merging with NFLP. To the contrary, such actions are entirely consistent with a genuine intent to merge with NFLP.

court must 'bear in mind the actual quantum and quality of proof necessary to support liability.'"

(quoting *Anderson*, 477 U.S. at 254)); *Andalex Res. v. Myers*, 871 P.2d 1041, 1046 (Utah Ct. App.

1994) (citing *Applied Genetics, International, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d

1238, 1243 (10th Cir. 1990), for the proposition that "clear and convincing standard must be

considered in determining whether motion for summary judgment should be granted on fraud

claim"). Because a false representation concerning a presently existing fact is an essential element

of a fraudulent misrepresentation claim under Utah law, *Kuhre*, 69 P.3d at 291–92, NFLP's claim

that Graystone and Myers fraudulently misrepresented Graystone's intention to merge with NFLP

fails as a matter of law. *See Andalex*, 871 P.2d at 1047 ("A misrepresentation of intended future

performance is not a 'presently existing fact' upon which a claim for fraud can be based unless a

plaintiff can prove that the representor, at the time of the representation, did not intend to perform

the promise and made the representation for the purpose of deceiving the promisee.").

Before concluding, the court notes a further difficulty with NFLP's fraudulent

misrepresentation claim. In its pleading, NFLP asserted that the alleged fraudulent

misrepresentation was Myers's representation that "Graystone intended to complete a merger with

[NFLP]." ECF No. 63 at 40. However, at oral argument, the fraudulent misrepresentation at issue

was a moving target, with NFLP's counsel stating, in essence, that the fraudulent misrepresentation

was not that Graystone intended to complete a merger with NFLP—because NFLP never intended

to merge, in a legal sense, with Graystone—but rather that Graystone intended to transition its

employees, including Myers, to NFLP as at-will employees. Apart from the court's concern

regarding the imprecise nature of the alleged fraudulent misrepresentation, as NFLP's counsel

conceded at oral argument, NFLP intended to hire Myers and the other Graystone employees as

at-will employees, who would be free to terminate their employment at NFLP at any time,

including day zero. Thus, the court fails to understand how NFLP could have reasonably relied on the alleged misrepresentation when—as at-will employees—Myers and the other Graystone employees were under no obligation to actually join NFLP. *See Sheedy v. BSB Props.*, No. 2:13-cv-290-JNP, 2016 U.S. Dist. LEXIS 178427, at *10 (D. Utah Jan. 26, 2016); *Brady v. Calyon Sec. (USA) Inc.*, 406 F. Supp. 2d 307, 316–17 (S.D.N.Y. 2005) (noting that, in the analogous situation of an at-will employee suing an employer, "claims of fraudulent inducement based on future promises . . . are not cognizable" under New York law because reasonable reliance is an essential element of such a claim and, "[b]ecause an at-will employee may be terminated at any time, any reliance on any representations of future intentions . . . is deemed unreasonable as a matter of law"). As a result, NFLP cannot establish reasonable reliance, another essential element of a fraudulent misrepresentation claim. *See Kuhre*, 69 P.3d at 291–92.

Accordingly, the court grants summary judgment in favor of Graystone and Myers on NFLP's fraudulent misrepresentation claim. *See Celotex*, 477 U.S. at 322.

VIII.    **Claim X: Negligent Misrepresentation Regarding Whether Graystone Had Merged and Intended to Merge with NFLP**

      Graystone and Myers move for summary judgment on NFLP's claim that Graystone and Myers negligently misrepresented that Graystone had merged with NFLP and that it intended to merge with NFLP. "The elements of negligent misrepresentation are similar to those of fraud except that negligent misrepresentation 'does not require the intentional mental state necessary to establish fraud.'" *Shah v. Intermountain Healthcare, Inc.*, 314 P.3d 1079, 1085 (Utah Ct. App. 2013) (citation omitted). The plaintiff, however, must establish, by clear and convincing evidence, *Jardine v. Brunswick Corp.*, 423 P.2d 659, 663 (Utah 1967), all of the other elements of fraud, including a false representation concerning a presently existing fact, *see Smith v. Frandsen*, 94 P.3d 919, 922–23 (Utah 2004). As discussed above, NFLP has failed to establish that Graystone or Myers ever represented that Graystone had merged with NFLP or that Graystone or Myers falsely represented that Graystone intended to merge with NFLP or that NFLP reasonably relied on the alleged misrepresentation. Accordingly, NFLP's negligent misrepresentation claim fails as a matter of law and the court grants summary judgment in favor of Graystone and Myers on NFLP's claim that Graystone and Myers negligently misrepresented that Graystone had merged with NFLP and that it intended to merge with NFLP.

IX.    **Claim XI: Promissory Estoppel**

      Graystone and Myers move for summary judgment on NFLP's promissory estoppel claim. Graystone and Myers argue that, to the extent NFLP's claim is premised on Myers's alleged promise that "Graystone had made the decision to merge with [NFLP]," ECF No. 63 at 43, they are entitled to summary judgment because "promissory estoppel only applies to representations of future facts, not existing facts," ECF No. 96 at 27. Moreover, to the extent that the promissory estoppel claim is based on Myers's alleged promise "that Graystone would complete a merger with

[NFLP]," ECF No. 63 at 43, Graystone and Myers argue that it fails as a matter of law because NFLP cannot establish that there was a clear and definite promise, reasonable reliance, or injury.

In response, NFLP first argues that, in *Youngblood v. Auto-Owners Insurance Co.*, 158 P.3d 1088, 1092–93 (Utah 2007), the Utah Supreme Court rejected the proposition that a promissory estoppel claim must involve a representation of a future fact. NFLP contends, in essence, that its promissory estoppel claim is actionable regardless of the extent to which the promises on which it is founded concerned presently existing facts. NFLP next asserts that the evidence that it presented regarding Myers's statements, reasonable reliance, and injury for the fraudulent and negligent misrepresentation claims—some of which is detailed above—likewise precludes summary judgment on the promissory estoppel claim. The court disagrees and grants summary judgment in favor of Graystone and Myers on NFLP's promissory estoppel claim.

As an initial matter, the court disagrees with NFLP's interpretation of the Utah Supreme Court's holding in *Youngblood*. Specifically, throughout the *Youngblood* opinion, the Utah Supreme Court goes to great lengths to limit its holding rejecting the distinction between equitable estoppel and promissory estoppel (and, correspondingly, between the need to establish a representation of a past or existing fact and the need to establish a representation of a future fact) to *insurance coverage* cases. *See, e.g.*, *id.* at 1092 ("Our caselaw recognizes equitable estoppel and promissory estoppel as two distinct legal principles, one a defense and one a cause of action in most instances. However, in *insurance coverage cases like this one* the technical distinction between equitable and promissory estoppel is of less analytic utility and approaches being irrelevant. Consequently, we depart from our traditional distinctions between equitable and promissory estoppel in evaluating the applicability of estoppel, as a general concept, to *cases of this type*." (emphasis added)); *id.* at 1094 ("Therefore, although our prior caselaw may have made

a distinction between equitable estoppel and promissory estoppel, we must modify that position. In *this case*, and in *other similar insurance coverage claims*, it is unnecessary to decide whether the agent's misrepresentations are to past or to future facts." (emphasis added)).

Consistent with other state and federal courts in Utah, the court concludes that, under Utah law, the traditional requirement that a promissory estoppel claim be premised on a misrepresentation of a future fact survives *Youngblood*. *See Bahr v. Imus*, 211 P.3d 987, 990 (Utah Ct. App. 2009) ("The *Youngblood* court discussed the differences between equitable and promissory estoppel, and clarified that a misrepresentation as to the future is generally required for application of promissory estoppel."); *IOSTAR Corp. v. Stuart*, No. 1:07-CV-133, 2009 U.S. Dist. LEXIS 9476, at *45 (D. Utah Feb. 3, 2009) ("Equitable estoppel concerns misrepresentations of present or past fact, whereas promissory estoppel concerns future facts." (citing *Youngblood*)). Therefore, to the extent that NFLP's promissory estoppel claim is based on Myers's representation that Graystone had made the decision to merge with NFLP—a past or existing fact—it is precluded as a matter of law.

NFLP's promissory estoppel claim also fails as a matter of law because NFLP has failed to identify a sufficiently clear and definite promise. "Promissory estoppel involves a clear and definite promise. The promise must be reasonably certain and definite, and a claimant's subjective understanding of the promisor's statements cannot, without more, support a promissory estoppel claim." *Lodge at Westgate Park City Resort & Spa Condo. Ass'n v. Westgate Resorts, Ltd.*, 440 P.3d 793, 800 (Utah Ct. App. 2019) (internal quotation marks and citation omitted). "[P]romissory estoppel cannot apply when the promise 'is so indefinite that it lacks—literally—any terms.'" *Id.* (quoting *Mitchell v. ReconTrust Co. NA*, 373 P.3d 189, 203 (Utah Ct. App. 2016)). Indeed, courts have concluded that statements such as, "we have a deal," do not qualify as clear and definite

promises when many important terms of the purported deal remain to be resolved. *See, e.g.,*
*Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 534–35 (D. Md. 1998) (concluding that
defendant's representative's "alleged statement that 'they had a deal' could not qualify as [a 'clear
and definite' promise] because so many important terms of the transaction were up in the air,
including the purchase price and the extent to which [the defendant] was willing to finance the
deal"); *see also McKenzie v. Comcast Cable Communs., Inc.*, 393 F. Supp. 2d 362, 373 (D. Md.
2005) (noting that "few, if any, terms of the agreement were settled and that subsequent
negotiations were necessary in order to form an enforceable contract" and that these circumstances
"effectively shut[] the door on [a promissory estoppel] theory of recovery").

Here, similar to the moving target of the representation underlying NFLP's fraudulent and
negligent misrepresentation claims, NFLP has failed to identify the statements that are the basis of
the promissory estoppel claim, let alone statements that constitute clear and definite promises. And
none of the statements that NFLP identified comes anywhere near a clear and definite promise that
"Graystone had made the decision to merge with [NFLP]" or that "Graystone would complete a
merger with [NFLP]," ECF No. 63 at 43. The statements that come closest—Myers's statements
that "we are merging with" NFLP, that "[w]e're excited to announce we're partnering with
[NFLP]," and that Graystone "was 'all in' on the combination with NFLP," ECF No. 111 at 25–
26—were primarily directed to Graystone employees (rather than NFLP) and, at best, amount to
general statements similar to "we have a deal." Important terms of the merger or combination
remained to be resolved, as reflected in the fact that Myers and NFLP were engaged in negotiations
in the days following these alleged statements. In short, NFLP has failed to identify a sufficiently
clear and definite promise to support its promissory estoppel claim. Consequently, the claim fails

as a matter of law and the court grants summary judgment in favor of Graystone and Myers on NFLP's promissory estoppel claim.

**CONCLUSION AND ORDER**

The court rules as follows:

The court GRANTS IN PART and DENIES IN PART Graystone and Myers's motion for partial summary judgment. ECF No. 96. The court grants summary judgment in favor of Graystone and Myers on North's UPWA claim (claim I) and NFLP's mail fraud claim (claim VI), Utah Truth in Advertising Act damages claim (claim VII), Lanham Act damages claim (claim VIII), fraudulent (claim IX) and negligent (claim X) misrepresentation claims regarding whether Graystone had merged and intended to merge with NFLP, and promissory estoppel claim (claim XI). The court denies summary judgment on Gautreau and North's breach of contract (claim II) and fraudulent (claim IV) and negligent (claim V) misrepresentation claims regarding Graystone's financial status and ability to pay the lease penalty.

DATED March 30, 2022.

BY THE COURT

Jill N. Parrish

United States District Court Judge